ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5113 (consolidated with Nos. 25-5121, 25-5154, 25-5155)

# In the United States Court of Appeals for the District of Columbia Circuit

---

FAIRHOLME FUNDS, INC, ON BEHALF OF ITS
SERIES, THE FAIRHOLME FUND, *et al.*,
*Plaintiffs-Appellees*,

*v.*

FEDERAL HOUSING FINANCE AGENCY, IN ITS
CAPACITY AS CONSERVATOR OF THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION AND THE
FEDERAL HOME LOAN MORTGAGE CORPORATION, *et al.*,
*Defendants-Appellants.*

---

On Appeal from the United States District Court for the District of Columbia
Nos. 13-cv-1053, 13-mc-1288 (Hon. Royce C. Lamberth)

---

## BRIEF FOR APPELLANTS

---

Meaghan VerGow
O'MELVENY & MYERS
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
mvergow@omm.com
*Counsel for Defendant-Appellant*
*Fannie Mae*

Michael J. Ciatti
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 661-7828
mciatti@kslaw.com
*Counsel for Defendant-Appellant*
*Freddie Mac*

John P. Elwood
R. Stanton Jones
Anthony J. Franze
Orion de Nevers
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
john.elwood@arnoldporter.com
*Counsel for Defendant-Appellant*
*Federal Housing Finance Agency*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28, Defendants-Appellants the Federal Housing Finance Agency, in its capacity as Conservator ("FHFA" or "Conservator") of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"); Fannie Mae; and Freddie Mac state as follows:

**I.    Parties and *Amici***

Defendants-Appellants ("Defendants") in these consolidated cases are:

- FHFA, in its capacity as Conservator of Fannie Mae and Freddie Mac;

- Fannie Mae;

- Freddie Mac.

Plaintiffs-Appellees/Cross-Appellants ("Plaintiffs") in these consolidated cases are:

- Berkley Insurance Company;

- Acadia Insurance Company;

- Admiral Indemnity Company;

- Admiral Insurance Company;

- Berkley Regional Insurance Company;

- Carolina Casualty Insurance Company;

- Midwest Employers Casualty Insurance Company;

- Nautilus Insurance Company;

- Preferred Employers Insurance Company;

- Joseph Cacciapalle;

- Michelle M. Miller;

- Timothy J. Cassell;

- Barry P. Borodkin.

No *amici* or intervenors appeared in the district court. The following parties appeared as *amici* in the prior appeal in this case in Case No. 14-5243 (consolidated with Nos. 14-5254, 14-5260, 14-5262):

- Center for Individual Freedom (in support of Plaintiffs);

- Association of Mortgage Investors, Mr. Robert H. Hartheimer, Independent Community Bankers of America and Mr. William M. Isaac (in support of Plaintiffs);

- 60 Plus Association, Inc. (in support of Plaintiffs);

- National Black Chamber of Commerce (in support of neither party);

- Investors Unite (in support of Plaintiffs);

- Timothy Howard and the Coalition for Mortgage Security (in support of Plaintiffs);

- Stephen Rattien, Pershing Square Capital Management, LP, Louise Rafter, and Josephine Rattien (in support of Plaintiffs);

- Jonathan R. Macey (in support of Plaintiffs);

- Better Markets, Inc. (in support of Defendants);

- Federal Deposit Insurance Corporation (in support of Defendants).

## II.    Rulings Under Review

Defendants appeal the final judgment entered on March 20, 2024, JA2349, all errors of law, the Opinions and Orders denying Defendants' Rule 50(b) Motion for Judgment as a Matter of Law dated March 14, 2025, JA2371, JA2393, and all earlier, merged judgments and orders, including the Orders granting in part and denying in part Defendants' Motion to Dismiss following remand, JA152, JA187; the Orders denying Defendants' Motion for Reconsideration of the Order on the Motion to Dismiss following remand, JA207; the Orders granting in part and denying in part Defendants' Motion for Summary Judgment, JA234, JA235; the bench Orders denying Defendants' Motions under Rule 50(a) and to decertify the classes in the first trial, JA525-26; the bench Order denying Defendants' Motion under Rule 50(a)

in the second trial, JA1445; the Orders granting Plaintiffs' Motion for Entry of Final Judgment, JA2338; and the Order Governing Plan of Allocation, JA2354.

## III.   Related Cases

This case was previously before this Court in Case No. 14-5243, and consolidated cases 14-5254, 14-5260, 14-5262.

There are three related cases pending in other federal appellate courts, two of which have been consolidated: *Fisher v. United States*, No. 24-1167 (Fed. Cir.), appeal docketed November 20, 2023; *Reid v. United States*, No. 24-1168 (Fed. Cir.), appeal docketed November 20, 2023 (consolidated with *Fisher*); and *Kelly v. United States*, No. 24-2042 (Fed. Cir.), appeal docketed July 3, 2024.

Defendants know of no other "related cases," as that term is defined by D.C. Circuit Rule 28(a)(1)(C), pending in other federal appellate courts or any other court in the District of Columbia.

## CORPORATE DISCLOSURE STATEMENT

As a federal agency, FHFA is not required to file corporate disclosure statements under Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1.

Fannie Mae is a government-sponsored enterprise chartered by Congress to "establish secondary market facilities for residential mortgages," to "provide stability in the secondary market for residential mortgages," and to "promote access to mortgage credit throughout the Nation." 12 U.S.C. § 1716(1), (4). Fannie Mae has no parent corporation. It is a publicly traded company and, according to public securities filings, no publicly held corporation owns more than 10% of Fannie Mae's common stock.

Freddie Mac is a government-sponsored enterprise chartered by Congress "to promote access to mortgage credit throughout the Nation." 12 U.S.C. § 1451 note. Freddie Mac has no parent corporation. It is a publicly traded company and, according to public securities filings, no publicly held corporation owns 10% or more of Freddie Mac's common stock.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ........................................................v

TABLE OF CONTENTS ........................................................................................vi

GLOSSARY .........................................................................................................xv

STATEMENT CONCERNING ORAL ARGUMENT ........................................xvi

INTRODUCTION .................................................................................................1

JURISDICTIONAL STATEMENT .......................................................................4

STATEMENT OF THE ISSUES...........................................................................4

STATUTORY AND REGULATORY PROVISIONS ...........................................5

STATEMENT OF THE CASE...............................................................................5

    A.   The Enterprises and Their Contracts with Private Shareholders ..............5

    B.   HERA, the Conservatorships, and the PSPAs............................................6

    C.   The Third Amendment to the PSPAs .........................................................9

    D.   Procedural History.....................................................................................10

        1.   Plaintiffs' Lawsuits and Defendants' Motions to Dismiss ...............10

        2.   The First Appeal .................................................................................11

        3.   The Supreme Court's Decision in *Collins v. Yellen* ........................12

        4.   Class Certification and Summary Judgment .....................................13

        5.   The Trials............................................................................................14

        6.   Denial of Defendants' Rule 50(b) Motion.........................................15

SUMMARY OF ARGUMENT .............................................................................16

STANDARD OF REVIEW ..................................................................................18

ARGUMENT ........................................................................................................19

I.     THE SUPREME COURT'S *COLLINS* DECISION FORECLOSES PLAINTIFFS' IMPLIED COVENANT CLAIM ...........................................19

II.    THE IMPLIED COVENANT DOES NOT APPLY HERE............................26

III.   PLAINTIFFS' IMPLIED COVENANT CLAIM ALLEGES A NON-COGNIZABLE ANTICIPATORY BREACH .................................................33

IV.  PLAINTIFFS FAILED TO PROVE WITH REASONABLE
     CERTAINTY THAT THE NET WORTH SWEEP HARMED THEM .........38

     A.   Plaintiffs Introduced No Evidence To Account for the Prompt
          Rebound in Share Prices Following the One-Day Drop .........................38

     B.   Plaintiffs Introduced No Evidence to Show That Current
          Shareholders Are Worse Off Today Due to the Net Worth Sweep .........41

     C.   Plaintiffs Introduced No Evidence to Account for a Potential
          Alternative Cause of the One-Day Drop ....................................................43

V.   POST-THIRD AMENDMENT PURCHASERS LACK STANDING
     BECAUSE THEY SUFFERED NO INJURY AND THE CLAIM
     HERE DOES NOT TRAVEL WITH THE SHARE .......................................46

     A.   The Longstanding Majority View Is That the Sale of a Security
          Does Not Automatically Assign a Legal Claim to the Buyer .................47

     B.   The Claim Here Was Not Automatically Assigned ................................51

CONCLUSION ........................................................................................................55

CERTIFICATE OF COMPLIANCE........................................................................57

CERTIFICATE OF SERVICE .................................................................................58

STATUTORY ADDENDUM
     12 U.S.C. § 4617 .......................................................................................Add. 1

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*ACA Fin. Guar. Corp. v. City of Buena Vista*,
   917 F.3d 206 (4th Cir. 2019) ...................................................................27

*Acticon AG v. China North East Petroleum Holdings*,
   692 F.3d 34 (2d Cir. 2012) ......................................................................39

*In re Activision Blizzard, Inc. S'holder Litig.*,
   124 A.3d 1025 (Del. Ch. 2015) ...........................................................53, 54

*In re AMC Ent. Holdings, Inc. S'holder Litig.*,
   299 A.3d 501 (Del. Ch. 2023) .................................................................53

*Baker v. Kroger Co.*,
   784 F.2d 1172 (4th Cir. 1986) .................................................................46

*Bauer v. Fed. Deposit Ins. Corp.*,
   38 F.4th 1114 (D.C. Cir. 2022)................................................................18

*Beach TV Props., Inc. v. Solomon*,
   2016 WL 6068806 (D.D.C. Oct. 14, 2016) .............................................47

*Berkley Ins. Co. v. FHFA*,
   2025 WL 823938 (D.D.C. Mar. 14, 2025) ............. 15, 16, 40, 41, 42, 43, 46, 55

*\*Bluebird Partners, L.P. v. First Fid. Bank, N.A. N.J.*,
   85 F.3d 970 (2d Cir. 1996) ................................................................18, 48

*Carr v. Fed. Nat'l Mortg. Ass'n*,
   92 Va. Cir. 472, 2013 WL 12237855 (2013).............................................36

*Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*,
   252 F.3d 911 (7th Cir. 2001) ...................................................................34

---

[*] Authorities upon which Appellants chiefly rely are marked with asterisks.

*In re Cfs-Related Sec. Fraud Litig.*,
  2001 U.S. Dist. LEXIS 27387 (N.D. Okla. Dec. 21, 2001) ...............................50

*Cheatham I.R.A. v. Huntington Nat'l Bank*,
  137 N.E.3d 45 (Ohio 2019) ....................................................................50, 51, 54

*Collins v. Yellen*,
  594 U.S. 220 (2021)........... 2, 4, 6, 7, 9, 10, 12, 13, 16, 19, 20, 21, 23, 24, 29, 32

*Condominium Servs., Inc. v. First Owners' Ass'n of Forty Six
  Hundred Condominium, Inc.*,
  281 Va. 561 (2011) .................................................................................38

*Day v. MCC Acquisition, LC*,
  848 S.E.2d 800 (Va. 2020) ....................................................................51

*DG BF, LLC v. Ray*,
  2021 WL 776742 (Del. Ch. Mar. 1, 2021) ...........................................16, 27, 30

*Dieckman v. Regency GP LP*,
  2018 WL 1006558 (Del. Ch. Feb. 20, 2018) .........................................36

*DNAML Pty, Ltd. v. Apple, Inc.*,
  2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015) ..............................................47, 48

*Duncan v. Theratx, Inc.*,
  775 A.2d 1019 (Del. 2001) ....................................................................41

*Dupree v. Younger*,
  598 U.S. 729 (2023)..............................................................................16

*Dura Pharmaceuticals v. Broudo*,
  544 U.S. 336 (2005)..............................................................................40

*eCommerce Indus., Inc. v. MWA Intel., Inc.*,
  2013 WL 5621678 (Del. Ch. Sept. 30, 2013).......................................38

*In re Estee Lauder Cos.*,
  2007 WL 1522620 (S.D.N.Y. May 21, 2007) .......................................39

*Fairfax-Falls Church Cmty. Servs. Bd. v. Herren*,
  337 S.E.2d 741 (Va. 1985) ...........................................................17, 34

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
    636 F. Supp. 3d 144 (D.D.C. 2022) ....................................................55

*Fairholme Funds, Inc. v. FHFA*,
    2018 WL 4680197 (D.D.C. Sept. 28, 2018) ............ 5, 6, 7, 11, 29, 33, 34, 35, 55

*Fairholme Funds, Inc. v. FHFA*,
    2022 WL 11110548 (D.D.C. Oct. 19, 2022) ..........................................14, 41, 42

*Fairholme Funds, Inc. v. FHFA*,
    2022 WL 4745970 (D.D.C. Oct. 3, 2022) ............... 13, 14, 24, 25, 30, 32, 34, 38

*Fairholme Funds, Inc. v. United States*,
    26 F.4th 1274 (Fed. Cir. 2022) ..........................................................20

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase
    Agreement Class Action Litigs.*,
    2021 WL 5799379 (D.D.C. Dec. 7, 2021) ...................................13, 55

*Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc.*,
    542 F. Supp. 2d 452 (E.D. Va. 2008) ................................................36

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007) ..............................................50

*Herr v. U.S. Forest Serv.*,
    803 F.3d 809 (6th Cir. 2015) ......................................................47, 48

*I.A.T.S.E. Loc. No. One Pension Fund v. Gen. Elec. Co.*,
    2016 WL 7100493 (Del. Ch. Dec. 6, 2016).......................................54

*In re Immucor, Inc. Sec. Litig.*,
    2011 WL 3844221 (N.D. Ga. Aug. 29, 2011) ...................................39

*Indep. Inv. Protective League v. Saunders*,
    64 F.R.D. 564 (E.D. Pa. 1974).........................................................48

*Jacobs v. FHFA*,
    908 F.3d 884 (3d Cir. 2018) ............................................................19

*Jaroslawicz v. M&T Bank Corp.*,
    2024 WL 474846 (D. Del. Feb. 7, 2024).........................................43

*Keystone Assocs. LLC v. Fulton*,
  2019 WL 3731722 (D. Del. Aug. 8, 2019) ..........................................................49

*Khan v. Warburg Pincus, LLC*,
  2025 WL 1251237 (Del. Ch. Apr. 30, 2025) ..........................................26, 28, 29

*Kronenberg v. Katz*,
  872 A.2d 568 (Del. Ch. 2004) ...........................................................................38

*Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*,
  881 F.3d 912 (D.C. Cir. 2018) ...........................................................................18

*Lowry v. Baltimore & Ohio R.R. Co.*,
  707 F.2d 721 (3d Cir. 1983) ..........................................................................48, 49

*\*Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*,
  62 A.3d 62 (Del. Ch. 2013) .........................................................................17, 34

*MHS Capital LLC v. Goggin*,
  2018 WL 2149718 (Del. Ch. May 10, 2018) .....................................................36

*Muldrow v. Re-Direct, Inc.*,
  493 F.3d 160 (D.C. Cir. 2007) ...........................................................................18

*Mut. Pharm. Co. v. Bartlett*,
  570 U.S. 472 (2013) ...........................................................................................33

*Nemec v. Shrader*,
  991 A.2d 1120 (Del. 2010) ................................................................................26

*Old Dominion Elec. Co-op. v. Ragnar Benson, Inc.*,
  2006 WL 2252514 (E.D. VA Aug. 4, 2006) ......................................................27

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*,
  2022 WL 1446552 (S.D.N.Y. Feb. 22, 2022) ..............................................50, 52

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*,
  2023 WL 5128079 (S.D.N.Y. Aug. 10, 2023) ...................................................50

*Perry Cap. LLC v. Lew*,
  70 F. Supp. 3d 208 (D.D.C. 2014) ...............................................................10, 11

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017)..................................... 1, 5, 6, 7, 8, 11, 30, 33, 34

*\*Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors
    LLC*,
    2012 WL 3548206 (Del. Ch. Aug. 16, 2012) ........................17, 27, 28

*Racepoint Partners, LLC v. JPMorgan Chase Bank*,
    2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006).....................................49

*Riggs Nat'l Bank of Wash., D.C. v. Linch*,
    36 F.3d 370 (4th Cir. 1994) ...............................................................27

*Ross v. Walton*,
    668 F. Supp. 2d 32 (D.D.C. 2009).....................................................39

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Assoc.*,
    324 F. Supp. 3d 387 (S.D.N.Y. 2018) ...............................................49

*Sabby Volatility Warrant Master Fund Ltd. v. Jupiter Wellness, Inc.*,
    2025 WL 1363171 (2d Cir. May 12, 2025)...................................52, 53

*Saks Fifth Ave., Inc. v. James, Ltd.*,
    630 S.E.2d 304 (Va. 2006) .................................................................38

*Shareholder Representative Servs. LLC v. Medidata Solutions, Inc.*,
    2020 WL 972618 (D. Del. Feb. 24, 2020)..........................................28

*Smyth v. United States*,
    302 U.S. 329 (1937)...........................................................................33

*In re Sunstates Corp. S'holder Litig.*,
    2001 WL 432447 (Del. Ch. Apr. 18, 2001).......................................52

*Estate of Taylor v. Flair Prop. Assocs.*,
    448 S.E.2d 413 (Va. 1994) ................................................................41

*In re Telectronics Pacing Sys., Inc.*,
    221 F.3d 870 (6th Cir. 2000) .............................................................54

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)...........................................................................46

*Twin Cities Bakery Workers Health and Welfare Fund v. Biovail Corp.*,
  2005 WL 3675999 (D.D.C. Mar. 31, 2005) ......................................42

*United States v. Texas*,
  507 U.S. 529 (1993) ...........................................................................49

*Urdan v. WR Capital Partners, LLC*,
  244 A.3d 668 (Del. 2020) ........................................................52, 53, 54

*US Fax Law Ctr., Inc. v. iHire, Inc.*,
  476 F.3d 1112 (10th Cir. 2007) .........................................................47

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
  720 F. Supp. 1379 (D. Ariz. 1989) .....................................................49

*In re Williams Sec. Litig.-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) .........................................................44

*Wilmington Leasing, Inc. v. Parrish Leasing Co.*,
  1996 WL 560190 (Del. Ch. Sept. 25, 1996) ......................................31

**Statutes**

12 U.S.C.
  § 4617(b)(2)(J) .....................................................................................4
  § 4617(b)(2)(J)(ii) ...................................................................12, 29, 30
  § 4617(b)(2)(J)(ii) ...........................................................................22, 31
  § 4617(d) .............................................................................................32
  § 4617(f) .........................................................................2, 4, 12, 16

28 U.S.C.
  § 1291 ...................................................................................................4
  § 1331 ...................................................................................................4
  § 1367 ...................................................................................................4

N.Y. Gen. Oblig. Law § 13-107(1) ...........................................................49

Va. Code Ann. § 8.01-26 ..........................................................................51

Va. Code § 8.1A-103(a)(3) ........................................................................52

**Court Rules**

Fed. R. Civ. P. 23(c)(2)(B) ........................................................54

**Other Authorities**

17A Am. Jur. 2d Contracts § 673 (Feb. 2024)...........................36

Restatement (Second) of Contracts § 253...........................34, 48

Restatement (Second) of Contracts § 324................................48

23 Williston on Contracts § 63:60 ..........................................33

29 Williston on Contracts § 74:6 (4th ed. 2023) .....................48

## GLOSSARY

FHFA            Federal Housing Finance Agency

HERA            Housing and Economic Recovery Act of 2008

PSPA            Senior Preferred Stock Purchase Agreement

## STATEMENT CONCERNING ORAL ARGUMENT

Appellants respectfully submit that oral argument would aid the Court in deciding the important question of statutory interpretation and other legal issues presented in this appeal.

## INTRODUCTION

In the depths of the 2008 financial crisis, with the housing market in collapse and Fannie Mae and Freddie Mac (the "Enterprises") teetering on insolvency, Congress created the Federal Housing Finance Agency ("FHFA") and authorized its appointment as the Enterprises' Conservator. To stabilize the mortgage market, Congress gave FHFA broad discretion to act in the public's "best interests"—even if doing so conflicted with the interests of the Enterprises or their shareholders. The government then injected nearly $200 billion in taxpayer funds to buttress the Enterprises and preserve confidence in the secondary mortgage market. It worked.

Plaintiffs here are a group of current Enterprise shareholders who assert that their shares lost value due to one aspect of the very efforts that helped save the Enterprises—and their share prices—from total ruin. This Court previously rejected most of Plaintiffs' claims but gave them a final chance to state a viable cause of action. *Perry Cap. LLC v. Mnuchin* ("*Perry II*"), 864 F.3d 591, 598-603 (D.C. Cir. 2017). This appeal concerns Plaintiffs' sole remaining claim: that FHFA, as Conservator, violated the implied covenant of good faith and fair dealing in Plaintiffs' shareholder contracts. Specifically, Plaintiffs contend that FHFA's agreement to the "Net Worth Sweep"—a component of the Third Amendment to the Enterprises' funding agreements with Treasury—was arbitrary and unreasonable because it eliminated the possibility of future dividends. They claim the Sweep

1

harmed them by causing a one-day drop in Enterprise share prices in August 2012. A jury awarded them over half a billion dollars.

That verdict cannot stand.  To begin, Plaintiffs' claim is barred by an intervening Supreme Court decision.  After this Court's decision in *Perry II*, the Supreme Court in *Collins v. Yellen*, 594 U.S. 220 (2021), unanimously rejected another shareholder challenge to the Net Worth Sweep advancing arguments materially identical to those Plaintiffs assert.  The Court held that the Conservator's "business decisions are protected from judicial review" under 12 U.S.C. § 4617(f), and that FHFA reasonably concluded that the Sweep served the public's interest in a stable mortgage market—even if it disfavored private shareholders—by ending "the circular practice of drawing funds from [Treasury] just to hand those funds back" to Treasury.  *Collins*, 594 U.S. at 233, 239, 254.  A jury cannot second-guess the Supreme Court's reasonableness determination.

Setting *Collins* aside, Plaintiffs' claim fails at every turn.  The implied covenant does not apply here because there is no contractual "gap" for it to fill—Congress authorized FHFA to act in the "best interests" of the public, and that standard is embedded in Plaintiffs' shareholder contracts.  Further, Plaintiffs' theory amounts to an anticipatory breach claim that is legally barred—shareholders in unilateral contracts cannot sue over a lost possibility of future dividends.  And their damages theory rests on a market blip, not actual harm—an ephemeral one-day

stock-price drop that quickly rebounded, and that Plaintiffs never connected to any actual or enduring harm to themselves. Finally, many of the Plaintiffs lack standing because they purchased their shares *after* the Sweep and thus suffered no loss.

In addition to these myriad legal defects, Plaintiffs' claim defies commonsense. Plaintiffs contend that the Net Worth Sweep upset their reasonable expectations relating to dividends. But by the time FHFA agreed to the Sweep, any expectation that shareholders would receive dividends was fanciful. Years before the Sweep, through actions Plaintiffs do not challenge here, the Conservator in 2008 eliminated dividends to private shareholders, then signed funding agreements with Treasury that independently barred their payment.

Plaintiffs reaped the benefits of a taxpayer-funded rescue, without which their investments would be entirely worthless. This case is not about protecting shareholders' reasonable expectations; it is an attempt to manufacture liability for a crisis-era decision that Congress and the shareholder contracts authorized, that FHFA reasonably executed, and that the Supreme Court already validated. Plaintiffs seek a windfall for a loss they never actually suffered, based on expectations the law does not recognize, under a theory the law does not permit.

This Court should reverse the judgment below and bring this long-running litigation to a close.

## JURISDICTIONAL STATEMENT

The district court invoked jurisdiction under 28 U.S.C. §§ 1331 and 1367. Defendants filed a timely notice of appeal on April 11, 2025. JA2394. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the Supreme Court's decision in *Collins v. Yellen*, 594 U.S. 220, 239, 254 (2021), which held as a matter of law that the Conservator's "business decisions are protected from judicial review" under 12 U.S.C. § 4617(f) and that "FHFA could have reasonably concluded that [the Net Worth Sweep] was in the best interests of members of the public who rely on a stable secondary mortgage market," forecloses Plaintiffs' claim that FHFA acted "arbitrarily and unreasonably" in making the business decision to agree to the Net Worth Sweep.

2. Whether the implied covenant of good faith and fair dealing applies where the shareholder contracts at issue specify the scope of FHFA's contractual discretion through their incorporation of the Housing and Economic Recovery Act's "best interests" provision, 12 U.S.C. § 4617(b)(2)(J).

3. Whether Plaintiffs' claim that the Net Worth Sweep reduced the value of their shares by depriving them of potential future dividends is a non-cognizable claim for anticipatory breach of contract.

4.      Whether Plaintiffs, who are current shareholders, proved harm or damages with reasonable certainty where they based their damages on a one-day drop in share prices, but failed to present evidence accounting for the prompt rebound in share prices or evidence excluding a potential alternative cause of the one-day price drop.

5.      Whether Plaintiffs who purchased their shares *after* the Net Worth Sweep lack standing because the implied covenant claim here was not automatically assigned to subsequent purchasers (i.e., the claim did not "travel with the shares").

## STATUTORY AND REGULATORY PROVISIONS

Relevant provisions are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.      The Enterprises and Their Contracts with Private Shareholders

Fannie Mae and Freddie Mac are government-sponsored enterprises that Congress established to expand access to home-mortgage credit and promote affordable housing.  *Perry II*, 864 F.3d at 599.  They are "vital for the Nation's economic health," and their failure would "imperil" the broader national economy. *Id.* at 598-99.

The Enterprises have long had private shareholders who, by purchasing shares, enter into a shareholder contract.  *Fairholme Funds, Inc. v. FHFA* ("*MTD Ruling II*"), 2018 WL 4680197, at *8-9 (D.D.C. Sept. 28, 2018).  This contract

encompasses not only the stock certificate, corporate charter, and bylaws, but also "the corporate law under which the corporation is formed and regulated." *Id.* at *8. By operation of law, shareholders are bound by the contract's terms, including any subsequent modifications to those terms. *Id.* at *9; *see* JA2330.

Private shareholders have no legal entitlement to dividends. The shareholder contracts "do not require the Board of either Enterprise to declare dividends." JA2401. Instead, they "provide for dividends 'if declared by the Board of Directors, in its sole discretion.'" *Perry II*, 864 F.3d at 631 (citation omitted); *see* JA2401.

### B.    HERA, the Conservatorships, and the PSPAs

The Enterprises "became major players in the United States' housing market. Indeed, in the lead up to 2008, [their] mortgage portfolios had a combined value of $5 trillion and accounted for nearly half of the United States mortgage market. But in 2008, the United States economy fell into a severe recession, in large part due to a sharp decline in the national housing market. [The Enterprises] suffered a precipitous drop in the value of their mortgage portfolios, pushing [them] to the brink of default." *Perry II*, 864 F.3d at 599. In 2008 alone, the Enterprises "lost more ... than they had earned in the previous 37 years combined. Though they remained solvent, many feared the [Enterprises] would eventually default and throw the housing market into a tailspin." *Collins*, 594 U.S. at 228 (citation omitted).

In response to this unprecedented crisis, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA").  HERA established FHFA as the Enterprises' safety-and-soundness regulator and authorized its Director to place either Enterprise into conservatorship or receivership.  JA2401-02.  HERA also authorized the Treasury Department to purchase Enterprise securities to infuse the Enterprises with capital and ensure their liquidity and stability.  *Perry II*, 864 F.3d at 600; *see* JA1596.

On September 6, 2008, FHFA's Director placed the Enterprises into conservatorships and immediately announced that the Enterprises' "common stock and preferred stock dividends will be eliminated."  JA2402.  HERA "invests FHFA as conservator with broad authority and discretion over the operation of" the Enterprises.  *Perry II*, 864 F.3d at 600.  Unlike in a "typical conservatorship," HERA authorizes FHFA to take action "that, while not in the best interests of the regulated entity, is beneficial to the Agency and, by extension, the public it serves."  *Collins*, 594 U.S. at 238.  In other words, FHFA "can subordinate the best interests of the [Enterprises] to ... those of the public."  *Id.* at 254.  HERA's "best interests" provision is undisputedly incorporated into Plaintiffs' shareholder contracts.  *MTD Ruling II*, 2018 WL 4680197, at *9.

On September 7, 2008, the Conservator entered into the Senior Preferred Stock Purchase Agreements ("PSPAs") with Treasury on behalf of each Enterprise.

Under the PSPAs, Treasury committed to make up to $100 billion available to each Enterprise (the "Treasury Commitment" or "Commitment") to ensure that they maintained positive net worth. JA2403. "In exchange for that extraordinary capital infusion, Treasury received one million senior preferred shares in each company." *Perry II*, 864 F.3d at 601. As relevant here, "[t]hose shares entitled Treasury to: (i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the entities were dissolved; [and] (ii) a dollar-for-dollar increase in that liquidation preference each time Fannie and Freddie drew upon Treasury's funding commitment." *Id.* The PSPAs also required the Enterprises to pay quarterly dividends to Treasury "at a rate of 10% of Treasury's liquidation preference or a commitment to increase the liquidation preference by 12% ...." *Id.*; *see* JA2403. The PSPAs also explicitly "barred the Enterprises from making any other distributions to Enterprise stockholders—including issuing dividends to shareholders—without Treasury's consent." JA2404; *see* JA3331 § 5.1 (Fannie Mae); JA3346 § 5.1 (Freddie Mac).

In 2009, as the Enterprises' losses deepened and their draws on the Treasury Commitment grew, the PSPAs were amended twice to increase the Commitment in order to prevent the Enterprises' collapse. The First Amendment doubled the Commitment to $200 billion for each Enterprise. JA2404. When even that appeared

8

insufficient, the Second Amendment increased the Commitment to an unlimited amount through December 31, 2012, when it would again become capped. *Id.*

The Enterprises "drew sizeable amounts from Treasury's capital commitment ...." *Collins*, 594 U.S. at 233. "And because of the fixed-rate dividend formula [under the original PSPAs], the more money they drew, the larger their dividend obligations became. The [Enterprises] consistently lacked the cash necessary to pay them, and they began the circular practice of drawing funds from Treasury's capital commitment just to hand those funds back as a quarterly dividend." *Id.*

"By the middle of 2012, the [Enterprises] had drawn over $187 billion, and $26 billion of that was used to satisfy their dividend obligations." *Id.* With the Treasury Commitment to be capped at the end of 2012, "there was a realistic possibility that the [Enterprises] would have consumed some or all of the remaining capital commitment in order to pay their dividend obligations, which were themselves increasing in size every time the [Enterprises] made a draw." *Id.* at 239.

## C.    The Third Amendment to the PSPAs

On August 17, 2012, the Conservator and Treasury amended the PSPAs for a third time. The Third Amendment ended the unsustainable practice of circular draws by "replac[ing] the fixed-rate dividend formula (which was tied to the size of Treasury's investment) with a variable dividend formula (which was tied to the

companies' net worth)." *Id.* at 233.  Under this variable dividend, "[i]f the net worth of Fannie Mae or Freddie Mac at the end of a quarter exceeded the capital reserve, the amendment required the company to pay all of the surplus to Treasury.  But if a company's net worth at the end of a quarter did not exceed the reserve or if it lost money during a quarter, the amendment did not require the company to pay anything." *Id.* at 234 (emphasis omitted).  The Conservator agreed to the Net Worth Sweep to place the Enterprises on sounder financial footing.  *Id.* at 234, 239.  The Third Amendment also required the Enterprises to shrink their retained mortgage portfolios at an accelerated pace to "reduce risk exposure."  JA4417.[1]

### D.    Procedural History

#### 1.    Plaintiffs' Lawsuits and Defendants' Motions to Dismiss

This appeal involves two lawsuits brought in 2013 challenging the Net Worth Sweep: (1) a class action on behalf of current holders of Freddie Mac common stock and both Enterprises' junior preferred stock ("Class Plaintiffs"), and (2) an individual action by owners of both Enterprises' junior preferred stock ("Berkley Plaintiffs").  *Perry Cap. LLC v. Lew* ("*Perry I*"), 70 F. Supp. 3d 208, 214 (D.D.C. 2014).  Initially, the lawsuits asserted claims for violations of the Administrative

---

[1]  Later, FHFA and Treasury adopted a Fourth Amendment, which "eliminated the variable dividend formula" (i.e., the Net Worth Sweep) and replaced it with increases to Treasury's liquidation preference that allowed the Enterprises to build capital.  *Collins*, 594 U.S. at 244; *see* JA2411.

Procedure Act and the Takings Clause, breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing. *Id.* at 218. All Plaintiffs claimed that they were injured because the Net Worth Sweep deprived them of potential future dividends and rights in a liquidation. *Id.* at 218-19. The district court dismissed the action in its entirety. *Id.* at 246.

### 2.    The First Appeal

This Court affirmed the district court's dismissal in most respects. *Perry II*, 864 F.3d at 598-99. It held that under Delaware and Virginia law,[2] Plaintiffs "have no enforceable right to dividends because the [stock] certificates accord the Companies complete discretion to declare or withhold dividends." *Id.* at 629. But the Court remanded for further consideration of Plaintiffs' claims for breach of contract with respect to liquidation preferences and breach of the implied covenant with respect to liquidation preferences and dividends. *Id.* at 633-34.

On remand, after Plaintiffs filed amended complaints adding more claims, the district court dismissed everything except the implied covenant claim regarding dividends. *MTD Ruling II*, 2018 WL 4680197, at *7. The court then denied Defendants' motion for reconsideration, which sought dismissal of the implied covenant claim as asserting a non-cognizable anticipatory breach. JA210.

---

[2]  Delaware law applies to contract claims relating to Fannie Mae, and Virginia law applies to contract claims relating to Freddie Mac. *Perry II*, 864 F.3d at 626 n.24.

### 3.     The Supreme Court's Decision in *Collins v. Yellen*

Private shareholders also brought separate lawsuits against the federal government challenging the Net Worth Sweep in other courts, which uniformly dismissed them. *Collins*, 594 U.S. at 237 (collecting cases). In *Collins*, shareholders asserted that the Sweep violated the Constitution and the APA. Like Plaintiffs here, they "claim[ed] that the [Conservator] adopted the third amendment at a time when the [Enterprises] were on the precipice of a financial uptick and that they would soon have been in a position not only to pay cash dividends, but also to build up capital buffers to absorb future losses." *Id.* at 240. The *Collins* plaintiffs also "contend[ed] that the FHFA could have protected Treasury's capital commitment by ordering the [Enterprises] to pay the dividends in kind rather than in cash." *Id.*

The Supreme Court unanimously rejected those arguments. It held that the Conservator "can subordinate the best interests of the [Enterprises] to its own best interests and those of the public," *id.* at 254 (citing 12 U.S.C. § 4617(b)(2)(J)(ii)), and that the Conservator's "business decisions are protected from judicial review," *id.* (citing § 4617(f)). The Court further held that FHFA, as Conservator, acted within its statutory authority under HERA's "best interests" provision when agreeing to the Net Worth Sweep, because FHFA "could have reasonably concluded that [the Sweep] was in the best interests of members of the public who rely on a stable secondary mortgage market." *Id.* at 239. At the time of the Third Amendment,

12

"there was a realistic possibility that the [Enterprises] would have consumed some or all of the remaining capital commitment in order to pay their dividend obligations, which were themselves increasing in size every time the [Enterprises] made a draw. The third amendment eliminated this risk …. " *Id.* The Court thus held that FHFA acted reasonably to "ensure[] that all of Treasury's capital was available to backstop the [Enterprises'] operations during difficult quarters." *Id.*

### 4. Class Certification and Summary Judgment

In 2021, the district court certified three classes of "current holders" of Enterprise shares—"or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement"—under Rule 23(b)(3). *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigs.* ("*Class Cert. Ruling*"), 2021 WL 5799379, at *3 (D.D.C. Dec. 7, 2021); JA232.[3] These "current holders" include those who have held their shares continuously since before the Third Amendment and those who purchased their shares after the Third Amendment.

In 2022, the district court granted partial summary judgment for Defendants. *Fairholme Funds, Inc. v. FHFA* ("*MSJ Ruling*"), 2022 WL 4745970 (D.D.C. Oct. 3, 2022). It rejected Plaintiffs' lost-dividends damages theory—which claimed that the

---

[3] The district court defined "final judgment" here to mean its judgment *after* resolution of all appeals or expiration of appeal deadlines. JA2350 n.1; JA2354-55.

Net Worth Sweep deprived them of dividends they otherwise would have received—as impermissibly speculative. *Id.* at *9-10. But the court found that a genuine dispute of material fact precluded summary judgment on Plaintiffs' lost-value damages theory, which claimed that the Sweep caused their shares to decline in value by eliminating any possibility of future dividends. *Id.* at *11. The court rejected Defendants' arguments that *Collins* foreclosed Plaintiffs' implied covenant claim and that the shareholder contracts contain no "gaps" for the implied covenant to fill. *Id.* at *5-7; *see Fairholme Funds, Inc. v. FHFA* ("*SJ Reconsideration Ruling*"), 2022 WL 11110548, at *6 (D.D.C. Oct. 19, 2022) (denying Plaintiffs' motion to reconsider summary judgment dismissing lost-dividends theory).

### 5.    The Trials

A first trial in 2022 ended in a mistrial. The second took place in 2023.

Both trials involved a single claim: that Defendants breached the implied covenant by agreeing to the Net Worth Sweep. JA2330-32. Plaintiffs sought damages under the "lost-value theory," contending that the Sweep caused a one-day decline in the market value of the relevant Enterprise shares on August 17, 2012—the date the Third Amendment was announced. JA2385.

In calculating that lost value, Plaintiffs' damages expert, Dr. Mason, relied on a draft event study in the work papers of Defendants' expert, Dr. Attari. That study showed a $1.6 billion decline in the market value of the relevant Enterprise shares

on August 17, 2012, but also revealed that the share prices substantially rebounded within approximately six weeks.  JA2972-73.

During trial, Defendants orally moved for judgment as a matter of law under Rule 50(a) which the court denied.  JA1433-45; August 1, 2023 Minute Entry.

The jury returned a verdict for Plaintiffs, awarding $299.4 million to Fannie Mae junior preferred shareholders, $281.8 million to Freddie Mac junior preferred shareholders, and $31.2 million to Freddie Mac common shareholders.  JA2336.

The district court entered judgment, including prejudgment interest, in the amount of $812,050,000.  JA2351.

### 6.    Denial of Defendants' Rule 50(b) Motion

Defendants filed a renewed motion for judgment as a matter of law under Rule 50(b).  *Berkley Ins. Co. v. FHFA* ("*Rule 50(b) Decision*"), 2025 WL 823938, at *4 (D.D.C. Mar. 14, 2025).

The district court invoked the law-of-the-case doctrine to deny Defendants' arguments that (1) *Collins* forecloses Plaintiffs' claim; (2) the shareholder contracts contain no "gap" for the implied covenant to fill; and (3) post-Third Amendment purchasers lack Article III standing.  *Id.* at *6-11.  The court refused to consider Defendants' argument that Plaintiffs are asserting a non-cognizable anticipatory breach claim because Defendants had not raised the issue in their Rule 50(a) motion

at trial. *Id.* at *7.[4]  And the court denied Defendants' argument that Plaintiffs failed to prove harm or damages with reasonable certainty, finding that Plaintiffs properly based harm and damages on the one-day share-price drop, despite the prompt rebound and Plaintiffs' failure to address a potential alternative cause of the drop. *Id.* at *8-10.

## SUMMARY OF ARGUMENT

Plaintiffs' implied covenant claims fail as a matter of law for several independent reasons.

*First*, the claim is foreclosed by *Collins*, which held that the Conservator's "business decisions are protected from judicial review" under 12 U.S.C. § 4617(f), and that the Conservator "could have *reasonably* concluded that [the Net Worth Sweep] was in the best interests of members of the public who rely on a stable secondary mortgage market." 594 U.S. at 239, 254 (emphasis added). Given those unanimous holdings, a jury could not properly determine that the Conservator's business decision to enter into the Net Worth Sweep was *unreasonable*.

*Second*, the implied covenant does not even apply here. "When a contract confers discretion on one party," "the implied covenant does not come into play when 'the scope of discretion is specified,' because in that instance, 'there is no

---

[4] This purely legal issue was raised and ruled upon in Defendants' motion to dismiss and motion for reconsideration, *Rule 50(b) Decision*, 2025 WL 823938, at *7 n.5, and thus preserved for appeal. *See Dupree v. Younger*, 598 U.S. 729, 736 (2023).

gap.'" *DG BF, LLC v. Ray*, 2021 WL 776742, at *15 (Del. Ch. Mar. 1, 2021). Thus, for example, if a contract specifies that a party must exercise its discretion "reasonably" or in "good faith," or in the "best interest" of an entity, the implied covenant does not apply. *Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012). Here, the shareholder contracts specify the scope of FHFA's contractual discretion through their incorporation of HERA's "best interests" provision. That provision—not the implied covenant—specifies how FHFA may exercise its discretion and precludes the claim that FHFA should exercised its discretion in favor of shareholders.

*Third*, Plaintiffs' implied covenant claim alleges a non-cognizable anticipatory breach of contract. When a party repudiates future performance of a contract, the opposing party may sue for anticipatory breach immediately *only* if the contract remains bilateral. *Fairfax-Falls Church Cmty. Servs. Bd. v. Herren*, 337 S.E.2d 741, 744 (Va. 1985); *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 78 n.102 (Del. Ch. 2013). Here, Plaintiffs claim that the Net Worth Sweep repudiated the Enterprises' future dividend-related obligations. But they cannot sue for that anticipatory breach because the shareholder contracts are unilateral, not bilateral: shareholders fully completed their performance simply by purchasing the shares.

*Fourth*, Plaintiffs failed to prove harm or damages with reasonable certainty based on the one-day share-price drop. Specifically, Plaintiffs failed to introduce evidence (1) accounting for the fact that share prices promptly rebounded; (2) accounting for a potential alternative cause of the one-day share-price drop; or (3) showing that *current* shareholders are worse off today than they would be without the Net Worth Sweep. Thus, the jury had no basis to find with reasonable certainty that the Sweep harmed current shareholders.

*Finally*, even if any Plaintiffs have cognizable claims at all, Plaintiffs who purchased shares *after* August 17, 2012, lack standing because they were not injured by the one-day share-price drop and the claim here does not "travel with the share." Plaintiffs do not contend that post-Third Amendment purchasers were themselves injured, but argue that the *sellers'* implied covenant claim was automatically assigned to subsequent purchasers. That defies settled law that legal claims related to a security "are not automatically assigned to a subsequent purchaser upon the sale of the underlying security." *Bluebird Partners, L.P. v. First Fid. Bank, N.A. N.J.*, 85 F.3d 970, 974 (2d Cir. 1996). Thus, if the Court reaches this issue, the claims of post-Third Amendment purchasers should be dismissed for lack of standing.

## STANDARD OF REVIEW

This Court reviews *de novo* purely legal errors adjudicated on a motion to dismiss, motion for summary judgment, or Rule 50(b) motion. *Bauer v. Fed.*

*Deposit Ins. Corp.*, 38 F.4th 1114, 1121 (D.C. Cir. 2022); *Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 918 (D.C. Cir. 2018); *Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007).

## ARGUMENT

## I.  THE SUPREME COURT'S *COLLINS* DECISION FORECLOSES PLAINTIFFS' IMPLIED COVENANT CLAIM

In *Collins*, the Supreme Court unanimously held that the Conservator's business decisions are protected from judicial review under § 4617(f), and that the Conservator acted reasonably in agreeing to the Net Worth Sweep.  As a matter of law, those holdings foreclose Plaintiffs' claim that the Conservator's decision to agree to the Sweep was arbitrary or unreasonable in violation of the implied covenant.  JA2330.  *Collins* disposes of this case.

For starters, *Collins* emphasized that § 4617(f)—which prohibits courts from taking "any action to restrain or affect the exercise of [the] powers or functions of the Agency as a conservator"—"sharply circumscribe[s] judicial review of any action that the FHFA takes as a conservator."  594 U.S. at 236-37.  As *Collins* held, the Conservator's business decisions—including those made for the public's benefit—"are protected from judicial review" under § 4617(f).  *Id.* at 254; *see Jacobs v. FHFA*, 908 F.3d 884, 895 (3d Cir. 2018) (holding that § 4617(f) barred money-damages claim because it "forbids courts to take 'any action' that seeks to 'restrain or affect' the Agency's exercise of its powers as conservator," and "[i]f monetary

19

relief would have that effect, then it is barred"). The decision challenged in this case was a core exercise of the Conservator's broad "powers under HERA" that allow the Conservator to "subordinat[e] the best interests of the Enterprises and [their] shareholders to [FHFA's] own best interests and those of the public." *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1286-87 (Fed. Cir. 2022) (relying on *Collins*). Thus, neither the jury nor the court below could second-guess the reasonableness of the Conservator's decision to agree to the Net Worth Sweep.

Importantly, *Collins* squarely rejected the central element of Plaintiffs' implied covenant claim—that FHFA acted "arbitrarily or unreasonably" in agreeing to the Net Worth Sweep. JA2331. *Collins* upheld the pleading-stage dismissal of a claim by shareholder plaintiffs challenging the Sweep under the APA. The Court unanimously held—while assuming the truth of factual allegations materially identical to Plaintiffs' positions here, and drawing all reasonable inferences in the shareholder plaintiffs' favor—that FHFA's agreement to the Sweep was within the Conservator's statutory authority, and therefore not actionable under the APA, *because* it was reasonable.

In particular, *Collins* held that the Net Worth Sweep was within FHFA's statutory authority to act in the "best interests" of the public because FHFA "*reasonably* viewed [the Sweep] as more certain to ensure market stability" than the alternative approaches favored by the shareholder plaintiffs. 594 U.S. at 240

20

(emphasis added). "The facts alleged in the complaint," the Court explained, "demonstrate that the FHFA chose a path of rehabilitation that was designed to serve public interests by ensuring [the Enterprises'] continued support of the secondary mortgage market." *Id.* at 238. It was "undisputed" that the Enterprises "had repeatedly been unable to make their fixed quarterly dividend payments without drawing on Treasury's capital commitment," and that "the cap on Treasury's capital commitment was scheduled to be reinstated" at the end of 2012. *Id.* at 239. "If things had proceeded as they had in the past, there was a realistic possibility that the [Enterprises] would have consumed some or all of the remaining capital commitment in order to pay their dividend obligations, which were themselves increasing in size every time the [Enterprises] made a draw." *Id.* The Net Worth Sweep "eliminated this risk." *Id.* The Court thus held that there was a *reasonable basis* for the Sweep—namely, to "ensure[] that all of Treasury's capital was available to backstop the [Enterprises'] operations during difficult quarters." *Id.*

The Court concluded that, "[w]hether or not this new arrangement was in the best interests of the [Enterprises] or their shareholders, the FHFA could have *reasonably* concluded that it was in the best interests of members of the public who rely on a stable secondary mortgage market." *Id.* (emphasis added). HERA's "best interests" provision—which, again, is incorporated into Plaintiffs' shareholder contracts—authorizes FHFA, as Conservator, to "subordinate the best interests of

the [Enterprises] to its own best interests and those of the public." *Id.* at 254 (citing 12 U.S.C. § 4617(b)(2)(J)(ii).  As a matter of law, that holding forecloses Plaintiffs' claim that FHFA acted arbitrarily or unreasonably.

Plaintiffs' evidence and arguments at trial confirm that their implied covenant claim contravenes *Collins*.  Specifically, Plaintiffs claimed that FHFA's business decision to enter into the Net Worth Sweep was unreasonable for the same two reasons asserted by the shareholder plaintiffs in *Collins* and rejected by the Supreme Court.

First, *Collins* rejected the argument that, at the time of the Net Worth Sweep,

the Enterprises were about to become profitable:

| Shareholder plaintiffs' arguments in *Collins* | Plaintiffs' arguments here | Supreme Court's reasoning in *Collins* |
|---|---|---|
| The shareholder plaintiffs "claim[ed] that the FHFA adopted the third amendment at a time when the companies were on the precipice of a financial uptick and ... would soon have been in a position not only to pay cash dividends, but also to build up capital buffers to absorb future losses." 594 U.S. at 240. "Thus, the shareholders assert[ed], sweeping all the companies' earnings to Treasury increased rather than decreased the risk that the companies would make further draws and eventually deplete Treasury's commitment." *Id.* | Plaintiffs argued that "all signs were good that [the Enterprises] were about to have sustained profitability," which "would mean they barely need to draw down on the Treasury commitment at all, much less draw down so much that it would threaten to exhaust the commitment." JA784; *see also, e.g.*, JA2058 (closing) ("Maybe they are turning the corner. Maybe they are going to make big profits. Maybe those write-downs will become write-ups and they can get back on their feet ....  But the net worth sweep changed that."). | "The nature of the conservatorship authorized by [HERA] permitted the Agency to reject the shareholders' suggested strategy in favor of one that the Agency reasonably viewed as more certain to ensure market stability. The success of the strategy that the shareholders tout was dependent on speculative projections about future earnings, and recent experience had given the FHFA reasons for caution." 594 U.S. at 240. |

23

Second, *Collins* rejected Plaintiffs' argument that, in lieu of the Net Worth Sweep, the Enterprises could have addressed the circular-draw problem by paying dividends to Treasury "in kind":

| Shareholder plaintiffs' arguments in *Collins* | Plaintiffs' arguments here | Supreme Court's reasoning in *Collins* |
| --- | --- | --- |
| "[T]he shareholders contend[ed] that the FHFA could have protected Treasury's capital commitment by ordering the companies to pay the dividends in kind rather than in cash," which would have resulted only in a modest "penalty." 594 U.S. at 239-240. | Plaintiffs argued that if the Enterprises just "used the safety valve, the payment-in-kind option, they don't need to draw on the commitment at all." JA791. Paying in kind was a "foolproof solution to the so-called problem that [FHFA] was trying to solve." JA794; *see also, e.g.*, JA2083 (closing) ("So if you are worried about the bond and MBS investors and the commitment, the payment in kind is a really good option."); JA2086 ("Kind of like the payment in kind provision. They could have tried for that. They didn't. No evidence that they considered any of these alternatives."). | "This argument rests on a misunderstanding of the agreement between the companies and Treasury. The companies' stock certificates required Fannie Mae and Freddie Mac to pay their dividends 'in cash in a timely manner.' If the companies had failed to do so, they would have incurred a penalty[] . . . . Thus, paying Treasury in kind would not have satisfied the cash dividend obligation, and the risk that the companies' cash dividend obligations would consume Treasury's capital commitment in the future would have remained." 594 U.S. at 240-41 (citation omitted). |

Nevertheless, the district court distinguished *Collins* on the theory that this case "involve[s] a different type of reasonableness analysis." *MSJ Ruling*, 2022 WL 4745970, at *5. In the district court's view, "[a]t issue in *Collins* was whether FHFA

24

could reasonably have determined that adopting the Third Amendment was 'in the *best interests* of the *regulated entity* or the *Agency*,' and thus acted within its statutory authority as conservator of the [Enterprises] in so doing." *Id.* (citation omitted). The court ruled that, "[h]ere, in contrast, the issue is whether FHFA 'violated the reasonable *expectations* of the *parties*' by adopting the Third Amendment." *Id.* (citation omitted).

That is no distinction at all. HERA's "best interests" provision is incorporated into the shareholder contracts and thus, as a matter of law, informs shareholders' reasonable expectations. Thus, shareholders must reasonably expect that FHFA, as Conservator, will act in the *public* interest without regard for whether doing so is in *shareholders'* interests. There is no daylight between shareholders' reasonable expectations and the Supreme Court's holding that FHFA as Conservator *reasonably* determined that its actions served the public interest. Yet the jury in this case was instructed, over Defendants' objection, that "[w]hile HERA authorized FHFA to act in the best interests of the [Enterprises], the FHFA, or the public, FHFA's exercise of that statutory authority can still have violated the implied covenant of good faith and fair dealing if it exercised that authority in a way that arbitrarily or unreasonably violated plaintiffs' reasonable expectations under the contract." JA2331. The jury should never have been asked whether FHFA acted reasonably in making the business decision to enter into the Net Worth Sweep, when the Supreme Court

already held that it had.  This case should be dismissed as a matter of law under *Collins*.

## II.    THE IMPLIED COVENANT DOES NOT APPLY HERE

Beyond *Collins*, Plaintiffs' claim independently fails as a matter of law because the implied covenant does not apply here.  Under Delaware and Virginia law, when a contract confers discretion, the implied covenant applies only if the contract fails to specify the scope of that discretion, thus leaving a "gap" for the implied covenant to fill.  Here, the shareholder contracts—by incorporating HERA's "best interests" provision—specify the scope of FHFA's contractual discretion: FHFA must act in the "best interests" of the Enterprises *or* the public.  Thus, the shareholder contracts contain no "gap" for the implied covenant to fill, and Plaintiffs' claim fails as a matter of law.

"The implied covenant of good faith and fair dealing is a limited and extraordinary legal remedy."  *Khan v. Warburg Pincus*, *LLC*, 2025 WL 1251237, at *5 (Del. Ch. Apr. 30, 2025).  "It is best understood as a way of implying terms in an agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."  *Id.*  Essentially, courts "infer[] contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."  *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).

Critically, "[a]n essential predicate for the application of the implied covenant is the existence of a 'gap' in the relevant agreement." *DG BF, LLC v. Ray*, 2021 WL 776742, at *15 (Del. Ch. Mar. 1, 2021). Even "[w]hen a contract confers discretion on one party," "the implied covenant does not come into play when 'the scope of discretion is specified,' because in that instance, 'there is no gap.'" *Id.* (citations omitted). In other words, "[w]hen a contract provision states how a grant of discretion is to be exercised, there is no place for the implied covenant in that provision." *Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012) (citation omitted), *aff'd sub nom. DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chi.*, 75 A.3d 101 (Del. 2013) (citation omitted). Contracts can define the scope of discretion by "provid[ing] a contractual standard for evaluating the decision." *Id.*[5]

In *Policemen's Annuity & Benefit Fund of Chicago*, limited partners exercised their discretion under the partnership agreement to remove the managing partner. 2012 WL 3548206, at *1. The managing partner challenged his removal under an implied covenant theory, arguing that the Delaware court "should imply, in [the

---

[5] Virginia law is in accord. *Old Dominion Elec. Co-op. v. Ragnar Benson, Inc.*, 2006 WL 2252514, at *9 (E.D. VA Aug. 4, 2006) (implied covenant applies only when contract confers "unfettered discretion of one party," not when discretion is "expressly 'fettered'" by contract (quoting *Riggs Nat'l Bank of Wash., D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir. 1994))); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 216 (4th Cir. 2019) (similar).

removal provision], a requirement that the Limited Partners must act reasonably if they exercise their discretion to remove the Managing Partner." *Id.* at *11. The court rejected that claim. Although the agreement's removal provision "allow[ed] for discretion," it "provide[d] how discretion is to be exercised—the Limited Partners must 'in good faith determine that removal of the Managing Partner is necessary for the best interest of the Limited Partnership.'" *Id.* at *12 (alterations omitted). The plaintiff thus could pursue an *express* breach-of-contract claim for an alleged failure to make that "best interest" determination, but the implied covenant did not apply because the contract specified a standard for the exercise of the limited partners' discretion. *Id.* "[I]f the scope of discretion is specified, there is no gap in the contract as to the scope of the discretion, and there is no reason for the Court to look to the implied covenant to determine how discretion should be exercised." *Id.*; *accord Shareholder Representative Servs. LLC v. Medidata Solutions, Inc.*, 2020 WL 972618, at *1 (D. Del. Feb. 24, 2020) (dismissing implied covenant claim because contract specified that defendant may operate business "in any manner in which [defendant] deems appropriate in its sole and *good faith* discretion" and thus "expressly delineated the limits on Defendant's discretion").

Similarly, in *Khan v. Warburg*, plaintiffs asserted that an LLC agreement contained an implied term that defendants "would not eliminate Class B unitholders' tag-along right through a 'coerced' Amendment to permit differential

28

consideration." 2025 WL 1251237, at *7. The court, however, concluded that there was no contractual gap to fill because the agreement "expressly allowed [defendants] to 'act exclusively in [their] own interest[s] and without regard to the interest of any other Person.' ... As a result, the LLC Agreement has no gap preventing [defendants] from negotiating for disparate consideration. ... By its very terms, the LLC Agreement allowed [defendants] to put their interests ahead of Class B unitholders, so long as [defendants] complied with the LLC Agreement's terms." *Id.* at *7-8.

So too here: there is no "gap" in the shareholder contracts as to the scope of FHFA's discretion. The contracts incorporate HERA's "best interests" provision, *see MTD Ruling II*, 2018 WL 4680197, at *9, which specifies that FHFA, as Conservator, may "take any action authorized by [HERA] which the Agency determines is in the best interests of the regulated entity or the Agency." 12 U.S.C. § 4617(b)(2)(J)(ii); *see Collins*, 594 U.S. at 238-39 (HERA authorizes FHFA to act in "the best interests of ... the public" "[w]hether or not [that] [i]s in the best interests of the [Enterprises] or their shareholders"). That language is materially indistinguishable from the contract language that foreclosed implied covenant claims in *Policemen's Annuity*, *Shareholder Representative Services*, and *Khan*. As in those cases, the contracts here grant FHFA discretion to take certain acts (to "take any action authorized by [HERA]") and prescribe *how* that discretion is to be exercised ("in the best interests of the regulated entity or the Agency"). 12 U.S.C.

29

§ 4617(b)(2)(J)(ii). Thus, there is no gap and "the implied covenant does not come into play." *DG BF, LLC*, 2021 WL 776742, at *15 (citation omitted). Indeed, just like the contract in *Khan*, the shareholder contracts here permit the Conservator to put the public's interests ahead of Plaintiffs' interests, which it did.

The conclusion that there is no gap to fill is consistent with this Court's *Perry II* decision. In remanding Plaintiffs' implied covenant claim for further consideration, this Court did not resolve how HERA's "best interests" provision fit into the analysis. *Perry II*, 864 F.3d at 631. It instead directed the district court to "evaluate [the implied covenant] claim under the correct legal standard," which "should consider" whether HERA's "best interests" provision (and the PSPAs' restriction on dividends to private shareholders) affected shareholders' reasonable expectations and their ability to bring the claim. *Id.* (citing, *inter alia*, 12 U.S.C. § 4617(b)(2)(J)(ii)). The district court failed to do that.

Instead, the district court held that, notwithstanding HERA's "best interests" provision, the shareholder contracts contain a gap because "whether a certain act falls within FHFA's statutorily authorized discretion and whether FHFA may incur monetary damages for exercising that discretion in a manner inconsistent with its independent contractual obligations are two separate inquiries." *MSJ Ruling*, 2022 WL 4745970, at *7. That is wrong. Because HERA's "best interests" provision is incorporated into the shareholder contracts, the scope of FHFA's statutorily

authorized discretion and its contractual discretion are coextensive.  The statute *defines* the scope of FHFA's contractual discretion—FHFA may exercise its discretion to act in what it determines are the "best interests" of the public, even if the action does not further the Enterprises' business objectives.  12 U.S.C. § 4617(b)(2)(J)(ii).

In opposing Defendants' Rule 50(b) motion, Plaintiffs relied on *Wilmington Leasing, Inc. v. Parrish Leasing Co.*, 1996 WL 560190 (Del. Ch. Sept. 25, 1996), but that case is inapposite.  The court recognized an implied covenant claim where a partnership agreement authorized limited partners to remove the general partner if they determined that he "has failed or is unable to perform satisfactorily as General Partner." *Id.* at *1.  "In these specific circumstances, an implied requirement that the limited partners' discretion be exercised reasonably and in good faith is appropriate, for without that limitation, the contractual condition would be marginalized." *Id.* at *2.  In other words, the implied covenant was needed to give that condition "significance and effect." *Id.*  "[A]bsent such an implied requirement, the limited partners could remove ... a general partner who was performing satisfactorily," and if that was what the parties intended, "they could have drafted [the agreement] to permit removal without requiring the satisfaction of any predicate standard." *Id.*

Here, there is no need to read any additional requirement into HERA's "best interests" provision to give that provision "significance and effect." *Id.* To the contrary, such a reading would turn the "best interests" provision on its head—it makes no sense to say the implied covenant requires FHFA to prioritize *shareholder* expectations when HERA and the shareholder contract itself specify that FHFA instead may act in the *public* interest. The point of the "best interests" provision is to allow FHFA to "*subordinate* the best interests of the company to its own best interests and those of the public." *Collins*, 594 U.S. at 254 (emphasis added). Imputing an implied covenant to act in the interests of shareholders would not give effect to the "best interests" provision; it would nullify it.

Finally, the district court relied on HERA's repudiation provision. *MSJ Ruling*, 2022 WL 4745970, at *7. That provision authorized FHFA, "within a reasonable period following" its appointment as Conservator, to repudiate Enterprise contracts deemed "burdensome" and explicitly limited the damages available in the event of such a repudiation. 12 U.S.C. § 4617(d). As a threshold matter, this provision does not apply here because the Conservator did not repudiate the shareholder contracts at issue. Further, the question here is not whether FHFA can be held liable for a contract repudiation of the limited type Congress specified that allows for damages. The question is whether the implied covenant applies in this case *at all* given that Plaintiffs' shareholder contracts, by incorporating HERA's

32

"best interests" provision, already specify the scope of FHFA's contractual discretion.  Under Delaware and Virginia law, the answer to that question is *no*.[6]

## III.    PLAINTIFFS' IMPLIED COVENANT CLAIM ALLEGES A NON-COGNIZABLE ANTICIPATORY BREACH

Plaintiffs' implied covenant claim also fails because it asserts, in substance, a non-cognizable anticipatory breach of the Enterprises' future dividend-related obligations (if any) under the shareholder contracts.

If a contracting party breaches a *present* contractual obligation, the other party generally may sue for damages immediately.  But if a party "repudiat[es]" a *future* obligation, the other party may *not* sue for damages immediately—unless the anticipatory breach doctrine applies.  *Perry II*, 864 F.3d at 632.

As relevant here, the anticipatory breach doctrine "does not apply to unilateral contracts, especially when the only remaining performance is the payment of money," *MTD Ruling II*, 2018 WL 4680197, at *5 (citing *Smyth v. United States*, 302 U.S. 329, 356 (1937)), or to "bilateral contracts that have become unilateral by full performance on one side," *id.* (quoting 23 Williston on Contracts § 63:60).  "In other words, 'if the payee has completely performed his side of the contract and is just awaiting payment, he can't declare a breach and sue for immediate payment just

---

[6] Indeed, Delaware and Virginia law cannot—and do not—prohibit conduct that *Collins* held to be authorized by HERA.  *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (holding that federal law controls over contrary state law).

because he has reason (even compelling reason) to doubt that the other party will pay when due.'" *Id.* (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 915 (7th Cir. 2001)).  Both Delaware and Virginia apply this limitation.  *Id.* at *6; *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 78 n.102 (Del. Ch. 2013); *Fairfax-Falls Church Cmty. Servs. Bd. v. Herren*, 337 S.E.2d 741, 743 (Va. 1985); *see generally* Restatement (Second) of Contracts § 253, cmt. c.

Here, Plaintiffs claim that the Net Worth Sweep prevented the Enterprises from possibly paying dividends at some unspecified point "in the future."  JA2331; *see also MSJ Ruling*, 2022 WL 4745970, at *11 (noting Plaintiffs' claim that the Sweep supposedly deprived them of "any possibility of *future* dividends" (emphasis added)).  But Plaintiffs' shareholder contracts are unilateral—Plaintiffs "completed their end of the bargain by purchasing ... shares" and owe no further contractual obligation.  *MTD Ruling II*, 2018 WL 4680197, at *6.  Plaintiffs' implied covenant claim therefore amounts to a non-cognizable claim of anticipatory breach.

This Court's *Perry II* decision reinforces the conclusion that Plaintiffs are asserting an unripe claim for anticipatory breach.  This Court held that Plaintiffs' "claims for breach of contract with respect to liquidation preferences are better understood as claims for anticipatory breach," and remanded those claims on that basis.  *Perry II*, 864 F.3d at 633.  The district court then dismissed those claims,

explaining that Plaintiffs' performance was complete, and Defendants' performance was not yet due. As to Plaintiffs, they "completed their end of the bargain by purchasing ... shares," and as to Defendants, "[w]ith respect to the liquidation preference, the only remaining performance is payment of the preference by Fannie Mae or Freddie Mac upon liquidation (if it ever occurs)." *MTD Ruling II*, 2018 WL 4680197, at *6. Thus, "Plaintiffs fail[ed] to state a claim for breach of contract." *Id.* The *same logic* forecloses Plaintiffs' implied covenant claim. Just as Plaintiffs claimed that the Net Worth Sweep eliminated the possibility that private shareholders could receive value for their liquidation preference rights in the event of a future liquidation, they now claim that it also eliminated the possibility of future dividend payments. The limitation on anticipatory breach claims for unilateral contracts accordingly bars Plaintiffs' current claim just as it barred their claims related to the elimination of future liquidation preference rights.

In reaching the opposite conclusion, the district court distinguished implied covenant claims from breach-of-contract claims, reasoning that the former do not sound in anticipatory breach because they seek to enforce "an ongoing obligation; performance is always due." JA209. The court thus contrasted the dismissed breach-of-contract claims, which sought "to hold defendants presently accountable for a future breach of an express provision," with implied covenant claims, which "seek to hold defendants presently accountable for a present breach." *Id.*

35

No such distinction exists; implied covenant claims are not exempt from the rules regarding anticipatory breach.  It is blackletter law that "[a] violation of the implied covenant of good faith and fair dealing is a breach of contract, which is not separate from other breach of contract claims."  17A Am. Jur. 2d Contracts § 673 (Feb. 2024).  Virginia courts require that implied covenant claims be pleaded as a form of breach of contract, and do not recognize such claims as standalone counts. "It is well-settled that Virginia law does not recognize an independent cause of action for breach of the implied warranty of good faith and fair dealing, but it does give rise to a breach of contract claim."  *Carr v. Fed. Nat'l Mortg. Ass'n*, 92 Va. Cir. 472, 2013 WL 12237855, at *4 (2013); *see also Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 465 (E.D. Va. 2008) ("the breach of [implied covenant] duties gives rise to an action for breach of contract, not a separate claim"). In Delaware, too, "a claim for breach of the implied covenant is contractual."  *MHS Capital LLC v. Goggin*, 2018 WL 2149718, at *11 (Del. Ch. May 10, 2018).  The implied covenant is merely a doctrine "by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement."  *Dieckman v. Regency GP LP*, 2018 WL 1006558, at *3 (Del. Ch. Feb. 20, 2018) (citation omitted).  The court below thus erred in treating implied covenant claims as materially distinct from breach of contract claims for anticipatory breach purposes.

36

Furthermore, the district court's statement that the implied covenant imposes an "ongoing" obligation evades the relevant question—namely, when would the contractual benefits at issue become due, such that Plaintiffs would be harmed by not receiving them?  Because dividends could become due only at some indefinite point in the future—and only after the Conservator lifted the termination of dividends and Treasury gave consent as required by the PSPAs—Plaintiffs' implied covenant claim based on the elimination of those benefits is anticipatory.

If the district court's distinction were the law, little would remain of the well-established unilateral-contract limitation on anticipatory breach claims.  A plaintiff could easily circumvent this limitation by recharacterizing the alleged anticipatory breach of contract as a "present" breach of the implied covenant.  And it would be easy for disappointed promisees to plausibly allege that an action that made it impossible for them to receive the fruits of their bargain in the future was the result of arbitrary or unreasonable action now.  If such promisors can be liable for a "present breach" of the obligation to "operate in good faith and not violate their co-contracting party's reasonable expectations," JA209, the longstanding limitation on anticipatory breach claims would be meaningless, as a plaintiff could virtually always recover the same damages under an implied covenant theory.  That cannot be the law.

## IV.   PLAINTIFFS FAILED TO PROVE WITH REASONABLE CERTAINTY THAT THE NET WORTH SWEEP HARMED THEM

For an implied covenant claim, a plaintiff must prove with "reasonable certainty" both "the existence of damages" and that those damages "flowed from the defendant's violation of the contract." *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013); *see Saks Fifth Ave., Inc. v. James, Ltd.*, 630 S.E.2d 304, 311 (Va. 2006). "Speculation and conjecture" about the plaintiff's alleged harm "cannot form the basis of the recovery." *Condominium Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.*, 281 Va. 561, 577 (2011); *see Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004).

Here, Plaintiffs had to prove with reasonable certainty that current shareholders suffered harm based on their "lost-value" theory—namely, "that the Third Amendment, by eliminating any possibility of future dividends for shareholders, deprived plaintiffs' shares of much of their value, even if such dividends were not reasonably certain to occur in the foreseeable future." *MSJ Ruling*, 2022 WL 4745970, at *11. Plaintiffs failed to carry that burden.

### A.   Plaintiffs Introduced No Evidence To Account for the Prompt Rebound in Share Prices Following the One-Day Drop

Plaintiffs based their damages on the one-day decline in Enterprise share prices on August 17, 2012, but they failed to account for the substantial rebound in share prices shortly thereafter. This dooms their claim as a matter of law.

When shareholder-plaintiffs base their alleged damages on a share-price drop, courts require them to account for any prompt rebound.  The reason is simple: "Calculating damages based on the date [of a share-price drop] may substantially overestimate plaintiff's actual damages," because markets often overreact to new information, then promptly correct.  *Acticon AG v. China North East Petroleum Holdings*, 692 F.3d 34, 38 (2d Cir. 2012) (citation omitted).  Courts thus "do[] not calculate damages based on a single day decline in price, but instead allow[] the security an opportunity to recover."  *Id.* (citation omitted).

In *Ross v. Walton*, 668 F. Supp. 2d 32 (D.D.C. 2009), for example, shareholder-plaintiffs alleged harm from the company's stock-price drop after a corrective disclosure, even though the stock promptly rebounded to its pre-disclosure price.  The court dismissed the case on the pleadings, explaining that it was "unaware of any authority in which actual economic loss was found when the stock value returned to the pre-disclosure prices and could have been sold at a profit just after the class period."  *Id.* at 43.  Other courts are in accord.  *See, e.g.*, *In re Immucor, Inc. Sec. Litig.*, 2011 WL 3844221, at *2 (N.D. Ga. Aug. 29, 2011) ("Plaintiff failed to adequately plead economic loss and loss causation because Immucor's share price quickly rebounded to pre-disclosure levels ... ."); *In re Estee Lauder Cos.*, 2007 WL 1522620, at *1 n.5 (S.D.N.Y. May 21, 2007) ("Plaintiff's contention that an economic loss is sustained simply as a result of the fact that the

39

price of the stock dropped following disclosure is unpersuasive."). These decisions rely on *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), which held that securities-fraud plaintiffs fail to establish loss causation where they merely allege that "the price on the date of purchase was inflated because of the misrepresentation" without addressing subsequent share-price changes. *Id.* at 342.

Here, it is undisputed that Enterprise share prices substantially rebounded within weeks after the one-day drop on August 17, 2012. JA2972-73. Indeed, by the end of October 2012, Enterprise share prices were *higher* than they had been just a week before the Third Amendment's announcement. JA2975. Plaintiffs introduced no evidence addressing that prompt rebound. They accordingly failed to prove harm or damages from the share-price drop with reasonable certainty.

Ignoring the decisions above, the district court concluded that "the jury was free to conclude that those rebound share prices were irrelevant in the ultimate finding of harm to current shareholders." *Rule 50(b) Decision*, 2025 WL 823938, at *9. The court reasoned that "the Net Worth Sweep is 'a fundamental and permanent change to the capital structure of the company,' permanently alienating shareholders from the profits of the [Enterprises], which remains in place to this today." *Id.* (quoting Pls.' Opp'n at 34). But that ignores the fact that share prices promptly rebounded following the one-day drop, which would make no sense if the Sweep

had in fact "permanently alienat[ed] shareholders from the profits of the [Enterprises]." *Id.*

At bottom, the decision below ignores the economic rationale underlying the cases requiring plaintiffs to address price rebounds: markets often overreact, so measuring shareholders' damages based on a one-day share-price drop, while ignoring a prompt price rebound, overstates any damages actually caused by the alleged wrongdoing. Because they did not address the prompt rebound in share prices following the one-day drop, Plaintiffs failed to prove harm or damages with reasonable certainty and their claim should be dismissed as a matter of law.

### B.    Plaintiffs Introduced No Evidence to Show That Current Shareholders Are Worse Off Today Due to the Net Worth Sweep

Contract damages must be "measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001); *accord Estate of Taylor v. Flair Prop. Assocs.*, 448 S.E.2d 413, 414 (Va. 1994). Here, the promisees are current shareholders who sought damages based on the share-price drop on August 17, 2012. JA2329-31. Plaintiffs thus needed to prove with reasonable certainty that current shareholders must be paid some amount of money today to be "put ... in the same position as if" the Net Worth Sweep had not happened. *SJ Reconsideration Ruling*, 2022 WL 11110548, at *4 (quoting *Duncan*, 775 A.2d at 1022). In other

41

words, Plaintiffs bore the burden at trial to prove that, but for the Net Worth Sweep, the market value of their shares would be higher *today* than it actually is.

Plaintiffs introduced no evidence at trial attempting to show either how much their shares are worth today or how much those shares would be worth today absent the Net Worth Sweep. No evidence addressed whether share prices today would be higher, lower, or the same absent the Sweep. The jury thus had no evidentiary basis to conclude that current shareholders must be paid *any* amount of money today to be put in the "same position" they would occupy but for the Sweep. *Id.*

Plaintiffs recognized this problem but their only attempt to address it at trial was conclusory and legally insufficient. Plaintiffs' counsel asked their damages expert: "Professor Mason, does the $1.6 billion in damages from the net worth sweep still persist today?" JA955. Dr. Mason responded, in a single word without any elaboration, "Yes." *Id.* That *ipse dixit* falls short of providing the "reasonable certainty" necessary to establish harm and damages. *See, e.g.*, *Twin Cities Bakery Workers Health and Welfare Fund v. Biovail Corp.*, 2005 WL 3675999, at *5 (D.D.C. Mar. 31, 2005) (holding that expert's *ipse dixit* was "too speculative to forge the chain of causation plaintiffs' proof of damages requires").

The district court, however, found that Defendants "confus[e] the evidence that proves the *existence* of harm ... with the evidence that proves a reasonable *estimate* of that harm." *Rule 50(b) Decision*, 2025 WL 823938, at *9. According to

the court, the "one-day stock drop was the evidence used to provide a reasonable *estimate* of the measure of that harm. But it was far from the only evidence of the *existence* of that harm." *Id.*

That is wrong. Even if the one-day price drop were just a measure of damages, the jury was properly instructed that "Plaintiffs b[ore] the burden of proving that measure of damages with reasonable certainty." JA2332. And because Plaintiffs still own their shares, the one-day drop could measure harm to them only if it carried forward as a reasonable estimate of the additional value Plaintiffs' shares would have *today* absent the Net Worth Sweep. But the notion that "share price declines on a single day carry forward through time or are sustained within the share price on a later date" is "wholly speculative." *Jaroslawicz v. M&T Bank Corp.*, 2024 WL 474846, at *17-18 (D. Del. Feb. 7, 2024). Courts thus cannot infer that "share price declines on individual days are sustained and internalized without alteration over long periods of time, given the complexity of markets and market forces acting on share prices on a continuous basis." *Id.* at *17.

## C. Plaintiffs Introduced No Evidence to Account for a Potential Alternative Cause of the One-Day Drop

Plaintiffs also failed to prove harm or damages with reasonable certainty because they introduced no evidence to account for a possible alternative cause of the one-day drop. The evidence they relied on did not isolate the impact of the Net

Worth Sweep from another component of the Third Amendment that could have negatively impacted share prices.

Plaintiffs' main damages evidence was a draft "event study" in the work papers of Defendants' expert, Dr. Attari, that measured the one-day share-price drop of $1.6 billion.  JA936, JA938-40.  The law is clear—and Plaintiffs' expert Dr. Mason acknowledged—that, "to be a properly conducted event study, the event study must have a method to exclude alternative potential causes of the purported impact of the event in question."  JA980; *see, e.g.*, *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009).  As Dr. Mason admitted, the event study here "measures the effect of the [T]hird [A]mendment" as a whole, even though "[t]he net worth sweep is just ... one provision of the overall [T]hird [A]mendment."  JA979-80.  Importantly here, the Third Amendment *also* required the Enterprises to "shrink[] one part of the[ir] business"—namely, their retained mortgage portfolios.  JA981-82.

Yet Dr. Mason conceded that the event study here "does not ... attempt[] to distinguish between the impact of the net worth sweep on the stock prices and any impact of the acceleration of the reduction of the retained mortgage portfolios."  JA982.  He further acknowledged that the event study "does not try to analyze how much of the $1.6 billion stock price drop may have been caused by the net worth sweep and how much of that drop may have been caused by this other acceleration

of the reduction of the retained mortgage portfolios." *Id.*  In Dr. Mason's words, "Defendants' event study does not do that." *Id.*  Dr. Mason also acknowledged that "when an event study cannot distinguish between the impact of the net worth sweep and the impact of the acceleration of the reduction of the retained mortgage portfolios," an expert "lacks any economically sound basis for concluding that the net worth sweep had the effect that the expert claims." *Id.* at 982-83.  Thus, Dr. Mason's *own testimony* shows that Plaintiffs did not present "any economically sound basis" for determining what portion of the share-price drop on August 17, 2012 may have been attributable to the Net Worth Sweep versus the accelerated reduction of the Enterprises' retained mortgage portfolios.  *Id.*

On redirect, Plaintiffs attempted to ask Dr. Mason for his "opinion about whether it was the net worth sweep or ... this accelerated reduction[] that actually caused Fannie and Freddie's preferred and common stock to fall by 50 percent on one day." JA993.  The district court sustained Defendants' objection because Dr. Mason's reports disclosed no such opinion.  JA993-94, JA1028.  The jury accordingly had no evidentiary basis to determine with reasonable certainty what portion of the one-day share-price drop may have been attributable to the Net Worth Sweep versus the accelerated reduction.

Yet, the district court credited Dr. Mason's conclusory statement that "in his opinion, there was no reason to believe that anything besides the Net Worth Sweep

45

could have caused the August 17, 2012 stock price drop." *Rule 50(b) Decision*, 2025 WL 823938, at *10. This ignored Dr. Mason's concessions on cross that the event study did *not* account for the accelerated reduction as a potential alternative cause of the share-price drop, and that there was accordingly no "economically sound basis" to conclude that the Sweep caused the drop. JA983. Expert testimony on direct cannot prove an injury "to a reasonable degree of certainty" if an "assumption" underlying that testimony "was destroyed by" admissions elicited on cross. *Baker v. Kroger Co.*, 784 F.2d 1172, 1174-75 (4th Cir. 1986).

## V.    POST-THIRD AMENDMENT PURCHASERS LACK STANDING BECAUSE THEY SUFFERED NO INJURY AND THE CLAIM HERE DOES NOT TRAVEL WITH THE SHARE

In a class action, "[e]very class member must have Article III standing in order to recover individual damages. Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citation omitted). Here, all Plaintiffs who bought shares *after* the Net Worth Sweep lack standing because they suffered no injury from the complained-of one-day share-price drop.

Indeed, Plaintiffs do not contend that post-Third Amendment purchasers suffered injury from the price drop. Rather, they contend that the implied covenant claim here "travels with the share"—i.e., the claim was automatically assigned to subsequent purchasers. Put differently, Plaintiffs contend that former shareholders

who held shares on August 17, 2012, and sold the shares thereafter "were damaged, but they ... sold their rights to recovery when they sold the shares to the next buyer. And if that buyer sold to another buyer, those rights were further passed."  Berkley ECF 430 at 45; Class ECF 423 at 45.  But this "travels with the share" theory contradicts decades of authority and should be rejected here.

A.    **The Longstanding Majority View Is That the Sale of a Security Does Not Automatically Assign a Legal Claim to the Buyer**

Because post-Third Amendment purchasers' standing rests on a purported assignment of the claim, Plaintiffs must prove a valid assignment.  *US Fax Law Ctr., Inc. v. iHire, Inc.*, 476 F.3d 1112, 1120 (10th Cir. 2007) (only a "valid assignment confers standing"); *Beach TV Props., Inc. v. Solomon*, 2016 WL 6068806, at *17 (D.D.C. Oct. 14, 2016) ("Because the attempted assignment ... was invalid under Virginia law, [plaintiff] does not have standing ....").  They cannot do so.

In general, a legal claim relating to property is not automatically assigned when the property is sold—the claim does not "travel" with the property.  "As a matter of common law, the right to bring a 'chose in action' was a personal right separate from the property that gave rise to the right .... There was no presumption of an automatic assignment of the right to bring a claim associated with the property when the property was sold.  Instead, the law has required an express assignment of the right to bring a cause of action."  *DNAML Pty, Ltd. v. Apple, Inc*., 2015 WL 9077075, at *4 (S.D.N.Y. Dec. 16, 2015) (citations omitted); *see also Herr v. U.S.*

*Forest Serv.*, 803 F.3d 809, 821 (6th Cir. 2015) (Sutton, J.) ("Choses of action to enforce property rights do not, as a general matter, automatically transfer when the underlying property changes hands."). The Restatement (Second) of Contracts thus provides that contract-related claims are not automatically assigned to buyers. *Herr*, 803 F.3d at 821 (quoting Restatement (Second) of Contracts § 324); *see also* 29 *Williston on Contracts* § 74:6 (4th ed. 2023) (similar). Absent "an express assignment of the right to bring a cause of action," the seller retains the claim. *DNAML*, 2015 WL 9077075, at *4.

Courts have long held that this common-law no-automatic-assignment rule applies to federal securities fraud claims. In a leading case, a district court rejected, as "totally without merit," a contention that securities claims travel with the share. *Indep. Inv. Protective League v. Saunders*, 64 F.R.D. 564, 572 (E.D. Pa. 1974). "To adopt plaintiffs' extraordinary theory would be to deprive injured persons of their rights and give their causes of action to one who has suffered no injury himself but who simply has been shrewd or lucky enough to have put his hands on a security that once belonged to a person who was defrauded." *Id.* Courts of appeals have adopted the same rule. *See, e.g.*, *Bluebird Partners, LP v. First Fid. Bank, N.A. N.J.*, 85 F.3d 970, 974-75 (2d Cir. 1996) (rejecting proposed "rule of automatic assignment"); *Lowry v. Baltimore & Ohio R.R. Co.*, 707 F.2d 721, 730 (3d Cir. 1983) (en banc) (plurality op.) (because the "action did not run with the debentures, the

plaintiffs, as subsequent purchasers, ... lack standing to assert their claims of federal securities fraud"). "Such an approach is necessary to ensure that compensation for fraudulent securities dealings inures to those persons who were injured by the fraud, rather than to corporate bounty hunters." *Lowry*, 707 F.2d at 729.

The overwhelming majority of states likewise "have adopted the rule applied to federal securities law claims—*i.e.* there is no automatic transfer." *Keystone Assocs. LLC v. Fulton*, 2019 WL 3731722, at *3 (D. Del. Aug. 8, 2019); *accord, e.g.*, *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1420-21 (D. Ariz. 1989) (rejecting travels-with-the-share theory under Washington law). "The majority rule is that there is no automatic assignment of an accompanying litigation right or claim when transferring property." *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Assoc.*, 324 F. Supp. 3d 387, 398 (S.D.N.Y. 2018).

To depart from the no-automatic-assignment rule, a state's legislature "must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (citations omitted). For instance, New York's legislature "enacted such a provision for the automatic assignment of bondholders' claims." *Racepoint Partners, LLC v. JPMorgan Chase Bank*, 2006 WL 3044416, at *4 (S.D.N.Y. Oct. 26, 2006). The New York statute states: "Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer" relating to the bond. N.Y. Gen. Obl. Law § 13-107(1).

49

And state-law versions of Uniform Commercial Code § 8-302 do not satisfy this requirement. Courts have repeatedly held that § 8-302—which provides that a purchaser of securities "acquires all rights in the security that the transferor had or had power to transfer"—does not abrogate the common law's no-automatic-assignment rule. *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 2022 WL 1446552, at *13 (S.D.N.Y. Feb. 22, 2022), *report and recommendation adopted in part, rejected in part*, 2023 WL 5128079 (S.D.N.Y. Aug. 10, 2023) (finding that seller had standing to sue in securities class action and state UCCs did not automatically assign claims); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 373 n.126 (S.D.N.Y. 2007) (Section 8-302(a) "does not provide for the automatic transfer of fraud claims against third parties"); *In re Cfs-Related Sec. Fraud Litig.*, 2001 U.S. Dist. LEXIS 27387, at *44, *46 (N.D. Okla. Dec. 21, 2001) ("§ 8-302 is limited to the transfer of interests in a security only, and [does not] contemplate the transfer of causes of action for fraud which arise during the process of negotiating for and entering into a contract for the transfer of a particular security."); *Cheatham I.R.A. v. Huntington Nat'l Bank*, 137 N.E.3d 45, 49 (Ohio 2019) (holding that Ohio's § 8-302 "does not automatically assign rights to a purchaser upon a transfer of title" for breach of contract action).

Applying these principles here, Plaintiffs' implied covenant claim was not automatically assigned to subsequent purchasers under Virginia or Delaware law.

### B.    The Claim Here Was Not Automatically Assigned

**1.**  Under Virginia law, Plaintiffs' implied covenant claim against Freddie Mac did not travel with the shares.

*First*, unlike New York, Virginia does not have a statute abrogating the common-law's no-automatic-assignment rule.   To the contrary, Virginia's legislature has recognized that only certain claims *can* be assigned, and even then, there is no *automatic* assignment.  *See* Va. Code Ann. § 8.01-26 ("Only those causes of action for damage to real or personal property, whether such damage be direct or indirect, and causes of action ex contractu are assignable.").

*Second*, contrary to the district court's view, Virginia's UCC § 8-302 does not abrogate the common-law rule.   The only case interpreting Virginia's § 8-302 addresses issues concerning the title of shares.  *Day v. MCC Acquisition, LC*, 848 S.E.2d 800, 807 (Va. 2020) ("Given the clarity of the UCC's intended reach, we agree that '[t]he provisions of Article 8 relating to transfer are concerned with the transfer of title ....'" (citation omitted)).  That is consistent with the prevailing view that Article 8 was never intended as an assignment-of-claims provision but rather "primarily concerns issues of title, such as defenses against enforcement of ownership rights."  *Cheatham*, 137 N.E.3d at 52 (citation omitted).  Indeed, neither Plaintiffs nor the district court have ever identified any Virginia jurisprudence supporting the view that the claim here traveled to subsequent purchasers.

*Third*, interpreting Virginia's UCC to automatically assign claims would contradict Virginia's statutory directive to construe its UCC "to make uniform the law among the various jurisdictions." Va. Code § 8.1A-103(a)(3). "[I]t would be presumptuous and contrary to principles of comity" to adopt a travels-with-the-share interpretation of a state's UCC that "is contrary to most every state's own rule." *Pacific Life Insurance*, 2022 WL 1446552, at *13.

Thus, Plaintiffs who purchased Freddie Mac shares after the Third Amendment did not automatically acquire the implied covenant claim under Virginia law and accordingly lack standing.

**2.** Plaintiffs' implied covenant claim against Fannie Mae also did not travel with the shares under Delaware law.

Under Delaware's outlier interpretation of its UCC § 8-302, rights "in the security" travel with the share, but "personal rights" do not—and the rights at issue here are personal in nature under Delaware law. *Urdan v. WR Capital Partners, LLC*, 244 A.3d 668, 677 (Del. 2020). "Under Delaware law, 'the right to receive payment of a lawfully declared dividend is a separate property right of the record stockholders and, thus, is not a right "in the security"' that transfers with the sale of shares.'" *Sabby Volatility Warrant Master Fund Ltd. v. Jupiter Wellness, Inc.*, 2025 WL 1363171, at *2 (2d Cir. May 12, 2025) (quoting *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001)). Thus, in *Sabby*, the Second

Circuit held that "[t]he district court erred in holding that [a former shareholder] lost standing to pursue its breach of contract claim" seeking payment of dividends after it sold the shares. *Id.*

The present case is the flipside of *Sabby*—shareholders who bought shares *after* they lost value seek to recover the lost value that preceded their ownership. But this claim is "personal"—the *seller* held any claim to the losses, much like a seller whose shares lost value because of fraud. *Urdan*, 244 A.3d at 677 (personal claims include "a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud in connection with the purchase or sale of shares").

Here, there is no meaningful difference between a claim seeking payment of dividends (personal under Delaware law) and a claim seeking to recover the lost value of shares based on lost possible dividends. As in *Sabby*, if anyone had standing to assert a claim for such lost value, it is *former* shareholders who sold their shares *after* the price dropped, not purchasers who acquired the shares at a reduced price.

That conclusion is reinforced by the fact that the district court certified the classes under Rule 23(b)(3). "The personal nature of federal securities claims manifests itself in the fact that class certification generally must be obtained under Rule 23(b)(3)." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015); *see In re AMC Ent. Holdings, Inc. S'holder Litig.*, 299 A.3d 501, 530 n.164 (Del. Ch. 2023) (same); *Urdan*, 244 A.3d at 677-78 & nn.22, 26, 31. "By

53

contrast, because Delaware corporate law claims are [non-personal and] tied to the shares themselves, they are certified under Rules 23(b)(1) and (b)(2)." *In re Activision Blizzard*, 124 A.3d at 1056. That distinction makes sense. Unlike in class actions certified under Rule 23(b)(1) or (b)(2), members of a Rule 23(b)(3) class are entitled to "personal notice and an opportunity to opt out." *In re Telectronics Pacing Sys., Inc.*, 221 F.3d 870, 881 (6th Cir. 2000); *see* Fed. R. Civ. P. 23(c)(2)(B). If Plaintiffs' implied covenant claim is sufficiently personal that it requires individual class notice and an opportunity to opt out under Rule 23, it is likewise sufficiently personal that it does not travel with the shares under Delaware law.

Beyond that, "nothing in the record indicates that the market into which the Plaintiff sold its [shares] valued the potential breach-of-duty claim in the price of the stock." *Urdan*, 244 A.2d at 679 n.36 (quoting *I.A.T.S.E. Loc. No. One Pension Fund v. Gen. Elec. Co.*, 2016 WL 7100493, at *6 (Del. Ch. Dec. 6, 2016). Rather, "[t]he heavily discounted price of the security reflects its diminished value, so the buyer is not paying for any existing choses in action." Brief of *Amici Curiae* Commercial Law Professors, *Cheatham*, 2018 WL 4256793, at *31.

Thus, Plaintiffs who purchased Fannie Mae shares after the Third Amendment did not automatically acquire the implied covenant claim under Delaware law and accordingly lack standing.

**3.** The district court never seriously engaged with Virginia or Delaware law

on this issue.  The court initially adopted the "travels with the share" theory, in passing, in a single conclusory paragraph in its 2018 motion-to-dismiss ruling, in a context unrelated to standing.  There, the court stated, without elaboration, that Plaintiffs' claims "related to dividends and liquidation preferences traveled with the shares to subsequent purchasers."  *MTD Ruling II*, 2018 WL 4680197, at *8.  The court then relied on this cursory ruling throughout the case, never further analyzing Virginia or Delaware law.  *Class Cert. Ruling*, 2021 WL 5799379, at *8; *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 636 F. Supp. 3d 144, 158 (D.D.C. 2022).  At the Rule 50(b) stage, the court rejected this argument, without substantive analysis, based on "law of the case."  *Rule 50(b) Decision*, 2025 WL 823938, at *11.

Under longstanding settled law, the implied covenant claim here did not travel with the shares.  Thus, the claims of post-Third Amendment purchasers should be dismissed for lack of standing and the judgment reduced by an amount attributable to shares held by those post-Third Amendment purchasers.

## CONCLUSION

For the foregoing reasons, this Court should reverse and enter judgment for Defendants.

Dated: September 12, 2025

Respectfully submitted,

/s/ *Meaghan VerGow*
Meaghan VerGow
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
 (202) 383-5300
mvergow@omm.com

*Counsel for Defendant-Appellant*
*Fannie Mae*

/s/ *Michael J. Ciatti*
Michael J. Ciatti
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
 (202) 661-7828
mciatti@kslaw.com

*Counsel for Defendant-Appellant*
*Freddie Mac*

/s/ *John P. Elwood*
John P. Elwood
R. Stanton Jones
Anthony J. Franze
Orion de Nevers
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
John.Elwood@arnoldporter.com

*Counsel for Defendant-Appellant*
*Federal Housing Finance Agency*

**CERTIFICATE OF COMPLIANCE**

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the foregoing brief contains 12,989 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

Dated: September 12, 2025                    Respectfully submitted,

                                             */s/ John P. Elwood*
                                             John P. Elwood

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2025, I caused the foregoing document to be electronically filed using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 12, 2025            Respectfully submitted,

*/s/ John P. Elwood*
John P. Elwood

58

**STATUTORY ADDENDUM**

# TABLE OF CONTENTS

Page

12 U.S.C. § 4617. *Authority over critically undercapitalized regulated entities* ........................................................................Add. 1

### § 4617. Authority over critically undercapitalized regulated entities

**(a) Appointment of the Agency as conservator or receiver**

**(1) In general**

Notwithstanding any other provision of Federal or State law, the Director may appoint the Agency as conservator or receiver for a regulated entity in the manner provided under paragraph (2) or (4). All references to the conservator or receiver under this section are references to the Agency acting as conservator or receiver.

**(2) Discretionary appointment**

The Agency may, at the discretion of the Director, be appointed conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity.

**(3) Grounds for discretionary appointment of conservator or receiver**

The grounds for appointing conservator or receiver for any regulated entity under paragraph (2) are as follows:

**(A) Assets insufficient for obligations**

The assets of the regulated entity are less than the obligations of the regulated entity to its creditors and others.

**(B) Substantial dissipation**

Substantial dissipation of assets or earnings due to—

(i) any violation of any provision of Federal or State law; or

(ii) any unsafe or unsound practice.

**(C) Unsafe or unsound condition**

An unsafe or unsound condition to transact business.

**(D) Cease and desist orders**

Any willful violation of a cease and desist order that has become final.

**(E) Concealment**

Any concealment of the books, papers, records, or assets of the regulated entity, or any refusal to submit the books, papers, records, or affairs of the regulated entity, for inspection to any examiner or to any lawful agent of the Director.

**(F) Inability to meet obligations**

The regulated entity is likely to be unable to pay its obligations or meet the demands of its creditors in the normal course of business.

**(G) Losses**

The regulated entity has incurred or is likely to incur losses that will deplete all or substantially all of its capital, and there is no reasonable prospect for the regulated entity to become adequately capitalized (as defined in section 4614(a)(1) of this title).

**(H) Violations of law**

Any violation of any law or regulation, or any unsafe or unsound practice or condition that is likely to—

(i) cause insolvency or substantial dissipation of assets or earnings; or

(ii) weaken the condition of the regulated entity.

**(I) Consent**

The regulated entity, by resolution of its board of directors or its shareholders or members, consents to the appointment.

**(J) Undercapitalization**

The regulated entity is undercapitalized or significantly undercapitalized (as defined in section 4614(a)(3) of this title), and—

(i) has no reasonable prospect of becoming adequately capitalized;

(ii) fails to become adequately capitalized, as required by—

(I) section 4615(a)(1) of this title with respect to a regulated entity; or

(II) section 4616(a)(1) of this title with respect to a significantly undercapitalized regulated entity;

(iii) fails to submit a capital restoration plan acceptable to the Agency within the time prescribed under section 4622 of this title; or

(iv) materially fails to implement a capital restoration plan submitted and accepted under section 4622 of this title.

**(K) Critical undercapitalization**

The regulated entity is critically undercapitalized, as defined in section 4614(a)(4) of this title.

**(L) Money laundering**

The Attorney General notifies the Director in writing that the regulated entity has been found guilty of a criminal offense under section 1956 or 1957 of title 18 or section 5322 or 5324 of title 31.

**(4) Mandatory receivership**

**(A) In general**

The Director shall appoint the Agency as receiver for a regulated entity if the Director determines, in writing, that—

(i) the assets of the regulated entity are, and during the preceding 60 calendar days have been, less than the obligations of the regulated entity to its creditors and others; or

(ii) the regulated entity is not, and during the preceding 60 calendar days has not been, generally paying the debts of the regulated entity (other than debts that are the subject of a bona fide dispute) as such debts become due.

**(B) Periodic determination required for critically undercapitalized regulated entity**

If a regulated entity is critically undercapitalized, the Director shall make a determination, in writing, as to whether the regulated entity meets the criteria specified in clause (i) or (ii) of subparagraph (A)—

(i) not later than 30 calendar days after the regulated entity initially becomes critically undercapitalized; and

(ii) at least once during each succeeding 30-calendar day period.

**(C) Determination not required if receivership already in place**

Subparagraph (B) does not apply with respect to a regulated entity in any period

during which the Agency serves as receiver for the regulated entity.

**(D) Receivership terminates conservatorship**

The appointment of the Agency as receiver of a regulated entity under this section shall immediately terminate any conservatorship established for the regulated entity under this chapter.

**(5) Judicial review**

**(A) In general**

If the Agency is appointed conservator or receiver under this section, the regulated entity may, within 30 days of such appointment, bring an action in the United States district court for the judicial district in which the home office of such regulated entity is located, or in the United States District Court for the District of Columbia, for an order requiring the Agency to remove itself as conservator or receiver.

**(B) Review**

Upon the filing of an action under subparagraph (A), the court shall, upon the merits, dismiss such action or direct the Agency to remove itself as such conservator or receiver.

**(6) Directors not liable for acquiescing in appointment of conservator or receiver**

The members of the board of directors of a regulated entity shall not be liable to the shareholders or creditors of the regulated entity for acquiescing in or consenting in good faith to the appointment of the Agency as conservator or receiver for that regulated entity.

**(7) Agency not subject to any other Federal agency**

When acting as conservator or receiver, the Agency shall not be subject to the direction or supervision of any other agency of the United States or any State in the exercise of the rights, powers, and privileges of the Agency.

**(b) Powers and duties of the Agency as conservator or receiver**

**(1) Rulemaking authority of the agency**

The Agency may prescribe such regulations as the Agency determines to be appropriate regarding the conduct of conservatorships or receiverships.

**(2) General powers**

**(A) Successor to regulated entity**

The Agency shall, as conservator or receiver, and by operation of law, immediately succeed to—

(i) all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity; and

(ii) title to the books, records, and assets of any other legal custodian of such regulated entity.

**(B) Operate the regulated entity**

The Agency may, as conservator or receiver—

(i) take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity;

(ii) collect all obligations and money due the regulated entity;

(iii) perform all functions of the regulated entity in the name of the regulated entity which are consistent with the appointment as conservator or receiver;

(iv) preserve and conserve the assets and property of the regulated entity; and

(v) provide by contract for assistance in fulfilling any function, activity, action, or duty of the Agency as conservator or receiver.

**(C) Functions of officers, directors, and shareholders of a regulated entity**

The Agency may, by regulation or order, provide for the exercise of any function by any stockholder, director, or officer of any regulated entity for which the Agency has been named conservator or receiver.

**(D) Powers as conservator**

The Agency may, as conservator, take such action as may be—

(i) necessary to put the regulated entity in a sound and solvent condition; and

(ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.

**(E) Additional powers as receiver**

In any case in which the Agency is acting as receiver, the Agency shall place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity in such manner as the Agency deems appropriate, including through the sale of assets, the transfer of assets to a limited-life regulated entity established under subsection (i), or the exercise of any other rights or privileges granted to the Agency under this paragraph.

**(F) Organization of new enterprise**

The Agency may, as receiver for an enterprise, organize a successor enterprise that will operate pursuant to subsection (i).

**(G) Transfer or sale of assets and liabilities**

The Agency may, as conservator or receiver, transfer or sell any asset or liability of the regulated entity in default, and may do so without any approval, assignment, or consent with respect to such transfer or sale.

**(H) Payment of valid obligations**

The Agency, as conservator or receiver, shall, to the extent of proceeds realized from the performance of contracts or sale of the assets of a regulated entity, pay all valid obligations of the regulated entity that are due and payable at the time of the appointment of the Agency as conservator or receiver, in accordance with the prescriptions and limitations of this section.

**(I) Subpoena authority**

**(i) In general**

**(I) Agency authority**

The Agency may, as conservator or receiver, and for purposes of carrying out any power, authority, or duty with respect to a regulated entity (including determining any claim against the regulated entity and determining and realizing upon any asset of any person in the course of collecting money due the regulated entity), exercise any power established under section 4588 of this title.

**(II) Applicability of law**

The provisions of section 4588 of this title shall apply with respect to the exercise of any power under this subparagraph, in the same manner as such provisions apply under that section.

**(ii) Subpoena**

A subpoena or subpoena duces tecum may be issued under clause (i) only by, or with the written approval of, the Director, or the designee of the Director.

**(iii) Rule of construction**

This subsection shall not be construed to limit any rights that the Agency, in any capacity, might otherwise have under section 4517 or 4639 of this title.

**(J) Incidental powers**

The Agency may, as conservator or receiver—

(i) exercise all powers and authorities specifically granted to conservators or receivers, respectively, under this section, and such incidental powers as shall be necessary to carry out such powers; and

(ii) take any action authorized by this section, which the Agency determines is in the best interests of the regulated entity or the Agency.

**(K) Other provisions**

**(i) Shareholders and creditors of failed regulated entity**

Notwithstanding any other provision of law, the appointment of the Agency as receiver for a regulated entity pursuant to paragraph (2) or (4) of subsection (a) and its succession, by operation of law, to the rights, titles, powers, and privileges described in subsection (b)(2)(A) shall terminate all rights and claims that the stockholders and creditors of the regulated entity may have against the assets or charter of the regulated entity or the Agency arising as a result of their status as stockholders or creditors, except for their right to payment, resolution, or other satisfaction of their claims, as permitted under subsections (b)(9), (c), and (e).

**(ii) Assets of regulated entity**

Notwithstanding any other provision of law, for purposes of this section, the charter of a regulated entity shall not be considered an asset of the regulated entity.

**(3) Authority of receiver to determine claims**

**(A) In general**

The Agency may, as receiver, determine claims in accordance with the requirements of this subsection and any regulations prescribed under paragraph (4).

**(B) Notice requirements**

The receiver, in any case involving the liquidation or winding up of the affairs of a closed regulated entity, shall—

(i) promptly publish a notice to the creditors of the regulated entity to present their claims, together with proof, to the receiver by a date specified in the notice which shall be not less than 90 days after the date of publication of such notice; and

(ii) republish such notice approximately 1 month and 2 months, respectively, after the date of publication under clause (i).

**(C) Mailing required**

The receiver shall mail a notice similar to the notice published under subparagraph (B)(i) at the time of such publication to any creditor shown on the books of the regulated entity—

(i) at the last address of the creditor appearing in such books; or

(ii) upon discovery of the name and address of a claimant not appearing on the books of the regulated entity, within 30 days after the discovery of such name and address.

**(4) Rulemaking authority relating to determination of claims**

Subject to subsection (c), the Director may prescribe regulations regarding the allowance or disallowance of claims by the receiver and providing for administrative determination of claims and review of such determination.

**(5) Procedures for determination of claims**

**(A) Determination period**

**(i) In general**

Before the end of the 180-day period beginning on the date on which any claim against a regulated entity is filed with the Agency as receiver, the Agency shall determine whether to allow or disallow the claim and shall notify the claimant of any determination with respect to such claim.

**(ii) Extension of time**

The period described in clause (i) may be extended by a written agreement between the claimant and the Agency.

**(iii) Mailing of notice sufficient**

The requirements of clause (i) shall be deemed to be satisfied if the notice of any determination with respect to any claim is mailed to the last address of the claimant which appears—

(I) on the books of the regulated entity;

(II) in the claim filed by the claimant; or

(III) in documents submitted in proof of the claim.

**(iv) Contents of notice of disallowance**

If any claim filed under clause (i) is disallowed, the notice to the claimant shall contain—

(I) a statement of each reason for the disallowance; and

(II) the procedures available for obtaining agency review of the determination to disallow the claim or judicial determination of the claim.

**(B) Allowance of proven claim**

The receiver shall allow any claim received on or before the date specified in the notice published under paragraph (3)(B)(i) by the receiver from any claimant which is proved to the satisfaction of the receiver.

**(C) Disallowance of claims filed after filing period**

Claims filed after the date specified in the notice published under paragraph (3)(B)(i), or the date specified under paragraph (3)(C), shall be disallowed and such disallowance shall be final.

**(D) Authority to disallow claims**

**(i) In general**

The receiver may disallow any portion of any claim by a creditor or claim of security, preference, or priority which is not proved to the satisfaction of the receiver.

**(ii) Payments to less than fully secured creditors**

In the case of a claim of a creditor against a regulated entity which is secured by any property or other asset of such regulated entity, the receiver—

(I) may treat the portion of such claim which exceeds an amount equal to the fair market value of such property or other asset as an unsecured claim against the regulated entity; and

(II) may not make any payment with respect to such unsecured portion of the claim, other than in connection with the disposition of all claims of unsecured creditors of the regulated entity.

**(iii) Exceptions**

No provision of this paragraph shall apply with respect to—

(I) any extension of credit from any Federal Reserve Bank, Federal Home Loan Bank, or the United States Treasury; or

(II) any security interest in the assets of the regulated entity securing any such extension of credit.

**(E) No judicial review of determination pursuant to subparagraph (D)**

No court may review the determination of the Agency under subparagraph (D) to disallow a claim.

**(F) Legal effect of filing**

**(i) Statute of limitation tolled**

For purposes of any applicable statute of limitations, the filing of a claim with the receiver shall constitute a commencement of an action.

**(ii) No prejudice to other actions**

Subject to paragraph (10), the filing of a claim with the receiver shall not prejudice any right of the claimant to continue any action which was filed before the date of the appointment of the receiver, subject to the determination of claims by the receiver.

**(6) Provision for judicial determination of claims**

**(A) In general**

The claimant may file suit on a claim (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States for the district within which the principal place of business of the regulated entity is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim), before the end of the 60-day period beginning on the earlier of—

(i) the end of the period described in paragraph (5)(A)(i) with respect to any claim against a regulated entity for which the Agency is receiver; or

(ii) the date of any notice of disallowance of such claim pursuant to paragraph (5)(A)(i).

**(B) Statute of limitations**

A claim shall be deemed to be disallowed (other than any portion of such claim which was allowed by the receiver), and such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such claim, if the claimant fails, before the end of the 60-day period described under subparagraph (A), to file suit on such claim (or continue an action commenced before the appointment of the receiver).

**(7) Review of claims**

**(A) Other review procedures**

**(i) In general**

The Agency shall establish such alternative dispute resolution processes as may be appropriate for the resolution of claims filed under paragraph (5)(A)(i).

**(ii) Criteria**

In establishing alternative dispute resolution processes, the Agency shall strive for procedures which are expeditious, fair, independent, and low cost.

**(iii) Voluntary binding or nonbinding procedures**

The Agency may establish both binding and nonbinding processes under this subparagraph, which may be conducted by any government or private party. All parties, including the claimant and the Agency, must agree to the use of the process in a particular case.

**(B) Consideration of incentives**

The Agency shall seek to develop incentives for claimants to participate in the alternative dispute resolution process.

**(8) Expedited determination of claims**

**(A) Establishment required**

The Agency shall establish a procedure for expedited relief outside of the routine claims process established under paragraph (5) for claimants who—

(i) allege the existence of legally valid and enforceable or perfected security interests in assets of any regulated entity for which the Agency has been appointed receiver; and

(ii) allege that irreparable injury will occur if the routine claims procedure is followed.

**(B) Determination period**

Before the end of the 90-day period beginning on the date on which any claim is filed in accordance with the procedures established under subparagraph (A), the Director shall—

(i) determine—

(I) whether to allow or disallow such claim; or

(II) whether such claim should be determined pursuant to the procedures established under paragraph (5); and

(ii) notify the claimant of the determination, and if the claim is disallowed, provide a statement of each reason for the disallowance and the procedure for obtaining agency review or judicial determination.

**(C) Period for filing or renewing suit**

Any claimant who files a request for expedited relief shall be permitted to file a suit, or to continue a suit filed before the date of appointment of the receiver, seeking a determination of the rights of the claimant with respect to such security interest after the earlier of—

(i) the end of the 90-day period beginning on the date of the filing of a request for expedited relief; or

(ii) the date on which the Agency denies the claim.

**(D) Statute of limitations**

If an action described under subparagraph (C) is not filed, or the motion to renew a previously filed suit is not made, before the end of the 30-day period beginning on the date on which such action or motion may be filed under subparagraph (B), the claim shall be deemed to be disallowed as of the end of such period (other than any portion of such claim which was allowed by the receiver), such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such claim.

**(E) Legal effect of filing**

**(i) Statute of limitation tolled**

For purposes of any applicable statute of limitations, the filing of a claim with the receiver shall constitute a commencement of an action.

**(ii) No prejudice to other actions**

Subject to paragraph (10), the filing of a claim with the receiver shall not prejudice

any right of the claimant to continue any action that was filed before the appointment of the receiver, subject to the determination of claims by the receiver.

**(9) Payment of claims**

**(A) In general**

The receiver may, in the discretion of the receiver, and to the extent that funds are available from the assets of the regulated entity, pay creditor claims, in such manner and amounts as are authorized under this section, which are—

(i) allowed by the receiver;

(ii) approved by the Agency pursuant to a final determination pursuant to paragraph (7) or (8); or

(iii) determined by the final judgment of any court of competent jurisdiction.

**(B) Agreements against the interest of the Agency**

No agreement that tends to diminish or defeat the interest of the Agency in any asset acquired by the Agency as receiver under this section shall be valid against the Agency unless such agreement is in writing and executed by an authorized officer or representative of the regulated entity.

**(C) Payment of dividends on claims**

The receiver may, in the sole discretion of the receiver, pay from the assets of the regulated entity dividends on proved claims at any time, and no liability shall attach to the Agency by reason of any such payment, for failure to pay dividends to a claimant whose claim is not proved at the time of any such payment.

**(D) Rulemaking authority of the Director**

The Director may prescribe such rules, including definitions of terms, as the Director deems appropriate to establish a single uniform interest rate for, or to make payments of post-insolvency interest to creditors holding proven claims against the receivership estates of the regulated entity, following satisfaction by the receiver of the principal amount of all creditor claims.

**(10) Suspension of legal actions**

**(A) In general**

After the appointment of a conservator or receiver for a regulated entity, the conservator or receiver may, in any judicial action or proceeding to which such regulated entity is or becomes a party, request a stay for a period not to exceed—

(i) 45 days, in the case of any conservator; and

(ii) 90 days, in the case of any receiver.

**(B) Grant of stay by all courts required**

Upon receipt of a request by the conservator or receiver under subparagraph (A) for a stay of any judicial action or proceeding in any court with jurisdiction of such action or proceeding, the court shall grant such stay as to all parties.

**(11) Additional rights and duties**

**(A) Prior final adjudication**

The Agency shall abide by any final unappealable judgment of any court of competent jurisdiction which was rendered before the appointment of the Agency as conservator or receiver.

**(B) Rights and remedies of conservator or receiver**

In the event of any appealable judgment, the Agency as conservator or receiver—

(i) shall have all of the rights and remedies available to the regulated entity (before the appointment of such conservator or receiver) and the Agency, including removal to Federal court and all appellate rights; and

(ii) shall not be required to post any bond in order to pursue such remedies.

**(C) No attachment or execution**

No attachment or execution may issue by any court upon assets in the possession of the receiver, or upon the charter, of a regulated entity for which the Agency has been appointed receiver.

**(D) Limitation on judicial review**

Except as otherwise provided in this subsection, no court shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets or charter of any regulated entity for which the Agency has been appointed receiver; or

(ii) any claim relating to any act or omission of such regulated entity or the Agency as receiver.

**(E) Disposition of assets**

In exercising any right, power, privilege, or authority as conservator or receiver in connection with any sale or disposition of assets of a regulated entity for which the Agency has been appointed conservator or receiver, the Agency shall conduct its operations in a manner which—

(i) maximizes the net present value return from the sale or disposition of such assets;

(ii) minimizes the amount of any loss realized in the resolution of cases; and

(iii) ensures adequate competition and fair and consistent treatment of offerors.

**(12) Statute of limitations for actions brought by conservator or receiver**

**(A) In general**

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Agency as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—

(I) the 6-year period beginning on the date on which the claim accrues; or

(II) the period applicable under State law; and

(ii) in the case of any tort claim, the longer of—

(I) the 3-year period beginning on the date on which the claim accrues; or

(II) the period applicable under State law.

**(B) Determination of the date on which a claim accrues**

For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of—

(i) the date of the appointment of the Agency as conservator or receiver; or

(ii) the date on which the cause of action accrues.

**(13) Revival of expired state causes of action**

**(A) In general**

In the case of any tort claim described under clause (ii) for which the statute of limitations applicable under State law with respect to such claim has expired not more than 5 years before the appointment of the Agency as conservator or receiver, the Agency may bring an action as conservator or receiver on such claim without regard to the expiration of the statute of limitations applicable under State law.

**(B) Claims described**

A tort claim referred to under clause (i) is a claim arising from fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to the regulated entity.

**(14) Accounting and recordkeeping requirements**

**(A) In general**

The Agency as conservator or receiver shall, consistent with the accounting and reporting practices and procedures established by the Agency, maintain a full accounting of each conservatorship and receivership or other disposition of a regulated entity in default.

**(B) Annual accounting or report**

With respect to each conservatorship or receivership, the Agency shall make an annual accounting or report available to the Board, the Comptroller General of the United States, the Committee on Banking, Housing, and Urban Affairs of the Senate, and the Committee on Financial Services of the House of Representatives.

**(C) Availability of reports**

Any report prepared under subparagraph (B) shall be made available by the Agency upon request to any shareholder of a regulated entity or any member of the public.

**(D) Recordkeeping requirement**

After the end of the 6-year period beginning on the date on which the conservatorship or receivership is terminated by the Director, the Agency may destroy any records of such regulated entity which the Agency, in the discretion of the Agency, determines to be unnecessary, unless directed not to do so by a court of competent jurisdiction or governmental agency, or prohibited by law.

**(15) Fraudulent transfers**

**(A) In general**

The Agency, as conservator or receiver, may avoid a transfer of any interest of an entity-affiliated party, or any person determined by the conservator or receiver to be a debtor of the regulated entity, in property, or any obligation incurred by such party or person, that was made within 5 years of the date on which the Agency was appointed conservator or receiver, if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the regulated entity, the Agency, the conservator, or receiver.

**(B) Right of recovery**

To the extent a transfer is avoided under subparagraph (A), the conservator or receiver may recover, for the benefit of the regulated entity, the property transferred, or, if a court so orders, the value of such property (at the time of such transfer) from—

(i) the initial transferee of such transfer or the entity-affiliated party or person for whose benefit such transfer was made; or

(ii) any immediate or mediate transferee of any such initial transferee.

**(C) Rights of transferee or obligee**

The conservator or receiver may not recover under subparagraph (B) from—

(i) any transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith; or

(ii) any immediate or mediate good faith transferee of such transferee.

**(D) Rights under this paragraph**

The rights under this paragraph of the conservator or receiver described under subparagraph (A) shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under title 11.

**(16) Attachment of assets and other injunctive relief**

Subject to paragraph (17), any court of competent jurisdiction may, at the request of the conservator or receiver, issue an order in accordance with rule 65 of the Federal Rules of Civil Procedure, including an order placing the assets of any person designated by the conservator or receiver under the control of the court, and appointing a trustee to hold such assets.

**(17) Standards of proof**

Rule 65 of the Federal Rules of Civil Procedure shall apply with respect to any proceeding under paragraph (16) without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.

**(18) Treatment of claims arising from breach of contracts executed by the conservator or receiver**

**(A) In general**

Notwithstanding any other provision of this subsection, any final and unappealable judgment for monetary damages entered against the conservator or receiver for the

breach of an agreement executed or approved in writing by the conservator or receiver after the date of its appointment, shall be paid as an administrative expense of the conservator or receiver.

**(B) No limitation of power**

Nothing in this paragraph shall be construed to limit the power of the conservator or receiver to exercise any rights under contract or law, including to terminate, breach, cancel, or otherwise discontinue such agreement.

**(19) General exceptions**

**(A) Limitations**

The rights of the conservator or receiver appointed under this section shall be subject to the limitations on the powers of a receiver under sections 4402 through 4407 of this title.[1]

**(B) Mortgages held in trust**

**(i) In general**

Any mortgage, pool of mortgages, or interest in a pool of mortgages held in trust, custodial, or agency capacity by a regulated entity for the benefit of any person other than the regulated entity shall not be available to satisfy the claims of creditors generally, except that nothing in this clause shall be construed to expand or otherwise affect the authority of any regulated entity.

**(ii) Holding of mortgages**

Any mortgage, pool of mortgages, or interest in a pool of mortgages described in clause (i) shall be held by the conservator or receiver appointed under this section for the beneficial owners of such mortgage, pool of mortgages, or interest in accordance with the terms of the agreement creating such trust, custodial, or other agency arrangement.

**(iii) Liability of conservator or receiver**

The liability of the conservator or receiver appointed under this section for damages shall, in the case of any contingent or unliquidated claim relating to the mortgages held in trust, be estimated in accordance with the regulations of the Director.

**(c) Priority of expenses and unsecured claims**

**(1) In general**

Unsecured claims against a regulated entity, or the receiver therefor, that are proven to the satisfaction of the receiver shall have priority in the following order:

(A) Administrative expenses of the receiver.

(B) Any other general or senior liability of the regulated entity (which is not a liability described under subparagraph (C) or (D).[2]

(C) Any obligation subordinated to general creditors (which is not an obligation described under subparagraph (D)).

(D) Any obligation to shareholders or members arising as a result of their status as shareholder or members.

**(2) Creditors similarly situated**

All creditors that are similarly situated under paragraph (1) shall be treated in a similar manner, except that the receiver may take any action (including making payments) that does not comply with this subsection, if—

(A) the Director determines that such action is necessary to maximize the value of the assets of the regulated entity, to maximize the present value return from the sale or other disposition of the assets of the regulated entity, or to minimize the amount of any loss realized upon the sale or other disposition of the assets of the regulated entity; and

(B) all creditors that are similarly situated under paragraph (1) receive not less than the amount provided in subsection (e)(2).

**(3) Definition**

As used in this subsection, the term "administrative expenses of the receiver" includes—

(A) the actual, necessary costs and expenses incurred by the receiver in preserving the assets of a failed regulated entity or liquidating or otherwise resolving the affairs of a failed regulated entity; and

(B) any obligations that the receiver determines are necessary and appropriate to facilitate the smooth and orderly liquidation or other resolution of the regulated entity.

**(d) Provisions relating to contracts entered into before appointment of conservator or receiver**

**(1) Authority to repudiate contracts**

In addition to any other rights a conservator or receiver may have, the conservator or receiver for any regulated entity may disaffirm or repudiate any contract or lease—

(A) to which such regulated entity is a party;

(B) the performance of which the conservator or receiver, in its sole discretion, determines to be burdensome; and

(C) the disaffirmance or repudiation of which the conservator or receiver determines, in its sole discretion, will promote the orderly administration of the affairs of the regulated entity.

**(2) Timing of repudiation**

The conservator or receiver shall determine whether or not to exercise the rights of repudiation under this subsection within a reasonable period following such appointment.

**(3) Claims for damages for repudiation**

**(A) In general**

Except as otherwise provided under subparagraph (C) and paragraphs (4), (5), and (6), the liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be—

(i) limited to actual direct compensatory damages; and

(ii) determined as of—

---

[1] See References in Text note below.

[2] So in original. A second closing parenthesis probably should precede the period.

(I) the date of the appointment of the conservator or receiver; or

(II) in the case of any contract or agreement referred to in paragraph (8), the date of the disaffirmance or repudiation of such contract or agreement.

**(B) No liability for other damages**

For purposes of subparagraph (A), the term "actual direct compensatory damages" shall not include—

(i) punitive or exemplary damages;

(ii) damages for lost profits or opportunity; or

(iii) damages for pain and suffering.

**(C) Measure of damages for repudiation of financial contracts**

In the case of any qualified financial contract or agreement to which paragraph (8) applies, compensatory damages shall be—

(i) deemed to include normal and reasonable costs of cover or other reasonable measures of damages utilized in the industries for such contract and agreement claims; and

(ii) paid in accordance with this subsection and subsection (e), except as otherwise specifically provided in this section.

**(4) Leases under which the regulated entity is the lessee**

**(A) In general**

If the conservator or receiver disaffirms or repudiates a lease under which the regulated entity was the lessee, the conservator or receiver shall not be liable for any damages (other than damages determined under subparagraph (B)) for the disaffirmance or repudiation of such lease.

**(B) Payments of rent**

Notwithstanding subparagraph (A), the lessor under a lease to which that subparagraph applies shall—

(i) be entitled to the contractual rent accruing before the later of the date on which—

(I) the notice of disaffirmance or repudiation is mailed; or

(II) the disaffirmance or repudiation becomes effective, unless the lessor is in default or breach of the terms of the lease;

(ii) have no claim for damages under any acceleration clause or other penalty provision in the lease; and

(iii) have a claim for any unpaid rent, subject to all appropriate offsets and defenses, due as of the date of the appointment, which shall be paid in accordance with this subsection and subsection (e).

**(5) Leases under which the regulated entity is the lessor**

**(A) In general**

If the conservator or receiver repudiates an unexpired written lease of real property of the regulated entity under which the regulated entity is the lessor and the lessee is not, as of the date of such repudiation, in default, the lessee under such lease may either—

(i) treat the lease as terminated by such repudiation; or

(ii) remain in possession of the leasehold interest for the balance of the term of the lease, unless the lessee defaults under the terms of the lease after the date of such repudiation.

**(B) Provisions applicable to lessee remaining in possession**

If any lessee under a lease described under subparagraph (A) remains in possession of a leasehold interest under clause (ii) of subparagraph (A)—

(i) the lessee—

(I) shall continue to pay the contractual rent pursuant to the terms of the lease after the date of the repudiation of such lease; and

(II) may offset against any rent payment which accrues after the date of the repudiation of the lease, and any damages which accrue after such date due to the nonperformance of any obligation of the regulated entity under the lease after such date; and

(ii) the conservator or receiver shall not be liable to the lessee for any damages arising after such date as a result of the repudiation, other than the amount of any offset allowed under clause (i)(II).

**(6) Contracts for the sale of real property**

**(A) In general**

If the conservator or receiver repudiates any contract for the sale of real property and the purchaser of such real property under such contract is in possession and is not, as of the date of such repudiation, in default, such purchaser may either—

(i) treat the contract as terminated by such repudiation; or

(ii) remain in possession of such real property.

**(B) Provisions applicable to purchaser remaining in possession**

If any purchaser of real property under any contract described under subparagraph (A) remains in possession of such property under clause (ii) of subparagraph (A)—

(i) the purchaser—

(I) shall continue to make all payments due under the contract after the date of the repudiation of the contract; and

(II) may offset against any such payments any damages which accrue after such date due to the nonperformance (after such date) of any obligation of the regulated entity under the contract; and

(ii) the conservator or receiver shall—

(I) not be liable to the purchaser for any damages arising after such date as a result of the repudiation, other than the amount of any offset allowed under clause (i)(II);

(II) deliver title to the purchaser in accordance with the provisions of the contract; and

(III) have no obligation under the contract other than the performance required under subclause (II).

**(C) Assignment and sale allowed**

**(i) In general**

No provision of this paragraph shall be construed as limiting the right of the conservator or receiver to assign the contract described under subparagraph (A), and sell the property subject to the contract and the provisions of this paragraph.

**(ii) No liability after assignment and sale**

If an assignment and sale described under clause (i) is consummated, the conservator or receiver shall have no further liability under the contract described under subparagraph (A), or with respect to the real property which was the subject of such contract.

**(7) Service contracts**

**(A) Services performed before appointment**

In the case of any contract for services between any person and any regulated entity for which the Agency has been appointed conservator or receiver, any claim of such person for services performed before the appointment of the conservator or receiver shall be—

(i) a claim to be paid in accordance with subsections (b) and (e); and

(ii) deemed to have arisen as of the date on which the conservator or receiver was appointed.

**(B) Services performed after appointment and prior to repudiation**

If, in the case of any contract for services described under subparagraph (A), the conservator or receiver accepts performance by the other person before the conservator or receiver makes any determination to exercise the right of repudiation of such contract under this section—

(i) the other party shall be paid under the terms of the contract for the services performed; and

(ii) the amount of such payment shall be treated as an administrative expense of the conservatorship or receivership.

**(C) Acceptance of performance no bar to subsequent repudiation**

The acceptance by the conservator or receiver of services referred to under subparagraph (B) in connection with a contract described in such subparagraph shall not affect the right of the conservator or receiver to repudiate such contract under this section at any time after such performance.

**(8) Certain qualified financial contracts**

**(A) Rights of parties to contracts**

Subject to paragraphs (9) and (10), and notwithstanding any other provision of this chapter (other than subsection (b)(9)(B) of this section), any other Federal law, or the law of any State, no person shall be stayed or prohibited from exercising—

(i) any right of that person to cause the termination, liquidation, or acceleration of any qualified financial contract with a regulated entity that arises upon the appointment of the Agency as receiver for such regulated entity at any time after such appointment;

(ii) any right under any security agreement or arrangement or other credit enhancement relating to one or more qualified financial contracts; or

(iii) any right to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more contracts and agreements described in clause (i), including any master agreement for such contracts or agreements.

**(B) Applicability of other provisions**

Subsection (b)(10) shall apply in the case of any judicial action or proceeding brought against any receiver referred to under subparagraph (A), or the regulated entity for which such receiver was appointed, by any party to a contract or agreement described under subparagraph (A)(i) with such regulated entity.

**(C) Certain transfers not avoidable**

**(i) In general**

Notwithstanding paragraph (11), or any other provision of Federal or State law relating to the avoidance of preferential or fraudulent transfers, the Agency, whether acting as such or as conservator or receiver of a regulated entity, may not avoid any transfer of money or other property in connection with any qualified financial contract with a regulated entity.

**(ii) Exception for certain transfers**

Clause (i) shall not apply to any transfer of money or other property in connection with any qualified financial contract with a regulated entity if the Agency determines that the transferee had actual intent to hinder, delay, or defraud such regulated entity, the creditors of such regulated entity, or any conservator or receiver appointed for such regulated entity.

**(D) Certain contracts and agreements defined**

In this subsection the following definitions shall apply:

**(i) Qualified financial contract**

The term "qualified financial contract" means any securities contract, commodity contract, forward contract, repurchase agreement, swap agreement, and any similar agreement that the Agency determines by regulation, resolution, or order to be a qualified financial contract for purposes of this paragraph.

**(ii) Securities contract**

The term "securities contract"—

(I) means a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, or any interest in a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein (including any interest therein or based on the value thereof) or any option on any

of the foregoing, including any option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option, and including any repurchase or reverse repurchase transaction on any such security, certificate of deposit, mortgage loan, interest, group or index, or option;

(II) does not include any purchase, sale, or repurchase obligation under a participation in a commercial mortgage loan, unless the Agency determines by regulation, resolution, or order to include any such agreement within the meaning of such term;

(III) means any option entered into on a national securities exchange relating to foreign currencies;

(IV) means the guarantee by or to any securities clearing agency of any settlement of cash, securities, certificates of deposit, mortgage loans or interests therein, group or index of securities, certificates of deposit, or mortgage loans or interests therein (including any interest therein or based on the value thereof) or option on any of the foregoing, including any option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option;

(V) means any margin loan;

(VI) means any other agreement or transaction that is similar to any agreement or transaction referred to in this clause;

(VII) means any combination of the agreements or transactions referred to in this clause;

(VIII) means any option to enter into any agreement or transaction referred to in this clause;

(IX) means a master agreement that provides for an agreement or transaction referred to in subclause (I), (III), (IV), (V), (VI), (VII), or (VIII), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this clause, except that the master agreement shall be considered to be a securities contract under this clause only with respect to each agreement or transaction under the master agreement that is referred to in subclause (I), (III), (IV), (V), (VI), (VII), or (VIII); and

(X) means any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this clause, including any guarantee or reimbursement obligation in connection with any agreement or transaction referred to in this clause.

**(iii) Commodity contract**

The term ''commodity contract'' means—

(I) with respect to a futures commission merchant, a contract for the pur-

chase or sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade;

(II) with respect to a foreign futures commission merchant, a foreign future;

(III) with respect to a leverage transaction merchant, a leverage transaction;

(IV) with respect to a clearing organization, a contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade that is cleared by such clearing organization, or commodity option traded on, or subject to the rules of, a contract market or board of trade that is cleared by such clearing organization;

(V) with respect to a commodity options dealer, a commodity option;

(VI) any other agreement or transaction that is similar to any agreement or transaction referred to in this clause;

(VII) any combination of the agreements or transactions referred to in this clause;

(VIII) any option to enter into any agreement or transaction referred to in this clause;

(IX) a master agreement that provides for an agreement or transaction referred to in subclause (I), (II), (III), (IV), (V), (VI), (VII), or (VIII), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a commodity contract under this clause, except that the master agreement shall be considered to be a commodity contract under this clause only with respect to each agreement or transaction under the master agreement that is referred to in subclause (I), (II), (III), (IV), (V), (VI), (VII), or (VIII); or

(X) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this clause, including any guarantee or reimbursement obligation in connection with any agreement or transaction referred to in this clause.

**(iv) Forward contract**

The term ''forward contract'' means—

(I) a contract (other than a commodity contract) for the purchase, sale, or transfer of a commodity or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than 2 days after the date on which the contract is entered into, including a repurchase transaction, reverse repurchase transaction, consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement;

(II) any combination of agreements or transactions referred to in subclauses (I) and (III);

(III) any option to enter into any agreement or transaction referred to in subclause (I) or (II);

(IV) a master agreement that provides for an agreement or transaction referred to in subclauses (I), (II), or (III), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a forward contract under this clause, except that the master agreement shall be considered to be a forward contract under this clause only with respect to each agreement or transaction under the master agreement that is referred to in subclause (I), (II), or (III); or

(V) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in subclause (I), (II), (III), or (IV), including any guarantee or reimbursement obligation in connection with any agreement or transaction referred to in any such subclause.

**(v) Repurchase agreement**

The term "repurchase agreement" (including a reverse repurchase agreement)—

(I) means an agreement, including related terms, which provides for the transfer of one or more certificates of deposit, mortgage-related securities (as such term is defined in section 78c of title 15), mortgage loans, interests in mortgage-related securities or mortgage loans, eligible bankers' acceptances, qualified foreign government securities (defined for purposes of this clause as a security that is a direct obligation of, or that is fully guaranteed by, the central government of a member of the Organization for Economic Cooperation and Development, as determined by regulation or order adopted by the appropriate Federal banking authority), or securities that are direct obligations of, or that are fully guaranteed by, the United States or any agency of the United States against the transfer of funds by the transferee of such certificates of deposit, eligible bankers' acceptances, securities, mortgage loans, or interests with a simultaneous agreement by such transferee to transfer to the transferor thereof certificates of deposit, eligible bankers' acceptances, securities, mortgage loans, or interests as described above, at a date certain not later than 1 year after such transfers or on demand, against the transfer of funds, or any other similar agreement;

(II) does not include any repurchase obligation under a participation in a commercial mortgage loan, unless the Agency determines by regulation, resolution, or order to include any such participation within the meaning of this term;

(III) means any combination of agreements or transactions referred to in subclauses (I) and (IV);

(IV) means any option to enter into any agreement or transaction referred to in subclause (I) or (III);

(V) means a master agreement that provides for an agreement or transaction referred to in subclause (I), (III), or (IV), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a repurchase agreement under this clause, except that the master agreement shall be considered to be a repurchase agreement under this subclause only with respect to each agreement or transaction under the master agreement that is referred to in subclause (I), (III), or (IV); and

(VI) means any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in subclause (I), (III), (IV), or (V), including any guarantee or reimbursement obligation in connection with any agreement or transaction referred to in any such subclause.

**(vi) Swap agreement**

The term "swap agreement" means—

(I) any agreement, including the terms and conditions incorporated by reference in any such agreement, which is an interest rate swap, option, future, or forward agreement, including a rate floor, rate cap, rate collar, cross-currency rate swap, and basis swap; a spot, same day-tomorrow, tomorrow-next, forward, or other foreign exchange or precious metals agreement; a currency swap, option, future, or forward agreement; an equity index or equity swap, option, future, or forward agreement; a debt index or debt swap, option, future, or forward agreement; a total return, credit spread or credit swap, option, future, or forward agreement; a commodity index or commodity swap, option, future, or forward agreement; or a weather swap, weather derivative, or weather option;

(II) any agreement or transaction that is similar to any other agreement or transaction referred to in this clause and that is of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap markets (including terms and conditions incorporated by reference in such agreement) and that is a forward, swap, future, or option on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, quantitative measures associated with an occurrence, extent of an occurrence, or contingency associated with a financial, commercial, or economic consequence, or economic or financial indices or measures of economic or financial risk or value;

(III) any combination of agreements or transactions referred to in this clause;

(IV) any option to enter into any agreement or transaction referred to in this clause;

(V) a master agreement that provides for an agreement or transaction referred to in subclause (I), (II), (III), or (IV), together with all supplements to any such master agreement, without regard to whether the master agreement contains an agreement or transaction that is not a swap agreement under this clause, except that the master agreement shall be considered to be a swap agreement under this clause only with respect to each agreement or transaction under the master agreement that is referred to in subclause (I), (II), (III), or (IV); and

(VI) any security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to in subclause (I), (II), (III), (IV), or (V), including any guarantee or reimbursement obligation in connection with any agreement or transaction referred to in any such subclause.

**(vii) Treatment of master agreement as one agreement**

Any master agreement for any contract or agreement described in any preceding clause of this subparagraph (or any master agreement for such master agreement or agreements), together with all supplements to such master agreement, shall be treated as a single agreement and a single qualified financial contract. If a master agreement contains provisions relating to agreements or transactions that are not themselves qualified financial contracts, the master agreement shall be deemed to be a qualified financial contract only with respect to those transactions that are themselves qualified financial contracts.

**(viii) Transfer**

The term "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the equity of redemption of the regulated entity.

**(E) Certain protections in event of appointment of conservator**

Notwithstanding any other provision of this section, any other Federal law, or the law of any State (other than paragraph (10) of this subsection and subsection (b)(9)(B)), no person shall be stayed or prohibited from exercising—

(i) any right such person has to cause the termination, liquidation, or acceleration of any qualified financial contract with a regulated entity in a conservatorship based upon a default under such financial contract which is enforceable under applicable noninsolvency law;

(ii) any right under any security agreement or arrangement or other credit enhancement relating to 1 or more such qualified financial contracts; or

(iii) any right to offset or net out any termination values, payment amounts, or other transfer obligations arising under or in connection with such qualified financial contracts.

**(F) Clarification**

No provision of law shall be construed as limiting the right or power of the Agency, or authorizing any court or agency to limit or delay in any manner, the right or power of the Agency to transfer any qualified financial contract in accordance with paragraphs (9) and (10), or to disaffirm or repudiate any such contract in accordance with subsection (d)(1).

**(G) Walkaway clauses not effective**

**(i) In general**

Notwithstanding the provisions of subparagraphs (A) and (E), and sections 4403 and 4404 of this title, no walkaway clause shall be enforceable in a qualified financial contract of a regulated entity in default.

**(ii) Walkaway clause defined**

For purposes of this subparagraph, the term "walkaway clause" means a provision in a qualified financial contract that, after calculation of a value of a party's position or an amount due to or from 1 of the parties in accordance with its terms upon termination, liquidation, or acceleration of the qualified financial contract, either does not create a payment obligation of a party or extinguishes a payment obligation of a party in whole or in part solely because of the status of such party as a nondefaulting party.

**(9) Transfer of qualified financial contracts**

In making any transfer of assets or liabilities of a regulated entity in default which includes any qualified financial contract, the conservator or receiver for such regulated entity shall either—

(A) transfer to 1 person—

(i) all qualified financial contracts between any person (or any affiliate of such person) and the regulated entity in default;

(ii) all claims of such person (or any affiliate of such person) against such regulated entity under any such contract (other than any claim which, under the terms of any such contract, is subordinated to the claims of general unsecured creditors of such regulated entity);

(iii) all claims of such regulated entity against such person (or any affiliate of such person) under any such contract; and

(iv) all property securing, or any other credit enhancement for any contract described in clause (i), or any claim described in clause (ii) or (iii) under any such contract; or

(B) transfer none of the financial contracts, claims, or property referred to under subparagraph (A) (with respect to such person and any affiliate of such person).

**Add. 13**

**(10) Notification of transfer**

**(A) In general**

The conservator or receiver shall notify any person that is a party to a contract or transfer by 5:00 p.m. (Eastern Standard Time) on the business day following the date of the appointment of the receiver in the case of a receivership, or the business day following such transfer in the case of a conservatorship, if—

(i) the conservator or receiver for a regulated entity in default makes any transfer of the assets and liabilities of such regulated entity; and

(ii) such transfer includes any qualified financial contract.

**(B) Certain rights not enforceable**

**(i) Receivership**

A person who is a party to a qualified financial contract with a regulated entity may not exercise any right that such person has to terminate, liquidate, or net such contract under paragraph (8)(A) of this subsection or under section 4403 or 4404 of this title, solely by reason of or incidental to the appointment of a receiver for the regulated entity (or the insolvency or financial condition of the regulated entity for which the receiver has been appointed)—

(I) until 5:00 p.m. (Eastern Standard Time) on the business day following the date of the appointment of the receiver; or

(II) after the person has received notice that the contract has been transferred pursuant to paragraph (9)(A).

**(ii) Conservatorship**

A person who is a party to a qualified financial contract with a regulated entity may not exercise any right that such person has to terminate, liquidate, or net such contract under paragraph (8)(E) of this subsection or under section 4403 or 4404 of this title, solely by reason of or incidental to the appointment of a conservator for the regulated entity (or the insolvency or financial condition of the regulated entity for which the conservator has been appointed).

**(iii) Notice**

For purposes of this paragraph, the conservator or receiver of a regulated entity shall be deemed to have notified a person who is a party to a qualified financial contract with such regulated entity, if the conservator or receiver has taken steps reasonably calculated to provide notice to such person by the time specified in subparagraph (A).

**(C) Business day defined**

For purposes of this paragraph, the term ''business day'' means any day other than any Saturday, Sunday, or any day on which either the New York Stock Exchange or the Federal Reserve Bank of New York is closed.

**(11) Disaffirmance or repudiation of qualified financial contracts**

In exercising the rights of disaffirmance or repudiation of a conservator or receiver with respect to any qualified financial contract to which a regulated entity is a party, the conservator or receiver for such institution shall either—

(A) disaffirm or repudiate all qualified financial contracts between—

(i) any person or any affiliate of such person; and

(ii) the regulated entity in default; or

(B) disaffirm or repudiate none of the qualified financial contracts referred to in subparagraph (A) (with respect to such person or any affiliate of such person).

**(12) Certain security interests not avoidable**

No provision of this subsection shall be construed as permitting the avoidance of any legally enforceable or perfected security interest in any of the assets of any regulated entity, except where such an interest is taken in contemplation of the insolvency of the regulated entity, or with the intent to hinder, delay, or defraud the regulated entity or the creditors of such regulated entity.

**(13) Authority to enforce contracts**

**(A) In general**

Notwithstanding any provision of a contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of, or the exercise of rights or powers by, a conservator or receiver, the conservator or receiver may enforce any contract, other than a contract for liability insurance for a director or officer, or a contract or a regulated entity bond, entered into by the regulated entity.

**(B) Certain rights not affected**

No provision of this paragraph may be construed as impairing or affecting any right of the conservator or receiver to enforce or recover under a liability insurance contract for an officer or director, or regulated entity bond under other applicable law.

**(C) Consent requirement**

**(i) In general**

Except as otherwise provided under this section, no person may exercise any right or power to terminate, accelerate, or declare a default under any contract to which a regulated entity is a party, or to obtain possession of or exercise control over any property of the regulated entity, or affect any contractual rights of the regulated entity, without the consent of the conservator or receiver, as appropriate, for a period of—

(I) 45 days after the date of appointment of a conservator; or

(II) 90 days after the date of appointment of a receiver.

**(ii) Exceptions**

This subparagraph shall not—

(I) apply to a contract for liability insurance for an officer or director;

(II) apply to the rights of parties to certain qualified financial contracts under subsection (d)(8); or

(III) be construed as permitting the conservator or receiver to fail to comply with otherwise enforceable provisions of such contracts.

**(14) Savings clause**

The meanings of terms used in this subsection are applicable for purposes of this subsection only, and shall not be construed or applied so as to challenge or affect the characterization, definition, or treatment of any similar terms under any other statute, regulation, or rule, including the Gramm-Leach-Bliley Act, the Legal Certainty for Bank Products Act of 2000 [7 U.S.C. 27 to 27f], the securities laws (as that term is defined in section 78c(a)(47) of title 15), and the Commodity Exchange Act [7 U.S.C. 1 et seq.].

**(15) Exception for Federal Reserve and Federal Home Loan Banks**

No provision of this subsection shall apply with respect to—

(A) any extension of credit from any Federal Home Loan Bank or Federal Reserve Bank to any regulated entity; or

(B) any security interest in the assets of the regulated entity securing any such extension of credit.

**(e) Valuation of claims in default**

**(1) In general**

Notwithstanding any other provision of Federal law or the law of any State, and regardless of the method which the Agency determines to utilize with respect to a regulated entity in default or in danger of default, including transactions authorized under subsection (i), this subsection shall govern the rights of the creditors of such regulated entity.

**(2) Maximum liability**

The maximum liability of the Agency, acting as receiver or in any other capacity, to any person having a claim against the receiver or the regulated entity for which such receiver is appointed shall be not more than the amount that such claimant would have received if the Agency had liquidated the assets and liabilities of the regulated entity without exercising the authority of the Agency under subsection (i).

**(f) Limitation on court action**

Except as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver.

**(g) Liability of directors and officers**

**(1) In general**

A director or officer of a regulated entity may be held personally liable for monetary damages in any civil action described in paragraph (2) brought by, on behalf of, or at the re-

quest or direction of the Agency, and prosecuted wholly or partially for the benefit of the Agency—

(A) acting as conservator or receiver of such regulated entity; or

(B) acting based upon a suit, claim, or cause of action purchased from, assigned by, or otherwise conveyed by such receiver or conservator.

**(2) Actions addressed**

Paragraph (1) applies in any civil action for gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care than gross negligence, including intentional tortious conduct, as such terms are defined and determined under applicable State law.

**(3) No limitation**

Nothing in this subsection shall impair or affect any right of the Agency under other applicable law.

**(h) Damages**

In any proceeding related to any claim against a director, officer, employee, agent, attorney, accountant, appraiser, or any other party employed by or providing services to a regulated entity, recoverable damages determined to result from the improvident or otherwise improper use or investment of any assets of the regulated entity shall include principal losses and appropriate interest.

**(i) Limited-life regulated entities**

**(1) Organization**

**(A) Purpose**

The Agency, as receiver appointed pursuant to subsection (a)—

(i) may, in the case of a Federal Home Loan Bank, organize a limited-life regulated entity with those powers and attributes of the Federal Home Loan Bank in default or in danger of default as the Director determines necessary, subject to the provisions of this subsection, and the Director shall grant a temporary charter to that limited-life regulated entity, and that limited-life regulated entity may operate subject to that charter; and

(ii) shall, in the case of an enterprise, organize a limited-life regulated entity with respect to that enterprise in accordance with this subsection.

**(B) Authorities**

Upon the creation of a limited-life regulated entity under subparagraph (A), the limited-life regulated entity may—

(i) assume such liabilities of the regulated entity that is in default or in danger of default as the Agency may, in its discretion, determine to be appropriate, except that the liabilities assumed shall not exceed the amount of assets purchased or transferred from the regulated entity to the limited-life regulated entity;

(ii) purchase such assets of the regulated entity that is in default, or in danger of default as the Agency may, in its discretion, determine to be appropriate; and

(iii) perform any other temporary function which the Agency may, in its discretion, prescribe in accordance with this section.

**(2) Charter and establishment**

**(A) Transfer of charter**

**(i) Fannie Mae**

If the Agency is appointed as receiver for the Federal National Mortgage Association, the limited-life regulated entity established under this subsection with respect to such enterprise shall, by operation of law and immediately upon its organization—

(I) succeed to the charter of the Federal National Mortgage Association, as set forth in the Federal National Mortgage Association Charter Act [12 U.S.C. 1716 et seq.]; and

(II) thereafter operate in accordance with, and subject to, such charter, this Act, and any other provision of law to which the Federal National Mortgage Association is subject, except as otherwise provided in this subsection.

**(ii) Freddie Mac**

If the Agency is appointed as receiver for the Federal Home Loan Mortgage Corporation, the limited-life regulated entity established under this subsection with respect to such enterprise shall, by operation of law and immediately upon its organization—

(I) succeed to the charter of the Federal Home Loan Mortgage Corporation, as set forth in the Federal Home Loan Mortgage Corporation Charter Act[1] [12 U.S.C. 1451 et seq.]; and

(II) thereafter operate in accordance with, and subject to, such charter, this Act, and any other provision of law to which the Federal Home Loan Mortgage Corporation is subject, except as otherwise provided in this subsection.

**(B) Interests in and assets and obligations of regulated entity in default**

Notwithstanding subparagraph (A) or any other provision of law—

(i) a limited-life regulated entity shall assume, acquire, or succeed to the assets or liabilities of a regulated entity only to the extent that such assets or liabilities are transferred by the Agency to the limited-life regulated entity in accordance with, and subject to the restrictions set forth in, paragraph (1)(B);

(ii) a limited-life regulated entity shall not assume, acquire, or succeed to any obligation that a regulated entity for which a receiver has been appointed may have to any shareholder of the regulated entity that arises as a result of the status of that person as a shareholder of the regulated entity; and

(iii) no shareholder or creditor of a regulated entity shall have any right or claim against the charter of the regulated entity once the Agency has been appointed receiver for the regulated entity and a limited-life regulated entity succeeds to the charter pursuant to subparagraph (A).

**(C) Limited-life regulated entity treated as being in default for certain purposes**

A limited-life regulated entity shall be treated as a regulated entity in default at such times and for such purposes as the Agency may, in its discretion, determine.

**(D) Management**

Upon its establishment, a limited-life regulated entity shall be under the management of a board of directors consisting of not fewer than 5 nor more than 10 members appointed by the Agency.

**(E) Bylaws**

The board of directors of a limited-life regulated entity shall adopt such bylaws as may be approved by the Agency.

**(3) Capital stock**

**(A) No agency requirement**

The Agency is not required to pay capital stock into a limited-life regulated entity or to issue any capital stock on behalf of a limited-life regulated entity established under this subsection.

**(B) Authority**

If the Director determines that such action is advisable, the Agency may cause capital stock or other securities of a limited-life regulated entity established with respect to an enterprise to be issued and offered for sale, in such amounts and on such terms and conditions as the Director may determine, in the discretion of the Director.

**(4) Investments**

Funds of a limited-life regulated entity shall be kept on hand in cash, invested in obligations of the United States or obligations guaranteed as to principal and interest by the United States, or deposited with the Agency, or any Federal reserve bank.

**(5) Exempt tax status**

Notwithstanding any other provision of Federal or State law, a limited-life regulated entity, its franchise, property, and income shall be exempt from all taxation now or hereafter imposed by the United States, by any territory, dependency, or possession thereof, or by any State, county, municipality, or local taxing authority.

**(6) Winding up**

**(A) In general**

Subject to subparagraphs (B) and (C), not later than 2 years after the date of its organization, the Agency shall wind up the affairs of a limited-life regulated entity.

**(B) Extension**

The Director may, in the discretion of the Director, extend the status of a limited-life regulated entity for 3 additional 1-year periods.

**(C) Termination of status as limited-life regulated entity**

**(i) In general**

Upon the sale by the Agency of 80 percent or more of the capital stock of a lim-

ited-life regulated entity, as defined in clause (iv), to 1 or more persons (other than the Agency)—

(I) the status of the limited-life regulated entity as such shall terminate; and

(II) the entity shall cease to be a limited-life regulated entity for purposes of this subsection.

**(ii) Divestiture of remaining stock, if any**

**(I) In general**

Not later than 1 year after the date on which the status of a limited-life regulated entity is terminated pursuant to clause (i), the Agency shall sell to 1 or more persons (other than the Agency) any remaining capital stock of the former limited-life regulated entity.

**(II) Extension authorized**

The Director may extend the period referred to in subclause (I) for not longer than an additional 2 years, if the Director determines that such action would be in the public interest.

**(iii) Savings clause**

Notwithstanding any provision of law, other than clause (ii), the Agency shall not be required to sell the capital stock of an enterprise or a limited-life regulated entity established with respect to an enterprise.

**(iv) Applicability**

This subparagraph applies only with respect to a limited-life regulated entity that is established with respect to an enterprise.

**(7) Transfer of assets and liabilities**

**(A) In general**

**(i) Transfer of assets and liabilities**

The Agency, as receiver, may transfer any assets and liabilities of a regulated entity in default, or in danger of default, to the limited-life regulated entity in accordance with and subject to the restrictions of paragraph (1).

**(ii) Subsequent transfers**

At any time after the establishment of a limited-life regulated entity, the Agency, as receiver, may transfer any assets and liabilities of the regulated entity in default, or in danger of default, as the Agency may, in its discretion, determine to be appropriate in accordance with and subject to the restrictions of paragraph (1).

**(iii) Effective without approval**

The transfer of any assets or liabilities of a regulated entity in default or in danger of default to a limited-life regulated entity shall be effective without any further approval under Federal or State law, assignment, or consent with respect thereto.

**(iv) Equitable treatment of similarly situated creditors**

The Agency shall treat all creditors of a regulated entity in default or in danger of

default that are similarly situated under subsection (c)(1) in a similar manner in exercising the authority of the Agency under this subsection to transfer any assets or liabilities of the regulated entity to the limited-life regulated entity established with respect to such regulated entity, except that the Agency may take actions (including making payments) that do not comply with this clause, if—

(I) the Director determines that such actions are necessary to maximize the value of the assets of the regulated entity, to maximize the present value return from the sale or other disposition of the assets of the regulated entity, or to minimize the amount of any loss realized upon the sale or other disposition of the assets of the regulated entity; and

(II) all creditors that are similarly situated under subsection (c)(1) receive not less than the amount provided in subsection (e)(2).

**(v) Limitation on transfer of liabilities**

Notwithstanding any other provision of law, the aggregate amount of liabilities of a regulated entity that are transferred to, or assumed by, a limited-life regulated entity may not exceed the aggregate amount of assets of the regulated entity that are transferred to, or purchased by, the limited-life regulated entity.

**(8) Regulations**

The Agency may promulgate such regulations as the Agency determines to be necessary or appropriate to implement this subsection.

**(9) Powers of limited-life regulated entities**

**(A) In general**

Each limited-life regulated entity created under this subsection shall have all corporate powers of, and be subject to the same provisions of law as, the regulated entity in default or in danger of default to which it relates, except that—

(i) the Agency may—

(I) remove the directors of a limited-life regulated entity;

(II) fix the compensation of members of the board of directors and senior management, as determined by the Agency in its discretion, of a limited-life regulated entity; and

(III) indemnify the representatives for purposes of paragraph (1)(B), and the directors, officers, employees, and agents of a limited-life regulated entity on such terms as the Agency determines to be appropriate; and

(ii) the board of directors of a limited-life regulated entity—

(I) shall elect a chairperson who may also serve in the position of chief executive officer, except that such person shall not serve either as chairperson or as chief executive officer without the prior approval of the Agency; and

(II) may appoint a chief executive officer who is not also the chairperson, ex-

cept that such person shall not serve as chief executive officer without the prior approval of the Agency.

**(B) Stay of judicial action**

Any judicial action to which a limited-life regulated entity becomes a party by virtue of its acquisition of any assets or assumption of any liabilities of a regulated entity in default shall be stayed from further proceedings for a period of not longer than 45 days, at the request of the limited-life regulated entity. Such period may be modified upon the consent of all parties.

**(10) No Federal status**

**(A) Agency status**

A limited-life regulated entity is not an agency, establishment, or instrumentality of the United States.

**(B) Employee status**

Representatives for purposes of paragraph (1)(B), interim directors, directors, officers, employees, or agents of a limited-life regulated entity are not, solely by virtue of service in any such capacity, officers or employees of the United States. Any employee of the Agency or of any Federal instrumentality who serves at the request of the Agency as a representative for purposes of paragraph (1)(B), interim director, director, officer, employee, or agent of a limited-life regulated entity shall not—

(i) solely by virtue of service in any such capacity lose any existing status as an officer or employee of the United States for purposes of title 5 or any other provision of law; or

(ii) receive any salary or benefits for service in any such capacity with respect to a limited-life regulated entity in addition to such salary or benefits as are obtained through employment with the Agency or such Federal instrumentality.

**(11) Authority to obtain credit**

**(A) In general**

A limited-life regulated entity may obtain unsecured credit and issue unsecured debt.

**(B) Inability to obtain credit**

If a limited-life regulated entity is unable to obtain unsecured credit or issue unsecured debt, the Director may authorize the obtaining of credit or the issuance of debt by the limited-life regulated entity—

(i) with priority over any or all of the obligations of the limited-life regulated entity;

(ii) secured by a lien on property of the limited-life regulated entity that is not otherwise subject to a lien; or

(iii) secured by a junior lien on property of the limited-life regulated entity that is subject to a lien.

**(C) Limitations**

**(i) [3] In general**

The Director, after notice and a hearing, may authorize the obtaining of credit or

the issuance of debt by a limited-life regulated entity that is secured by a senior or equal lien on property of the limited-life regulated entity that is subject to a lien (other than mortgages that collateralize the mortgage-backed securities issued or guaranteed by an enterprise) only if—

(I) the limited-life regulated entity is unable to otherwise obtain such credit or issue such debt; and

(II) there is adequate protection of the interest of the holder of the lien on the property with respect to which such senior or equal lien is proposed to be granted.

**(D) Burden of proof**

In any hearing under this subsection, the Director has the burden of proof on the issue of adequate protection.

**(12) Effect on debts and liens**

The reversal or modification on appeal of an authorization under this subsection to obtain credit or issue debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so issued, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the issuance of such debt, or the granting of such priority or lien, were stayed pending appeal.

**(j) Other Agency exemptions**

**(1) Applicability**

The provisions of this subsection shall apply with respect to the Agency in any case in which the Agency is acting as a conservator or a receiver.

**(2) Taxation**

The Agency, including its franchise, its capital, reserves, and surplus, and its income, shall be exempt from all taxation imposed by any State, county, municipality, or local taxing authority, except that any real property of the Agency shall be subject to State, territorial, county, municipal, or local taxation to the same extent according to its value as other real property is taxed, except that, notwithstanding the failure of any person to challenge an assessment under State law of the value of such property, and the tax thereon, shall be determined as of the period for which such tax is imposed.

**(3) Property protection**

No property of the Agency shall be subject to levy, attachment, garnishment, foreclosure, or sale without the consent of the Agency, nor shall any involuntary lien attach to the property of the Agency.

**(4) Penalties and fines**

The Agency shall not be liable for any amounts in the nature of penalties or fines, including those arising from the failure of any person to pay any real property, personal property, probate, or recording tax or any recording or filing fees when due.

---

[3] So in original. No cl. (ii) has been enacted.

**Add. 18**

**(k) Prohibition of charter revocation**

In no case may the receiver appointed pursuant to this section revoke, annul, or terminate the charter of an enterprise.

(Pub. L. 102–550, title XIII, § 1367, Oct. 28, 1992, 106 Stat. 3980; Pub. L. 110–289, div. A, title I, § 1145(a), July 30, 2008, 122 Stat. 2734.)

### Editorial Notes

#### References in Text

This chapter, referred to in subsecs. (a)(4)(D) and (d)(8)(A), was in the original "this title", meaning title XIII of Pub. L. 102–550, Oct. 28, 1992, 106 Stat. 3941, which is classified principally to this chapter. For complete classification of title XIII to the Code, see Short Title note set out under section 4501 of this title and Tables.

Rule 65 of the Federal Rules of Civil Procedure, referred to in subsec. (b)(16), (17), is set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

Sections 4402 through 4407 of this title, referred to in subsec. (b)(19)(A), was in the original "sections 402 through 407 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (12 U.S.C. 4402 through 4407)", and was translated as reading "sections 402 through 407A of the Federal Deposit Insurance Corporation Improvement Act of 1991", meaning sections 402 to 407A of Pub. L. 102–242, which are classified to sections 4402 to 4407 of this title, to reflect the probable intent of Congress and the renumbering of section 407 of the Act as section 407A by Pub. L. 109–8, title IX, § 906(d)(1), Apr. 20, 2005, 119 Stat. 169.

The Gramm-Leach-Bliley Act, referred to in subsec. (d)(14), is Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1338. For complete classification of this Act to the Code, see Short Title of 1999 Amendment note set out under section 1811 of this title and Tables.

The Legal Certainty for Bank Products Act of 2000, referred to in subsec. (d)(14), is title IV of H.R. 5660, as enacted by Pub. L. 106–554, § 1(a)(5), Dec. 21, 2000, 114 Stat. 2763, 2763A–457, which is classified to sections 27 to 27f of Title 7, Agriculture. For complete classification of this Act to the Code, see Short Title of 2000 Amendment note set out under section 1 of Title 7 and Tables.

The Commodity Exchange Act, referred to in subsec. (d)(14), is act Sept. 21, 1922, ch. 369, 42 Stat. 998, which is classified generally to chapter 1 (§ 1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Federal National Mortgage Association Charter Act, referred to in subsec. (i)(2)(A)(i)(I), is title III of act June 27, 1934, ch. 847, 48 Stat. 1252, which is classified generally to subchapter III (§ 1716 et seq.) of chapter 13 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1716 of this title and Tables.

This Act, referred to in subsec. (i)(2)(A)(i)(II), (ii)(II), is Pub. L. 102–550, Oct. 28, 1992, 106 Stat. 3672, known as the Housing and Community Development Act of 1992. For complete classification of this Act to the Code, see Short Title of 1992 Amendment note set out under section 5301 of Title 42, The Public Health and Welfare, and Tables.

The Federal Home Loan Mortgage Corporation Charter Act, referred to in subsec. (i)(2)(A)(ii)(I), probably means the Federal Home Loan Mortgage Corporation Act, title III of Pub. L. 91–351, July 24, 1970, 84 Stat. 451, which is classified generally to chapter 11A (§ 1451 et seq.) of this title. For complete classification of this Act to the Code, see Short Title and Statement of Purpose note set out under section 1451 of this title and Tables.

#### Amendments

2008—Pub. L. 110–289 amended section generally. Prior to amendment, section related to appointment of conservators for critically undercapitalized enterprises.