**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 25-5113 (consolidated with Nos. 25-5121, 25-5154, 25-5155)**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

FAIRHOLME FUNDS, INC., ON BEHALF OF ITS SERIES, THE FAIRHOLME FUND, *et al.*,

*Plaintiffs-Appellees*,

v.

FEDERAL HOUSING FINANCE AGENCY, IN ITS CAPACITY AS CONSERVATOR OF THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Columbia
Nos. 13-cv-1053, 13-mc-1288 (Hon. Royce C. Lamberth)

### PLAINTIFFS' CORRECTED* RESPONSE BRIEF

Hamish P.M. Hume
Samuel C. Kaplan
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
hhume@bsfllp.com
skaplan@bsfllp.com

Adam Wierzbowski
Robert Kravetz
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
adam@blbglaw.com

Eric L. Zagar
KESSLER TOPAZ
MELTZER & CHECK, LLP
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
ezagar@ktmc.com

Michael J. Barry
GRANT & EISENHOFER, P.A.
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
mbarry@gelaw.com

*Counsel for Appellee Class*

David H. Thompson
Brian W. Barnes
John D. Ramer
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
Tel: (202) 220-9659
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Berkley Plaintiffs-*
*Appellees/Cross-Appellants*

*\*Plaintiffs' Corrected Response Brief removes the use of passim in the*
*Table of Authorities.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28, Plaintiffs-Appellees state as follows:

**I.    Parties and *Amici***

Defendants-Appellants ("Defendants"):

- Federal Housing Finance Agency, in its capacity as Conservator ("FHFA" or "Conservator");

- Federal National Mortgage Association ("Fannie");

- Federal Home Loan Mortgage Corporation ("Freddie").

Plaintiffs-Appellees ("Plaintiffs"):

- <u>Class Representatives:</u>

  - o  Joseph Cacciapalle;

  - o  Michelle M. Miller;

  - o  Timothy J. Cassell;

  - o  Barry P. Borodkin.

- <u>Berkley Plaintiffs:</u>

  - o  Berkley Insurance Company;

  - o  Acadia Insurance Company;

  - o  Admiral Indemnity Company;

  - o  Admiral Insurance Company;

  - o  Berkley Regional Insurance Company;

- o Carolina Casualty Insurance Company;

- o Midwest Employers Casualty Insurance Company;

- o Nautilus Insurance Company;

- o Preferred Employers Insurance Company;

The Berkley Plaintiffs are also Cross-Appellants and file a cross-appeal brief pursuant to the order at ECF 2124998 at 1. The Class Plaintiffs have joined in that cross appeal on a conditional basis as stated in their separately-filed Notice Pursuant to FRAP 28(i) Of Conditional Joinder Of Cross-Appeal.

No *amici* or intervenors appeared in the district court. The following parties appeared as *amici* in the prior appeal in this case in Case No. 14-5243 (consolidated with Nos. 14-5254, 14-5260, 14-5262):

- Center for Individual Freedom (in support of Plaintiffs);

- Association of Mortgage Investors, Mr. Robert H. Hartheimer, Independent Community Bankers of America and Mr. William M. Isaac (in support of Plaintiffs);

- 60 Plus Association, Inc. (in support of Plaintiffs);

- National Black Chamber of Commerce (in support of neither party);

- Investors Unite (in support of Plaintiffs);

- Timothy Howard and the Coalition for Mortgage Security (in support of Plaintiffs);

- Stephen Rattien, Pershing Square Capital Management, LP, Louise Rafter, and Josephine Rattien (in support of Plaintiffs);

- Jonathan R. Macey (in support of Plaintiffs);

- Better Markets, Inc. (in support of Defendants);

- Federal Deposit Insurance Corporation (in support of Defendants).

## II.    Rulings Under Review

Defendants appeal the final judgment entered on March 20, 2024, JA2349; the Opinion and Order denying Defendants' Rule 50(b) Motion for Judgment as a Matter of Law dated March 14, 2025, JA2371, JA2393; the Order granting in part and denying in part Defendants' Motion to Dismiss following remand, JA152, JA187; the Order denying Defendants' Motion for Reconsideration of the Order on the Motion to Dismiss following remand, JA207; and the Order granting in part and denying in part Defendants' Motion for Summary Judgment, JA234, JA235.

## III.    Related Cases

The Court has consolidated this appeal with Defendants' appeal in Case No. 25-5121, and Plaintiffs' cross-appeals in Case Nos. 25-5154 and 25-5155.

This case was previously before this Court in Case No. 14-5243 and consolidated cases 14-5254, 14-5260, 14-5262.

Plaintiffs do not believe the other cases identified by Defendants are "related cases," as that term is defined by D.C. Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1, the Berkley Plaintiffs submit this corporate disclosure statement.

W.R. Berkley Insurance Corporation owns directly or indirectly the following Plaintiffs-Appellees/Cross-Appellants: Berkley Insurance Company, Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, and Preferred Employers Insurance Company. No publicly held corporation owns 10% or more of any of the above-mentioned Plaintiffs-Appellees'/Cross-Appellants' stock.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............... i

CORPORATE DISCLOSURE STATEMENT ........................................................ iv

TABLE OF CONTENTS ...................................................................................... v

TABLE OF AUTHORITIES ................................................................................ vii

GLOSSARY ........................................................................................................ xiii

INTRODUCTION ................................................................................................ 1

STATUTES AND REGULATIONS ..................................................................... 5

STATEMENT OF THE CASE ............................................................................. 5

    A.    Private Shareholders' Investment in the Companies .................. 5

    B.    HERA, the 2008 Conservatorships, and the Original PSPAs ..... 6

    C.    Accounting Write-Downs and the 2012 Expectation of Record Profits ........................................................................................ 7

    D.    The Net Worth Sweep and its Effects ........................................ 9

    E.    How and Why the Net Worth Sweep Was Imposed ................. 10

    F.    Procedural History .................................................................... 12

        1.    *Perry II* ......................................................................... 12

        2.    Motion to Dismiss Denial On Remand .......................... 13

        3.    Class Certification ......................................................... 13

        4.    Summary Judgment ....................................................... 14

        5.    Jury Trial, Verdict, and Judgment ................................. 15

SUMMARY OF ARGUMENT ............................................................................ 15

STANDARD OF REVIEW ................................................................................. 17

ARGUMENT ...................................................................................................... 18

I.   THE COURT SHOULD REJECT DEFENDANTS' EFFORT TO REVERSE THE LIABILITY VERDICT.............................................18

    A.   *Collins* Provides No Basis For Reversing The Verdict.............18

    B.   The District Court Properly Ruled The Implied Covenant Applies Here. ...........................................................................25

    C.   Plaintiffs' Implied Covenant Claim Is Not A Claim For Anticipatory Breach. ..................................................................32

II.  PLAINTIFFS INTRODUCED SUFFICIENT EVIDENCE OF HARM AND DAMAGES...................................................................35

    A.   Defendants' "Rebound" Argument Is Meritless. ......................37

    B.   Plaintiffs Presented Sufficient Evidence That The Net Worth Sweep Harmed Current Class Members. ..................................40

    C.   There Is Sufficient Evidence Showing The Sweep Caused The Stock-Drop Used To Measure Damages. ..................................43

III. DEFENDANTS' ARGUMENT THAT THE IMPLIED COVENANT CLAIM DID NOT "TRAVEL" TO POST-SWEEP SHAREHOLDERS IS WAIVED AND MERITLESS.......................45

    A.   The Implied Covenant Claim Traveled to Post-Sweep Purchasers Under Delaware and Virginia Law. ........................45

        1.   Delaware Law ................................................................46

        2.   Virginia Law ..................................................................50

    B.   Defendants Are Also Wrong To Say Their Argument Is Jurisdictional, Which They Do To Evade Their Waiver. ..........53

CONCLUSION .......................................................................................54

CERTIFICATE OF COMPLIANCE .......................................................57

CERTIFICATE OF SERVICE ................................................................58

vi

# TABLE OF AUTHORITIES

## Cases

*Acticon AG v. China North East Petroleum Holdings, Ltd.*,
    692 F.3d 34 (2d Cir. 2012) ...............................................................38

*Allen v. El Paso Pipeline GP Co., LLC*,
    90 A.3d 1097 (Del. Ch. 2014)...........................................................48

*Am. Healthcare Admin. Servs. v. Aizen*,
    285 A.3d 461 (Del. Ch. 2022) ...........................................................24

*Baldwin v. New Wood Res., LLC*,
    283 A.3d 1099 (Del. 2022) ................................................................30

*Beard Rsch., Inc. v. Kates*,
    8 A.3d 573 (Del. Ch. 2010) ...............................................................42

*Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broad. Sys.*,
    2014 WL 2943570 (Del. Ch. June 27, 2014)......................................47

*C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*,
    131 F.3d 430 (4th Cir. 1997) .............................................................37

*Campbell v. District of Columbia*,
    894 F.3d 281 (D.C. Cir. 2018)...........................................................38

*\*Centex Corp. v. United States*,
    395 F.3d 1283 (Fed. Cir. 2005).........................................................23

*\*Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*,
    2015 WL 3863245 (Del. Super. Ct. June 10, 2015), *aff'd*, 134 A.3d 759 (Del.
    2016) ........................................................................................... 23, 27

*Christopher v. Cutter Lab'ys*,
    53 F.3d 1184 (11th Cir. 1995) ...........................................................37

*\*City of Pittsburgh Comprehensive Mun. Pension Trust Fund v. Conway*,
    2024 WL 1752419 (Del. Ch. Apr. 24, 2024) .....................................27

*Collins v. Yellen*,
    594 U.S. 220 (2021)...........................4, 14, 15, 16, 18, 19, 20, 21, 22, 24, 25, 26

vii

*Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*,
591 F.3d 1337 (11th Cir. 2009) ...........................................................53

*Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*,
302 A.3d 430 (Del. Ch. 2023)..............................................................27

*Daskalea v. District of Columbia*,
227 F.3d 433 (D.C. Cir. 2001) .............................................................35

*Day v. MCC Acquisition, LC*,
848 S.E.2d 800 (Va. 2020)...................................................................50

*DG BF, LLC v. Ray*,
2021 WL 776742 (Del. Ch. Mar. 1, 2021)...........................................29

*DNAML Pty, Ltd. v. Apple Inc.*,
2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015).......................................51

*E.I. DuPont deNemours & Co. v. Universal Moulded Prods. Corp.*,
191 Va. 525 (1950) ..............................................................................42

*FDIC v. Citibank N.A.*,
2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016) ......................................50

*Gerber v. Enter. Prod. Holdings, LLC*,
67 A.3d 400 (Del. 2013) ......................................................................28

*Gilbert v. El Paso Co.*,
490 A.2d 1050 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990) .................24

*Gruber v. Gilbertson*,
628 F. Supp. 3d 472 (S.D.N.Y. 2022) ..................................................45

*Halifax Fund L.P. v. Response USA, Inc.*,
1997 WL 33173241 (Del. Ch. May 13, 1997).......................................47

*Herr v. U.S. Forest Serv.*,
803 F.3d 809 (6th Cir. 2015)................................................................51

*Huron v. Cobert*,
809 F.3d 1274 (D.C. Cir. 2016) ...........................................................19

*In re Activision Blizzard Inc. S'holder Litig.,
124 A.3d 1025 (Del. Ch. 2015)....................................................... 47, 52

In re Cases,
2023 WL 11767011 (N.D. Fla. Nov. 17, 2023) ...................................54

In re CVR Ref., LP,
2020 WL 506680 (Del. Ch. Jan. 31, 2020) ........................................48

In re CVR Refining, LP,
2022 WL 2902642 (Del. Ch. July 22, 2022) ......................................48

In re Endeavor Grp. Holdings, Inc. S'holders' Litig.,
2025 WL 2754367 (Del. Ch. Sept. 29, 2025) .....................................47

In re Sunstates Corp. S'holder Litig.,
2001 WL 432447 (Del. Ch. Apr. 18, 2001) ........................................49

Jacobs v. FHFA,
908 F.3d 884 (3d Cir. 2018) ...............................................................19

Jaroslawicz v. M&T Bank Corp.,
2024 WL 474846 (D. Del. 2024) (Br.-43) .........................................43

Khan v. Warburg Pincus, LLC,
2025 WL 1251237 (Del. Ch. Apr. 30, 2025).......................................29

Lelchook v. Lebanese Canadian Bank,
2024 WL 967078 (S.D.N.Y. Mar. 6, 2024).........................................54

Macsenti v. Becker,
237 F.3d 1223 (10th Cir. 2001) ..........................................................37

*Marbled Murrelet v. Babbitt,
83 F.3d 1060 (9th Cir. 1996) ..............................................................36

Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.,
11 F.4th 345 (5th Cir. 2021)...............................................................53

Middleburg Training Center, Inc. v. Firestone,
477 F. Supp. 2d 719 (E.D. Va. 2007) .................................................51

*Miller v. Bill Harbert Int'l Constr. Inc.*,
608 F.3d 871 (D.C. Cir. 2010)......................................................41

*Pagliara v. Federal Home Loan Mort. Corp.*,
203 F. Supp. 3d 678 (E.D. Va. 2016)...............................................50

*\*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) ................. 1, 4, 12, 14, 15, 16, 18, 19, 20, 21, 22, 26, 27, 28, 30, 31, 33

*Policemen's Annuity and Benefit Fund of Chicago v. DV Realty Advisors LLC*,
2012 WL 3548206 (Del. Ch. Aug. 16, 2012) .......................................28

*Quad/Graphics, Inc. v. One2One Commc'ns LLC*,
2012 WL 280605 (E.D. Wis. Jan. 31, 2012)........................................53

*R.A. Mackie & Co., L.P. v. PetroCorp Inc.*,
329 F. Supp. 2d 477 (S.D.N.Y. 2004) ..............................................50

*S'holder Representative Servs. LLC v. Medidata Solutions, Inc.*,
2020 WL 972618 (D. Del. Feb. 24, 2020)..........................................28

*Sabby Volatility Warrant* Master *Fund Ltd. v. Jupiter Wellness, Inc.*,
2025 WL 1363171 (2d Cir. May 12, 2025) .........................................49

*Schonfeld v. Hilliard*,
218 F.3d 164 (2d Cir. 2000) .......................................................42

*SM Kids, LLC v. Google LLC*,
963 F.3d 206 (2d Cir. 2020).......................................................53

*Smith v. Washington Sheraton Corp.*,
135 F.3d 779 (D.C. Cir. 1998) .....................................................54

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...............................................................53

*U.S. Conf. of Mayors v. Great-West Life & Annuity Ins. Co.*,
327 F. Supp. 3d 125 (D.C. Cir. 2018)..............................................41

*United States v. Gaskin*,
364 F.3d 438 (2d Cir. 2004) .......................................................37

x

*United Va. Bank v. Dick Herriman Ford, Inc.*,
215 Va. 373 (1974) ......................................................................42

*\*Urdan v. WR Cap. Partners*,
244 A.3d 668 (Del. 2020) ....................................... 46, 47, 48, 49, 52

*Vasquez v. District of Columbia*,
110 F.4th 282 (D.C. Cir. 2024) ................................................. 18, 35

*Versata Software, Inc. v. SAP Am., Inc.*,
717 F.3d 1255 (Fed. Cir. 2013) ..........................................................36

*Vogt v. State Farm Life Ins. Co.*,
963 F.3d 753 (8th Cir. 2020) ............................................................37

*W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*,
311 A.3d 809 (Del. Ch. 2024)............................................................46

*W.G. Cornell Co. v. Ceramic Coating Co.*,
626 F.2d 990 (D.C. Cir. 1980)............................................................38

*\*Wilmington Leasing v. Parrish Leasing Co., L.P.*,
1996 WL 560190 (Del. Ch. Sept. 25, 1996) ....................................29

*Winshall v. Viacom Int'l, Inc.*,
76 A.3d 808 (Del. 2013) ..................................................................29

## **Statutes**

12 U.S.C §1719......................................................................5, 6

12 U.S.C. §4617....................................................................6

15 U.S.C. §78u-4..................................................................39

5 U.S.C. §706........................................................................21

6 Del. C. §8-302(a) ........................................................ 46, 50

Va. Code Ann. §8.8A-302(a)........................................... 46, 50

xi

## <u>Treatises</u>

Cox & Hazen, *Treatise on the Law of Corporations* §28:6 (4th ed. Dec. 2024 update)................................................................................................46

*Restatement (Second) of Contracts* §235 cmt. b.......................................32

**GLOSSARY**

| Abbreviation | Definition |
| --- | --- |
| FHFA | Federal Housing Finance Agency |
| GSEs or Companies | Government-sponsored enterprises; together, Fannie and Freddie |
| HERA | Housing and Economic Recovery Act of 2008 |
| MBS | Mortgage-backed securities |
| PSLRA | Private Securities Litigation Reform Act |
| PSPA | Senior Preferred Stock Purchase Agreement |
| SOC | Statement of the Case |
| Sweep | Net Worth Sweep |
| Treasury | United States Treasury Department |

## INTRODUCTION

In 2017, this Court reversed the dismissal of Plaintiffs' claim that the Net Worth Sweep violated the implied covenant inherent in their shareholder contracts, remanding the claim for evaluation "under the correct legal standard"—namely, whether the Sweep violated "the reasonable expectations of the parties." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 631 (D.C. Cir. 2017) ("*Perry II*"). The District Court faithfully heeded these instructions. Relying on all the sources this Court identified as relevant to reasonable contractual expectations, it rejected Defendants' argument "that since HERA permits the conservator to act in its own best interests, the FHFA can do whatever it wants and Plaintiffs could not expect otherwise." JA178. Instead, it ruled that while HERA gave FHFA expansive discretion, the whole point of the implied covenant was to address "whether Defendants exercised their discretion arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract." *Id.* After extensive proceedings involving discovery, experts, and summary judgment, a trial ultimately proved to the jury that Defendants did indeed exercise their discretion "arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract."

Defendants seek to overturn the verdict but offer no sound basis for doing so. They ignore the evidence presented at trial. That evidence proved that by changing the Treasury dividend from 10% of the principal amount to 100% of all future profits,

1

the Sweep eliminated the possibility of private shareholders ever receiving any distributions from the companies, no matter how large their profits. While FHFA claimed it did this to manage the risk of the companies not making enough profit to pay the 10% dividend, thus having to draw money from Treasury to pay that dividend (the so-called "circular draw"), the evidence undermined that. First, it showed FHFA decided to agree to the Sweep without any analysis of the "circular draw" issue—or of anything else relating to the Sweep. There is no document in which FHFA analyzed the pros and cons of the Sweep or studied the decision to agree to the Sweep. The Acting-Director who agreed to the Sweep admitted he did not consult anyone at the companies about it and requested no forecasts, projections, or analyses to assess the decision. In short, the evidence showed FHFA gave away 100% of all future profits, thereby permanently alienating private shareholders from the net worth of the companies, without making any determination whatsoever as to why it was doing so. No shareholder could ever reasonably expect such conduct. This alone proves a violation of the implied covenant.

Second, the evidence showed that FHFA knew there was no need for the Sweep to address "circular draws" because the companies were making profits above the 10% dividend and expecting to do so for the foreseeable future. They were also predicting record profits based on the reversal of accounting write-downs that would soon add tens of billions of dollars to their net worth. And that is exactly

what happened: when the Sweep took effect in 2013, the companies had massive net worth increases due to record profits and accounting reversals; so the Sweep caused the companies to pay *$130 billion of their net worth to Treasury, in cash*— which was *$111 billion more* than the 10% dividend would have required. No one expressed any surprise, concern, or desire to renegotiate. They expected it.

Further, the evidence showed FHFA acquiesced to Treasury personnel who pushed for the Sweep for the *opposite reason* proffered by FHFA: their concern was not insufficient profits to pay the 10% dividend, but profits that were *too large*, as they wanted to ensure the companies would not be allowed to rebuild capital and exit conservatorship.

Defendants know they cannot admit to this true motivation behind the Sweep because it contradicts the stated goals of the conservatorship, thereby proving a violation of reasonable expectations. They also cannot admit to a goal of just sending more money to Treasury at the expense of private shareholders because that shows a "targeting" of contractual rights, likewise proving a breach of the implied covenant.

So, rather than engage with the evidence, Defendants argue that no matter what the facts showed, no matter how arbitrary and unreasoned the decision, and no matter how pretextual the reasons, there can be no violation of the implied covenant. Their first version of this absolutist argument invokes *Collins v. Yellen*, 594 U.S. 220

3

(2021) ("*Collins*"). But *Collins* held only that FHFA's decision to agree to the Sweep fell within its broad statutory authority. It did not address the law or facts relevant to an implied covenant claim. The *Collins* holding was the same as the statutory authority holding in *Perry II*, which simultaneously reversed the dismissal of the implied covenant claim. That forecloses the *Collins* argument.

Under the second version of their absolutist argument, Defendants say the implied covenant does not apply at all to Plaintiffs' shareholder contracts. They claim a statutory provision giving FHFA broad discretion to act in the best interests of the companies or the public somehow provides enough ***specific guidance*** on how to exercise that discretion to "fill the gap" in the shareholder contracts, eliminating the need for the implied covenant. But that provision provides no guidance at all— it just gives broad discretion. And case law holds that the broader the discretion given to a contracting party, the greater the need for the implied covenant.

Defendants simply cannot sustain their absolutist position. According to them, they could have decided to give away 100% of all future net worth knowing the companies were about to make trillions in profits, and could have based the decision on a coin flip. Still they would win, according to them. Nothing supports that.

They also try to second-guess the jury's damages verdict, but that effort boils down to a disguised *Daubert* attack on Plaintiffs' expert, which they waived. Plus, ample evidence supports the verdict.

And while they now tell the Court the implied covenant claim did not "travel with the shares," when Plaintiffs sought class certification based expressly on the proposition that the claim ***does*** "travel with the shares," Defendants ***stipulated*** to certification. They were right back then, and wrong now.

The Court should affirm the verdict.

## STATUTES AND REGULATIONS

In addition to the statutes referenced in Defendants' brief, Plaintiffs identify 12 U.S.C §1719(g)(1)(C)(iii), (v).

## STATEMENT OF THE CASE

### A. Private Shareholders' Investment in the Companies

In 1968 and 1989, respectively, Fannie and Freddie became publicly-traded companies ("the Companies") financed by private shareholders. JA154.

Between 1996 and 2008, private shareholders invested over $33 billion into the Companies in exchange for preferred stock held by the preferred-stock Classes in this case. JA871; JA2417-18. Dividends on that preferred stock totaled $5.1 billion. JA871; JA2484-502. Of the $33 billion, $19.7 billion was invested in 2007-08 when, responding to the housing crisis, FHFA's predecessor pushed the Companies to raise additional private capital. JA871; JA2417-18.

5

### B. HERA, the 2008 Conservatorships, and the Original PSPAs

HERA authorized FHFA to place the Companies into conservatorship, and provided that FHFA's "Powers as conservator" are to take such actions as are "(i) necessary to put the [Companies] in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the [Company]." 12 U.S.C. §4617(b)(2)(D). "Solvent" means having more assets than liabilities, and thus having positive shareholder capital. JA934.

HERA authorized Treasury to purchase securities in the Companies, but expressly provided that Treasury must consider the Companies' "plan for the orderly resumption of private market funding or capital market access" and "[t]he need to maintain the corporation's status as a private shareholder-owned company." 12 U.S.C §1719(g)(1)(C)(iii), (v).

On September 6, 2008, FHFA placed the Companies into conservatorship and published a "Fact Sheet" stating that "[t]he purpose of appointing the Conservator is to preserve and conserve the Company's assets and property and to put the Company in a sound and solvent condition." JA2433. The Companies stated in their SEC filings that during the Conservatorship they were required to "maintain positive net worth" and "focus on returning to long-term profitability." JA3382; JA4444.

6

FHFA repeatedly stated its job under HERA was "to operate the institution until it is stabilized and then returned to the shareholders."  JA2452; JA3063; JA3083.  FHFA confirmed that the "economic interests of shareholders have not been eliminated, they continue to exist," JA2468, and "[s]tockholders will continue to retain all rights in the stock's financial worth; as such worth is determined by the market."  JA2434.

The original PSPAs between the Companies and Treasury provided that in exchange for making capital available, Treasury would receive senior preferred stock ("Senior Preferred Stock") with a liquidation preference equal to $1 billion (as an initial commitment fee) plus any amount of capital drawn from Treasury, and would earn a dividend equal to 10% of the outstanding liquidation preference if paid in cash; if the Companies failed to pay the dividend in cash, the liquidation preference would be increased by 12% (effectively paying the dividend "in kind").  JA4429.  The PSPA also gave Treasury warrants that, at a nominal value, allowed Treasury to acquire 79.9% of the common stock in each Company.  JA4429.

### C. Accounting Write-Downs and the 2012 Expectation of Record Profits

Once the Conservatorships began, FHFA directed the Companies to record large accounting write-downs based on predictions about the housing market and mortgage defaults, resulting in large non-cash losses.  JA1244-49.  This required the Companies to take significant draws from Treasury to avoid negative net worth,

7

which in turn increased the dividends owed to Treasury.  JA1271-72.  This "accounting decision" also led to the so-called "circular dividend," where the Companies drew from Treasury's commitment to pay its dividend.  JA158.  The PSPAs were amended twice to increase the amount of Treasury's commitment.  JA159.

Because the losses from 2008-11 came from accounting write-downs, it was foreseeable that, if and when the housing market recovered, these write-downs would be reversed, producing record profits.  JA1272-78.  That is what began to happen in early 2012, when the economy and housing markets recovered.  *Id.*; JA1243-44; JA2420-21; JA2629-39.  The Companies began releasing loan loss reserves, increasing profits.  JA2911.  Loan quality and other financial metrics improved.  *E.g.*, JA1242-61; JA2627-56.  Company documents predicted "a roaring recovery" (JA2573) and the "golden years of GSE earnings" (JA2657) based on continued reversals of write-downs taken previously in Conservatorship.  The Companies recorded growing profits in the first two quarters of 2012 that equaled or exceeded the dividend owed to Treasury.  JA1240-41; JA4431.  They were projected to have sustained profits sufficient to cover that 10% dividend for the foreseeable future.  JA2791; JA2824; JA2950; JA2586; JA2575; JA2864; JA1264-65; JA2935-36.

Given those projected profits, the Companies began discussing "re-recording certain deferred tax assets that had been written-off" (JA2933), which would lead to an increase of the Companies' net worth by approximately $75 billion. JA1274-77; *see also* JA1128-33. Just as the prior accounting reserve taken against that asset contributed to record losses, the expected reversal of that reserve would lead to record profits. JA1132-33.

### D. The Net Worth Sweep and its Effects

On August 17, 2012, Treasury and FHFA executed the Third Amendment to the PSPAs. It replaced the prior dividend rate (of 10% in cash or 12% in liquidation preference increases) with a dividend equal to 100% of the net worth of each Company, subject to a small reserve that would shrink to zero by 2018. JA4435-36. The officials who agreed to the Third Amendment referred to this as the "Net Worth Sweep" (the "Sweep"). *Id.* Treasury provided no new investment or other meaningful consideration in exchange for the Sweep. JA4436; JA1063.

On the day the Sweep was announced, the prices of the Companies' shares plummeted by over 50%, JA937; JA945-46, equal to $1.61 billion. JA943-45.

In 2013, the first year the Sweep took effect, the Companies paid Treasury over $130 billion in cash dividends—$111.2 billion *more* than they would have paid under the pre-existing 10% cash dividend. JA1219-21. By trial, the Sweep had caused Treasury to receive $151.2 billion more from the Companies than it would

9

have received under the pre-existing 10% cash dividend.  JA1221-22.  Contrary to what Defendants assert (at note 1), the Sweep has not been eliminated; instead, in 2019 it was converted to an "in-kind" sweep whereby 100% of the Companies' increase in net worth each quarter is added to Treasury's liquidation preference, rather than being paid in cash.  JA4437.

### E. How and Why the Net Worth Sweep Was Imposed

FHFA claims it agreed to the Sweep to avoid the risk of the Companies engaging in repeated "circular draws"—drawing money from Treasury to pay Treasury the 10% cash dividend—that could potentially cause a material erosion to the Treasury Commitment, which was to become capped at the end of 2012. JA2968; Br.-2, 9-10.  Defendants stress that such an erosion could unsettle the markets for GSE bonds and mortgage-backed-securities ("MBS").  JA2965.

There is not a single FHFA document analyzing the proposed Sweep, let alone one that justifies it based on the risk of circular draws, material erosion of the Commitment, or unsettled bond or MBS markets.  JA1765-67.  The FHFA Acting-Director who agreed to the Sweep, Mr. DeMarco, admitted he did not request any such analysis from anyone at FHFA or the Companies.  JA1891-95; JA1765-66; JA1796.  A senior GSE executive testified he was "surprised" by the Sweep, JA660-61, and the senior FHFA executive in charge of GSE financial projections testified she learned about the Sweep only when it was announced publicly, JA1312-13.

10

A June 25, 2012 Treasury memorandum recorded DeMarco telling Treasury Secretary Geithner that DeMarco "no longer sees the urgency of amending the PSPAs this year" because "the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future…"  JA2575.  Other documents and testimony expressed the same view. JA675-76; JA1354-55; JA1505.  No documents from the months before the Sweep express concerns about the GSE bond or MBS markets, which were stable or increasing in value in the months leading up to the Sweep.  JA1521-22.  A Treasury memo to prepare Secretary Geithner for congressional testimony says the $275 billion Commitment projected to be in place under the 2012 year-end cap would give "substantial cushion" and "should give market participants confidence," and that FHFA could always use the 12% payment-in-kind dividend option to ensure "that draws on the PSPAs are not used to pay dividends."  JA2586.

Far from being concerned the Companies may not make enough income to cover the 10% dividend, Treasury was instead concerned the Companies would make *too much* income, and thus would start building capital and appear on the road to exiting Conservatorship.  On July 31, 2012, FHFA sent Treasury the expected financial results for 2012's second quarter, showing profits in excess of the 10% dividend amount, thus building a positive net worth for each Company. JA2906-07. When this was forwarded to the Treasury point person for the Sweep, he responded:

11

"**Really makes sense to push the net worth sweep this quarter**." JA2906. A little over a week later, DeMarco's right-hand man who served as point person on the Sweep, Mr. Ugoletti, reported to DeMarco there was "a renewed push" from Treasury for the Sweep. JA2922; JA1836-38. It was executed eight days later. JA4435.

When Treasury announced the Sweep, it said it would ensure the Companies "will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." JA2954. Likewise, shortly after meeting with DeMarco on the eve of the Sweep, a senior FHFA official emailed his understanding that the purpose of the Sweep was to "demonstrate wind down." JA2933.

## F. Procedural History

### 1. *Perry II*

Plaintiffs filed this lawsuit in 2013, and it was dismissed in 2014 as part of a decision that also dismissed APA claims brought by non-class plaintiffs. JA98-111.

On appeal, this Court affirmed the dismissal of the APA claim, holding it was barred by HERA's anti-injunction provision (§4617(j)), since FHFA's decision to agree to the Sweep fell within its "extraordinarily broad" statutory authority under HERA. *Perry II*, 864 F.3d at 605-06. But it also held the District Court erred in ruling that "FHFA did not breach the implied covenant because it acted within its statutory authority." *Id.* at 630. It also reversed the district court's ruling that the

implied covenant claim was foreclosed because of class plaintiffs' lack of an enforceable right to specific dividends. *Id.* at 630-31. It held that while dividends are subject to the discretion of the board, "[a] party to a contract providing for such discretion violates the implied covenant if it acts arbitrarily or unreasonably." *Id*. at 631 (citation omitted). It remanded the implied covenant claim to the District Court to be evaluated under the "correct legal standard, namely, whether the Third Amendment violated the reasonable expectations of the parties." *Id*.

### 2.    Motion to Dismiss Denial On Remand

After remand, Plaintiffs filed their Second Amended Complaint, ECF 70, and Defendants moved to dismiss, ECF 66. The District Court denied the motion, holding Plaintiffs pled sufficient facts to support a finding that the Sweep violated their reasonable expectations under the shareholder contracts. JA165-81. It rejected Defendants' argument "that since HERA permits the conservator to act in its own best interests, the FHFA can do whatever it wants and Plaintiffs could not expect otherwise." JA178. It also rejected Defendants' argument that the implied covenant claim had to be dismissed as an anticipatory breach claim. JA209-10.

### 3.    Class Certification

Defendants stipulated to certification of three classes (JA4477-79), which the District Court certified (JA232). The certified classes are all current holders of: (1) Fannie preferred stock ("Fannie Preferred Class"), (2) Freddie preferred stock

("Freddie Preferred Class"), and (3) Freddie common stock ("Freddie Common Class"). *Id.*

### 4.    Summary Judgment

On September 23, 2022, the District Court partially granted and partially denied Defendants' summary judgment motion.  It rejected Defendants' arguments that the decision in *Collins* foreclosed Plaintiffs' implied covenant claim because the issue in *Collins* was whether FHFA acted within its statutory authority when agreeing to the Sweep—not, as in this case, "whether FHFA 'violated the reasonable *expectations* of the *parties*' by adopting the Third Amendment."  JA245 (emphasis in original) (quoting *Perry II*, 864 F.3d at 631).  It also rejected Defendants' argument that because HERA became part of the shareholder contracts, and because courts have held the Sweep fell within HERA's broad authority, there could not be a breach of the implied covenant.  JA246-48.  The court recognized that "whether a certain act falls within FHFA's statutorily authorized discretion and whether FHFA may incur monetary damages for exercising that discretion in a manner inconsistent with its independent contractual obligations are two separate inquiries."  JA247.

The District Court also held Plaintiffs could not seek damages based on the discounted present value of lost dividends (JA250-54) or a restitution of their investment, (JA256-59), but could seek damages based on their claim that the Sweep caused their shares to be worth less than they otherwise would have been, which

14

could be measured by the drop in stock price on the date of the Sweep's announcement (JA255-56).

### 5.  Jury Trial, Verdict, and Judgment

A trial took place in the fall of 2022, which ended in a deadlocked jury and a mistrial. JA82. A second trial commenced in July 2023 and resulted in a unanimous jury verdict for Plaintiffs, with the jury finding that Defendants' agreement to the Sweep breached the implied covenant of good faith and fair dealing inherent in the Companies' shareholder contracts, and awarding damages totaling $612.4 million, as follows: (i) $299.4 million for the Fannie Preferred Class; (ii) $281.8 million for the Freddie Preferred Class; and (iii) $31.2 million for the Freddie Common Class. JA2336.

The District Court entered final judgment of $812 million, including $199.65 million in pre-judgment interest for the Fannie Preferred Class. JA2351. Defendants filed a Rule 50(b) renewed motion for judgment as a matter of law, ECF 423, which the District Court denied, JA2371-92.

### SUMMARY OF ARGUMENT

Section I(A) rebuts Defendants' argument that the Supreme Court's *Collins* decision requires reversal. Like this Court's decision in *Perry II*, *Collins* decided only that FHFA acted within HERA's broad authority when it agreed to the Sweep. If such a ruling foreclosed the implied covenant claim, this Court would not have

remanded that claim in *Perry II*.  The inquiry into whether FHFA violated the implied covenant is entirely distinct from the statutory authority inquiry and depends upon facts not relevant to the statutory question—namely, facts showing whether FHFA's actions were an arbitrary or unreasonable violation of reasonable expectations under the shareholder contracts.  *Collins* did not come close to addressing such facts and thus cannot be a basis for reversing the jury's verdict.

Section I(B) rebuts Defendants' argument that HERA's "best interests" provision means there is "no gap to fill," precluding the implied covenant.  That "best interests" provision confers an enormous amount of discretion on FHFA without telling FHFA how to exercise that discretion, and thus is the opposite of a "gap-filling" provision.  Indeed, the broader the discretion conferred by a contract, the greater the need for the implied covenant.

Section I(C) rebuts Defendants' argument that Plaintiffs' claim is somehow an impermissible one for anticipatory breach.  Plaintiffs do not claim repudiation of an express future contractual obligation.  Instead, their claim is based on the 2012 breach of the implied covenant.  That is the claim they proved to the jury, and Defendants provide no legal authority allowing this Court to recharacterize it into something different.

Section II rebuts Defendants' arguments that there was insufficient evidence to support the jury's findings of injury and damages.  These are highly disfavored

16

arguments that require the Court to draw all inferences in Plaintiffs' favor. Defendants have waived their arguments, which are also meritless. The evidence showed that the harm caused by the Sweep was never ameliorated or lessened as the Sweep remains in effect, and that any changes in post-Sweep prices reflected unrelated phenomena. And expert evidence, including an event study prepared by Defendants' own expert, proved that the more-than-50% stock price decline on August 17, 2012, was caused by the Sweep. That represents a reasonable (and understated) measure of the damage caused by Defendants' breach.

Section III rebuts Defendants' argument that absent class members who purchased their shares after August 17, 2012, suffered no injury and lack standing. In the District Court, Defendants stipulated to the certification of the three classes of current shareholders, which was based on the proposition that the implied covenant claim traveled with the shares when sold. They cannot undo that stipulation, and have waived this argument. They are also wrong because Delaware law holds that claims inherent to share ownership, such as those associated with the relationship between shareholders and the company (like this claim), travel with the shares when sold. That same principle applies in other states, including Virginia.

## STANDARD OF REVIEW

Defendants' Standard of Review fails to make clear that, in deciding whether Plaintiffs presented sufficient evidence to prove harm (Br.-§IV), the Court must

apply "to the jury's decision the same forgiving standard as did the district court,"
i.e., it must "draw all reasonable inferences in favor of the nonmoving party" and
"may not make credibility determinations or weigh the evidence." *Vasquez v.
District of Columbia*, 110 F.4th 282, 290 (D.C. Cir. 2024).

Further, because Defendants' "sufficiency-of-the-evidence" argument is a
disguised *Daubert* attack on Plaintiffs' expert, the Court should either find waiver or
apply plain-error review. *See supra* n.6-7.

## ARGUMENT

## I. THE COURT SHOULD REJECT DEFENDANTS' EFFORT TO REVERSE THE LIABILITY VERDICT.

The Court should reject Defendants' three arguments for reversing the jury's
liability verdict.

### A. *Collins* Provides No Basis For Reversing The Verdict.

Defendants argue that *Collins* forecloses Plaintiffs' claim because it said
FHFA's "business decisions are protected from judicial review" by §4617(f). Br.-
19. Section 4617(f) bars courts from taking "any action to restrain or affect the
exercise of powers or functions of the Agency as a conservator or a receiver."
*Collins* applied that provision to dismiss an APA claim for injunctive relief. 594
U.S. at 227-28. It did not address a damages claim and did not hold that §4617(f)
prohibits any damages claims. In *Perry II*, this Court squarely held that §4617(f)
bars only "injunctive, declaratory, and other equitable relief," and thus does ***not*** bar

an implied covenant claim "insofar as it seeks damages." 864 F.3d at 630-31. That forecloses Defendants' argument. Plus, Defendants did not raise this §4617(f) argument on remand, thereby waiving it. *Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016).[1]

Defendants next argue that *Collins* made a factual finding that FHFA acted "reasonably" in agreeing to the Sweep when it "upheld the pleading-stage dismissal" of the APA claim in that case. Br.-20-26. That is incorrect and a distortion of *Collins*. The APA holding in *Collins* was the same as the APA holding in *Perry II*: i.e., that the APA claim contravened the anti-injunction provision of §4617(f). *Collins*, 594 U.S. at 227-28; *Perry II*, 864 F.3d at 604. *Perry II* makes clear that a ruling of statutory authority has no bearing on the viability of Plaintiffs' implied covenant claim, since it remanded the latter while upholding the former. *Perry II* forecloses Defendants' *Collins* argument.

*Collins* and *Perry II* recognized that whether §4617(f) barred the APA claim depended on "whether the FHFA was exercising its powers or functions as a conservator when it agreed to the third amendment." *Collins*, 594 U.S. at 237; *Perry*

---

[1] Defendants cite *Jacobs v. FHFA*, but it merely held that §4617(f) blocked a disgorgement claim seeking all money Treasury received under the Sweep. 908 F.3d 884, 894 (3d Cir. 2018). It recognized that "appropriate damages claims" not barred by §4617(f) would include breach-of-contract claims. *Id.* at 895. It also cited *Perry II* (as well as an Eighth Circuit case) as holding that §4617(f) bars "only equitable relief, not damages claims." *Id.* at 894.

*II*, 864 F.3d at 606.  Both courts held HERA authorized FHFA to agree to the Sweep, rejecting the same arguments to the contrary.  *Collins*, 594 U.S. at 237-42; *Perry II*, 864 F.3d at 606-15.  *Collins* used the word "reasonably" only in that context of reaching the same legal conclusion this Court reached in *Perry II*, where it simultaneously remanded the implied covenant claim—showing that the statutory authority holding does not determine the outcome of the implied covenant claim. Indeed, the *Perry II* majority emphasized the remand for the damages claims in rebutting the dissent's criticism that the APA dismissal was an "abandonment of the 'rule of law.'"  864 F.3d at 613-14.

Defendants fail to recognize this context for *Collins*' use of the word "reasonably."  That was obviously not a factual finding, since *Collins* affirmed pleading-stage dismissal of the APA claim.  Instead, as the District Court held, it was merely a way of supporting the conclusion that the Sweep was one of many permissible types of actions HERA's broad authority allowed FHFA to choose. JA243-44.  It helped describe the broad latitude HERA gave FHFA to make strategic decisions, thereby explaining the rejection of arguments that HERA simply did not permit such an action.  594 U.S. at 239-40.  *Perry II* said the same thing in rejecting the same arguments.  *See, e.g.*, 864 F.3d at 607, 610-11.

Even if one ignored *Perry II*, the decision in *Collins* could not impact the implied covenant claim.  As the District Court explained, unlike the statutory

authority inquiry, the implied covenant inquiry "is whether FHFA 'violated the reasonable *expectations* of the *parties*' by adopting the Third Amendment." JA244-45. A "party to a contract violates the implied covenant of good faith and fair dealing if it acts arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Id.* (cleaned up). In other words, under the implied covenant, "what is 'arbitrary' or 'unreasonable'—or conversely 'reasonable'—depends on the parties' original contractual expectations." JA245. *Collins* did not come close to addressing this: it did not purport to define the content of "reasonable expectations" under the shareholder contracts, nor to assess the Sweep's reasonableness or arbitrariness with respect to those expectations.

The Supreme Court did not even address the analogous (but distinct) inquiry of whether FHFA's agreement to the Sweep was "arbitrary" or "capricious" under the APA standards in 5 U.S.C. §706(2)(a). The whole point of *Collins* was to *deny* any such substantive review under the APA, which would have required production of the administrative record and briefing on the arbitrary and capricious standard. Like *Perry II*, *Collins* foreclosed any such review. Its purely statutory holding did not depend, and necessarily could not have depended, upon a searching factual review of the administrative record.[2]

---

[2] FHFA would never admit that whether its actions are *ultra vires* depends upon a factual inquiry into the substantive reasonableness of its decisions and decision-making process.

By the same token, in APA cases with no anti-injunction provision like §4617(f), there is nothing novel about a court finding an action to be within statutory authority but arbitrary and capricious under §706(a)(2).  It is even clearer that being statutorily authorized does not answer the distinct question of whether FHFA's action violated the *reasonable expectations of contractual counterparties*.  JA243-46.

Defendants present two charts comparing allegations in *Collins* to evidence in this case.  But *Collins* merely held (like *Perry II*) that those allegations could not change the conclusion that FHFA's action fell within HERA's broad authority.  It said nothing about whether those facts mean FHFA violated reasonable expectations under the shareholder contracts.

For example, *Perry II* held that "for purposes of" resolving the statutory authority question, "allegations of motive are neither here nor there" because HERA's authority does not depend on motive.  864 F.3d at 612.  It was therefore irrelevant in *Perry II* and *Collins* whether the facts showed that FHFA entered into the Sweep to address the "circular draw" phenomenon, or instead did so to acquiesce to Treasury's **opposite concern** of ensuring the Companies "will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  JA2954. But that is highly relevant here.  As the District Court correctly ruled, the reasons FHFA chose to agree to the Sweep, and whether the "circular draw" was pretextual, *are* important to whether FHFA's decision violated shareholders' reasonable

contractual expectations.  JA178-79.  Defendants have not challenged that ruling, and it was correct.  *See Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*, 2015 WL 3863245, at *8 (Del. Super. Ct. June 10, 2015), *aff'd*, 134 A.3d 759 (Del. 2016) (implied covenant evaluates whether determination made for "pretextual reason"); *see also Centex Corp. v. United States*, 395 F.3d 1283, 1304-11 (Fed. Cir. 2005) (tax legislation that intentionally "targeted" benefits under government contract violated implied covenant).

Thus, facts such as the following were irrelevant to the statutory inquiry in *Collins* but central to the implied covenant inquiry here:

- FHFA Acting-Director DeMarco told the Treasury Secretary shortly before he agreed to the Sweep that "**the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future**…," JA2575 (emphasis added)—directly contradicting FHFA's stated reasons for agreeing to the Sweep (JA2965-68).  DeMarco gave testimony at trial about this statement the jury could reasonably have found not credible.  *Compare* JA1665-67, JA1734-41, JA731-37.

- When Treasury's point person on the Sweep received a report in early August 2012 showing both Companies making profits in excess of the 10% dividend and thus building positive capital, he wrote "**Really makes sense to push the net worth sweep**."  JA2906 (emphasis added).  This led to a "renewed push" for the Sweep (JA2922), which was executed within two weeks (JA4435).

- Contrary to what it told the Court when this case began (JA2968-69), FHFA knew when it agreed to the Sweep that the Companies were considering a reversal of the deferred tax asset reserves, which would add tens of billions to their capital, (JA2933); but FHFA dismissed this because the Sweep was "designed to demonstrate wind down."  JA2933.

23

- FHFA's intent in agreeing to the Sweep was also revealed by what happened later: after the Sweep resulted in the Companies paying Treasury $111 billion more in 2013 dividends than they would have paid under the 10% dividend, not a single FHFA document expressed surprise or concern. JA1220-21; JA1757-58. Yet, incredibly, FHFA told the Court the Sweep would not result in more money going to Treasury. JA2968.

Likewise, it was irrelevant in *Collins*, but highly relevant here, whether FHFA's decision to agree to the Sweep was supported by a well-reasoned, substantiated, and orderly process, or instead reflected an arbitrary decision unsupported by facts or analysis. "At a minimum, the implied covenant requires that the party empowered with the discretion to make a determination 'use good faith in making that determination.'" *Am. Healthcare Admin. Servs. v. Aizen*, 285 A.3d 461, 479 (Del. Ch. 2022) (quoting *Gilbert v. El Paso Co*., 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990)). The evidence showed FHFA failed to meet this standard: it did no analysis whatsoever—not a single memo, document, or email analyzes the pros and cons of the Sweep or its likely impacts (JA1765-67); DeMarco consulted no one other than his right-hand man, a former Treasury employee (JA1891-95; JA1880-81); no forecasts or projections were considered, even though it was entirely foreseeable the Companies were poised for a "roaring recovery" (JA2573) with "golden years of GSE earnings" ahead (JA2657), and improved profits would lead to the reversal of accounting write-downs, resulting in a massive increase in the Companies' capital, JA1240-1302; JA1125-40; JA2933,

which would eliminate any possible concern over "circular draws," JA1277-78. And, of course, that is exactly what happened, which is why the Sweep caused the Companies to pay $130 billion in dividends to Treasury in 2013. JA1219-21.

Numerous other facts not relevant to statutory authority demonstrated that the Sweep violated reasonable expectations under the shareholder contracts. *See* SOC §§C-E. Credible experts testified that the Sweep was unprecedented in U.S. financial history. JA1086; JA1205-07. Defendants did not even try to show otherwise. Nor could they persuade the jury that the Sweep was something any shareholder could reasonably have expected.

Based on the evidence, the jury found that FHFA's decision to agree to the Sweep was an arbitrary and unreasonable violation of shareholders' contractual expectations. Nothing in *Collins* supports reversing that verdict. *Collins*, 594 U.S. at 242 ("we conclude only that under the terms of the Recovery Act, the FHFA did not exceed its authority" and therefore "the anti-injunction clause" bars the APA claim).

### B. The District Court Properly Ruled The Implied Covenant Applies Here.

Defendants argue the implied covenant does not apply when the contract specifies how discretion must be exercised, leaving "no gap" for the covenant to fill. Br.-26-33. They claim §4617(b)(2)(J)(ii)—HERA's "best interests" provision—

specifies "the scope of FHFA's contractual discretion: FHFA must act in the 'best interests' of the Enterprises *or* the public." Br.-26.

This makes no sense. The "best interests" provision *confers* discretion on FHFA; it does not specify how that discretion is to be exercised. Under the heading "Incidental Powers," it says FHFA "may" (not "must," per Defendants) "take any action authorized by" §4617 "which the Agency determines is in the best interests of the regulated entity or the Agency." §4617(b)(2)(J)(ii). *Collins* and *Perry II* held the best interests of "the Agency" means the "public interest." *Collins*, 594 U.S. at 238; *Perry II*, 864 F.3d at 600. The provision does not say how the FHFA shall "determine" whether a given action is in the interests of the Companies or the public or some (unspecified) combination of the two; nor what factors to consider; nor what process to follow. Rather, it merely enhances the already broad discretion conferred by HERA.

Defendants' argument is also inconsistent with *Perry II*, which rejected the APA claim because HERA is "framed in terms of expansive grants of permissive, discretionary authority for FHFA to exercise as the 'Agency determines is in the best interests of the regulated entity or the Agency.'" *Perry II*, 864 F.3d at 607. The Court emphasized that "may means may," and "may is, of course, permissive rather than obligatory." *Id.* (quotes omitted). Thus, to reject the APA claim, *Perry II* relied on the ***absence*** of anything that "specifies the scope" of the discretion conferred in

the "best interests" provision—defeating the premise of Defendants' argument. Further, *Perry II* simultaneously reversed the dismissal of the implied covenant claim and directed the District Court to consider both the "best interests" provision and multiple other sources informing reasonable shareholder expectations. *Id.* at 631. That remand is inconsistent with Defendants' argument that the "best interests" provision alone forecloses the implied covenant claim.

Moreover, caselaw holds that the broader the discretion a contract confers on one party, the greater the need for the implied covenant. "Terms that enhance the level of discretion, such as 'sole discretion,' do not eliminate the implied duty. When a party has sole discretion to make a decision, that setting provides ***more reason*** for the implied covenant to apply, not less." *Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*, 302 A.3d 430, 460 (Del. Ch. 2023) (cleaned up, citations omitted) (emphasis added); *Charlotte Broad.*, 2015 WL 3863245, at *7 ("The implied covenant particularly applies where the contract permits a party to exercise sole discretion."). Likewise, the implied covenant applies even where contractual language authorizes a party "to consider 'only such interests and factors as it desires, including its own interest.'" *City of Pittsburgh Comprehensive Mun. Pension Trust Fund v. Conway*, 2024 WL 1752419, at *21 n.246 (Del. Ch. Apr. 24, 2024). And this Court has already held that when a contract provides for one party to act "in its

sole discretion," that party "violates the implied covenant if it acts arbitrarily or unreasonably." *Perry II*, 864 F.3d at 631 (cleaned up).

Defendants' cases confirm that HERA's "best interests" provision cannot "fill the gap" to preclude the implied covenant. Each one turns on contractual language that specifically contemplated and addressed the conduct that was challenged and provided an objective standard for engaging in that conduct:

- A contract governing the acquisition of a business with an earn-out right for plaintiff provided that defendant-acquirer could operate the business as it "deems appropriate in its sole and *good faith* discretion," and further specified that defendants should "use *commercially reasonable efforts* to achieve the full payment of the Earnout Purchase Price." *S'holder Representative Servs. LLC v. Medidata Solutions, Inc.*, 2020 WL 972618, at *5 (D. Del. Feb. 24, 2020). These contractually-specified standards of "good faith" and "commercially reasonable efforts" were held to foreclose an implied covenant claim based on the failure to achieve the full earn-out. *Id*.

- A limited partnership agreement provided that the limited partners could remove the Managing Partner if they "*in good faith* determine" that removal of the Managing Partner "is necessary for the best interest of the" limited partnership. *Policemen's Annuity and Benefit Fund of Chicago v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012) (emphasis added). Since the contract addressed the precise act that was being challenged (removal of the Managing Partner), and specified the standard governing the discretion to take that act (a "good faith" determination of the best interests of the limited partnership), there was no reason to apply the implied covenant (which would merely have reiterated the "good faith" standard). *Id.*[3]

---

[3] In a later case involving an implied covenant claim, the Delaware Supreme Court reversed the Vice-Chancellor who decided *Policeman's Annuity*, holding that the covenant applied notwithstanding contract language invoking a general "good faith" standard. *Gerber v. Enter. Prod. Holdings, LLC*, 67 A.3d 400, 419-20 (Del. 2013),

- An LLC agreement provided that while minority shareholders had "tag-along" rights to receive the same compensation in an acquisition as majority shareholders, it also provided that those rights could be eliminated through a majority vote of those "adversely affected." *Khan v. Warburg Pincus, LLC*, 2025 WL 1251237, at *7-*8 (Del. Ch. Apr. 30, 2025). It also said the majority owed no fiduciary duties to the minority. *Id.* In connection with an acquisition, a majority of the adversely-impacted minority shareholders voted to approve the elimination of their tag-along rights. A court held that no implied covenant could be invoked regarding that elimination given the express provisions governing how that could be done. *Id.* at *6-*8.

Unlike the contractual provisions in these cases, HERA did not specifically contemplate and address the Sweep, nor specify the standards under which FHFA could agree to it. All it did was give FHFA broad discretion.

Further, Defendants admit that even where a contract supplies a general standard for the exercise of discretion, the implied covenant applies to give that standard "significance and effect." Br.-31 (citing *Wilmington Leasing v. Parrish Leasing Co., L.P.*, 1996 WL 560190 (Del. Ch. Sept. 25, 1996)); *see also DG BF, LLC v. Ray*, 2021 WL 776742, at *17 & n.132 (Del. Ch. Mar. 1, 2021) (implied covenant applies "if, notwithstanding contractual language on point, the defendant failed to uphold the plaintiff's reasonable expectations under that provision"). The Delaware Supreme Court has reiterated that the implied covenant "encompasses 'the principle

---

*overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

of contract construction that if one party is given discretion in determining whether [a] condition in fact has occurred[,] that party must use good faith in making that determination.'" *Baldwin v. New Wood Res., LLC*, 283 A.3d 1099, 1116 & n.97 (Del. 2022) (collecting cases).

Thus, the District Court correctly ruled that Defendants cannot simply invoke the "best interests" provision and say Plaintiffs must expect that FHFA "can do whatever it wants"; instead, "[t]he question is whether Defendants exercised their discretion arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract." JA247.

Defendants' position boils down to the extreme proposition that if an FHFA action falls within HERA's broad statutory authority, then that action ***cannot*** be a breach of the implied covenant—no matter what. That contradicts *Perry II*: if a ruling that FHFA acted within its statutory authority disposed of the implied covenant claim, there would have been no reason for the remand over eight years ago. In any event, an agency can obviously be statutorily authorized to take an action while also acting arbitrarily and unreasonably in deciding to take that action. *See* §I(A), above.[4]

---

[4] HERA expressly says the Companies can be liable for contractual damages for FHFA actions HERA authorizes. §4617(d). While not directly applicable, this provision confirms there is nothing odd about liability for contractual damages being based on actions authorized by HERA.

Defendants are also wrong that HERA's "best interests" provision alone defines Plaintiffs' reasonable expectations.  As *Perry II* recognized, Plaintiffs' reasonable contractual expectations were informed by much more than that provision, including:

- HERA required Treasury to consider the "need to maintain the corporation's status as a private shareholder-owned company" and "the orderly resumption of private market funding."  §1719(g)(1)(C)(iii), (v).

- HERA identified only two "Powers as conservator" for FHFA, which were to take actions "(i) necessary to put the [Companies] in a sound and solvent condition," and "(ii) appropriate to carry on the business of the [Companies] and preserve and conserve the assets and property of the [Companies]."  §4617(b)(2)(D).

- FHFA repeatedly stated its goal was to make the Companies "solvent," "preserve and conserve" their assets, ensure they "maintain a positive net worth," resume "normal business operations," and exit Conservatorship so they can be "returned to their shareholders."  JA2432-33; JA2452; JA3063-65; JA3083-84.

Based on the above, the jury rationally could have found that shareholders could never have reasonably expected something as drastic, unprecedented, and contrary to FHFA's stated goals as the Sweep.

Defendants say the implied covenant cannot require FHFA "to prioritize" shareholders over the public, Br.-32, but the District Court never held otherwise.  To the contrary, it instructed the jury that "HERA authorized FHFA to act in the best interests of the GSEs, the FHFA, or the public."  JA2331.  It further instructed that "FHFA's exercise of that statutory authority can still have violated the implied

31

covenant of good faith and fair dealing if it exercised that authority in a way that arbitrarily or unreasonably violated plaintiffs' reasonable expectations under the contract." *Id.*  Defendants do not challenge that instruction.  HERA did not require FHFA to prioritize shareholders, but merely provided that Defendants may have to pay damages if their conduct arbitrarily and unreasonably violated reasonable contractual expectations.  Based on ample evidence, SOC §§C-E, §I(A) above, that is what the jury found.

### C. Plaintiffs' Implied Covenant Claim Is Not A Claim For Anticipatory Breach.

Defendants ask the Court to characterize Plaintiffs' implied covenant claim as one for anticipatory breach of contractual dividend rights, which they say is premature because shareholders have a unilateral contract (i.e., have fully performed).  The District Court properly rejected this argument, JA209-10.

Plaintiffs' claim is not one for anticipatory breach because Plaintiffs do not "seek to hold defendants presently accountable for a future breach of an express provision."  JA209.  Instead, Plaintiffs "seek to hold defendants presently accountable for a present breach of an implied promise inherent in every contract— that both parties will operate in good faith and not violate their co-contracting party's reasonable expectations."  *Id.*  As the District Court recognized, that obligation "is an ongoing obligation; performance is always due."  *Id.*; *see also Restatement (Second) of Contracts* §235 cmt. b.  Defendants concede (as they must) that "[i]f a

contracting party breaches a present contractual obligation, the other party generally may sue for damages immediately." Br.-33.

Defendants have no answer to this straightforward point. They fail to cite a single case that has ever dismissed an implied covenant claim by holding it is "in substance" an anticipatory breach claim.

Defendants suggest that because the Sweep nullified any possibility of dividends being paid to private shareholders "in the future," that somehow converts the implied covenant claim into an anticipatory breach claim. No case supports that. What matters is when the *breach* occurred, not whether the harm caused by the breach persists "in the future." It is unremarkable that a current breach may cause harm "in the future"—such as one that triggers a "lost profits" claim, which in no way implicates the anticipatory breach doctrine.

Defendants devote more than a page to arguing that the breach of an implied covenant is a "breach of contract." Br.-35-36. No one has suggested otherwise. That a breach of the implied covenant is a breach of contract does nothing to support Defendants' position that the breach is an *anticipatory* one.

Nor does it help Defendants that *Perry II* found that a claim for breach of an express contractual provision (over liquidation rights) was anticipatory. 864 F.3d at 632-33. At the same time, *Perry II* remanded the implied covenant claim without in any way suggesting that *it* was "anticipatory." *Id.* at 630-31.

Defendants also ignore that the District Court instructed the jury on the implied covenant's legal standards (JA2330-32), and the jury then expressly found that Defendants violated the implied covenant by "entering into the Net Worth Sweep." JA2336. The jury found that a breach occurred on August 17, 2012—not that there was some anticipated breach of an express future obligation. Defendants do not claim there was insufficient evidence to support that verdict, or that the jury was improperly instructed (both of which would be waived arguments). Yet they are asking this Court to override the jury's factual determination as to what Plaintiffs proved to recharacterize Plaintiffs' claim into something contrary to what the jury found. No case or legal principle remotely supports that extreme outcome.

Defendants also say little will remain of the "unilateral contract" exception to the anticipatory breach doctrine. But the only way a party can bring an implied covenant claim is by meeting its standards, which are obviously different from the standards for anticipatory breach of an express provision. Defendants give no basis for asserting that every party barred by the unilateral contract exception will always be able to invoke the implied covenant.[5]

---

[5] It also would be bizarre to nullify an implied covenant verdict to give effect to a little-used and much-criticized exception to the anticipatory breach doctrine. JA163 (citing authorities).

## II.    PLAINTIFFS INTRODUCED SUFFICIENT EVIDENCE OF HARM AND DAMAGES.

Defendants make three "highly disfavored" arguments attempting to overturn the jury's damages verdict for insufficient evidence. *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2001) (reversal "warranted only if 'no reasonable juror could reach the verdict rendered in the case.'"). In assessing those arguments, this Court must apply "the same forgiving standard as did the district court" in denying the Rule 50 motion (JA2371-92), i.e., it must "draw all reasonable inferences in favor of the nonmoving party" and "may not make credibility determinations or weigh the evidence." *Vasquez*, 110 F.4th at 290.

Before rebutting Defendants' arguments, it is worth briefly summarizing how Plaintiffs proved both the existence of harm and the measure of damages. In general, the evidence showed that the Sweep transferred 100% of all future profits in the Companies to Treasury, which makes it impossible for private shareholders ever to receive anything, no matter how much the Companies make in future profits. JA1204; JA876-78; JA953. This alone made it reasonable for the jury to find that the Sweep harmed private shareholders.

Plaintiffs also presented expert testimony from Dr. Joseph Mason, who testified that a reasonable way to measure the harm was to look at the dramatic drop in the Companies' share prices caused by the Sweep's announcement. JA951-53; JA960-61. The day the Sweep was announced, the total market value of the three

35

classes of shares dropped by over 50%, approximately $1.6 billion.  JA944.  That testimony was based on an "event study" prepared by ***Defendants'*** expert, Dr. Attari, that analyzed the change in stock price on and around August 17, 2012, the date the Sweep was announced.  JA938-44.  Dr. Mason testified that this lost share value was caused by the Sweep, was a reasonable measure of Plaintiffs' damages, and persists to this day (since the Sweep remains in effect).  JA960-61; JA955.

Defendants did not offer any competing measure of damages.  Nor did they seek to exclude Dr. Mason's testimony.  While they now claim the evidence was "insufficient" to support the verdict, each argument is just an attack on the reliability and admissibility of Dr. Mason's testimony.  But they failed to ask the District Court to exclude that testimony, thus waiving any such argument on appeal. Numerous courts have held that where an "insufficiency argument is identical to the admissibility objection" to an expert that a party has waived, the insufficiency argument is also waived.  *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996) ("Although we recognize that evidence which is unreliable is necessarily insufficient, the appropriate time to raise *Daubert* challenges is at trial," and a waiver of that challenge cannot be evaded by couching argument "in terms of insufficiency of the evidence"); *id.* at 1067 (rule prevents "unfair advantage").[6]  Other courts treat

---

[6] *See also Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013) (rejecting as waived an attack on expert methodology made "[u]nder the guise of sufficiency of the evidence"); *C.B. Fleet Co. v. SmithKline Beecham Consumer*

such arguments as raising nothing more than a "plain error" review of the expert's testimony,[7] which Defendants have not even attempted to demonstrate.

Defendants chose not to argue any of these alleged inadequacies of evidence to the jury. They also did not ask their expert, Dr. Attari, to address any of these alleged inadequacies in his testimony.

In addition to being waived, each argument is meritless.

**A. Defendants' "Rebound" Argument Is Meritless.**

Defendants argue that Dr. Mason failed "to account for" certain increases in the Companies' stock prices in late 2012. Br.-38-41. In addition to being waived as a disguised attack on expert methodology (see above), this argument is also waived because Defendants repeatedly agreed they would ***not*** argue "that the share price increases after the Third Amendment mitigated damages," JA4497, nor "that post-third amendment prices would be relevant to the damages," JA1038. They waived again by failing to raise the argument in their Rule 50(a) motion at the close of

---

*Healthcare, L.P.*, 131 F.3d 430, 437 (4th Cir. 1997) (rejecting as waived argument challenging expert testimony "under the guise of a challenge to the substantive sufficiency of this evidence"); *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 769 (8th Cir. 2020) (defendant "waived any argument regarding the admissibility of the expert damages models" by failing to object at or before trial); *United States v. Gaskin*, 364 F.3d 438, 460 n.8 (2d Cir. 2004) (rejecting as waived appellant argument that "evidence was insufficient" because it challenged foundation of expert opinion not objected to).

[7] *Christopher v. Cutter Lab'ys*, 53 F.3d 1184, 1192 (11th Cir. 1995); *Macsenti v. Becker*, 237 F.3d 1223, 1233–34 (10th Cir. 2001).

Plaintiffs' case-in-chief (JA1441-42).  *Campbell v. District of Columbia*, 894 F.3d 281, 286-88 (D.C. Cir. 2018).  Moreover, there is an additional waiver because this argument relates to mitigation.  Once Plaintiffs presented evidence of harm and damages from the Sweep, it was Defendants' burden to prove that damages were mitigated.  *W.G. Cornell Co. v. Ceramic Coating Co*., 626 F.2d 990, 993 (D.C. Cir. 1980) (citation omitted).  They chose not to present any evidence or argument about post-Sweep share prices.  Having made that choice, they "cannot now claim that the award was improper" because Dr. Mason failed to address post-Sweep prices.  *Cornell*, 626 F.2d at 993.

The argument is also meritless.  Defendants claim that because a one-day price drop may overestimate damages, "Courts thus 'do[] not calculate damages based on a single day decline in price, but instead allow[] the security an opportunity to recover.'"  Br.-39 (quoting *Acticon AG v. China North East Petroleum Holdings, Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012)).  But that quote does not describe what "Courts" do generally; it describes one inapplicable "provision" in the Private Securities Litigation Reform Act ("PSLRA").  *Acticon*, 692 F.3d at 38-39.  That provision caps damages "in a securities fraud action" (*id*. at 38) to the difference between (a) the price the plaintiff paid for the security when the fraudulent statement was in effect, and (b) the security's mean trading price "during the 90-day period" after the

38

corrective disclosure.  15 U.S.C. §78u-4(e)(1).  That rule does not apply here.  *Id.* (cap applies only "in any action arising under this chapter").

Nor is the policy underlying the PSLRA rule relevant here.  Unlike a securities fraud case, where the injury is an inflation of the stock price caused by misrepresentations, the injury in this case is that the Sweep caused "a fundamental and permanent change to the capital structure of the company, permanently alienating shareholders from the profits of the GSEs."  JA2388.  The share-price drop was used to provide a reasonable estimate of damages, not because it was, in and of itself, the injury over which this case was brought.  JA525.

Regardless, as shown in §II(C), the evidence overwhelmingly showed that the Sweep caused the one-day price drop; and it is literally impossible for any post-Sweep spike in price to reflect the elimination or amelioration of the Sweep, because it remains in effect.  Nor could Defendants reasonably suggest that subsequent price increases reflected some sort of market reevaluation of its significance, given that it eliminated any possibility of future distributions to shareholders.  Given that, the only rational conclusion is that the share-drop *understated* damages.  This fact pattern does not remotely trigger the policy concerns that animated the PSLRA's "bounce-back" provision.[8]

---

[8] Even in the inapposite PSLRA context, the Second Circuit recognized that it is "improper to offset gains that the plaintiff recovers after the fraud" if "the stock recovers value for completely unrelated reasons."  *Acticon*, 692 F.3d at 41.

Defendants do not even attempt to offer a coherent explanation for how subsequent price increases could have reflected an absence of harm or otherwise been connected to the Sweep, nor did they make any such argument to the jury. To the contrary, Defendants' own expert, Dr. Attari, prepared the event study and lists events associated with post-Sweep changes in stock price that had nothing to do with the Sweep. JA2983-85. Dr. Attari made no effort to suggest that subsequent events reflected a mitigation or absence of harm, nor did Defendants make any such suggestion to the jury. JA4516-4607. The jury could have reasonably concluded that such silence spoke volumes. Moreover, Plaintiffs' expert addressed the fact that the market perceived a residual value in the shares notwithstanding the Sweep's nullification of all possibility of participating in future profits, JA1042; JA1045, which shows why positive economic news after the Sweep could result in increased prices. But subsequent prices shed zero light on how to value the harm caused by the Sweep—and thus are irrelevant, as Defendants agreed below.

### B. Plaintiffs Presented Sufficient Evidence That The Net Worth Sweep Harmed Current Class Members.

Defendants next argue that Plaintiffs failed to present evidence to show current shareholders are "worse off today due to the Net Worth Sweep." Br.-41-43. That is incorrect. Plaintiffs introduced evidence showing that the Sweep remains in effect—while it now transfers the Companies' net worth to Treasury by adding to Treasury's liquidation preference, it still gives *100%* of all profits and net worth to

40

Treasury.  JA878; JA4437; JA4501.  This shows obvious harm to current shareholders, and certainly allowed a reasonable jury to so conclude.

To the extent Defendants are arguing that the stock-drop on August 17, 2012, was not a reasonable *measure* of damages suffered by the three classes of current shareholders, that is nothing more than a disguised *Daubert* challenge to Dr. Mason's entire testimony—which was not made, and hence was waived.  *See supra* n.6.  Indeed, far from arguing that Plaintiffs needed to present more analysis about events after August 17, 2012, Defendants expressly represented to the District Court that such post-Sweep events were "not relevant."  JA1038.  That further waived any ability to argue on appeal that more expert analysis of post-Sweep injury was needed.

In any event, the stock-drop from August 17, 2012, *is* a reasonable measure of the classes' damages.  The standard for estimating damages is permissive—so long as "the award is within a reasonable range and that the jury did not engage in speculation or other improper activity," damages should be upheld.  *United States ex rel. Miller v. Bill Harbert Int'l Constr. Inc.*, 608 F.3d 871, 905 (D.C. Cir. 2010); *see also U.S. Conf. of Mayors v. Great-West Life & Annuity Ins. Co.,* 327 F. Supp. 3d 125, 135 (D.C. Cir. 2018) ("Precisely determining damages" from contract breach "can be challenging, but so long as plaintiffs can provide reasonable support for their damages claim, a defendant cannot avoid liability by arguing the damages calculation is imprecise."); *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch.

2010) ("Responsible estimates of damages" are permissible since "[p]ublic policy has led Delaware courts to show a general willingness to make a wrongdoer bear the risk of uncertainty of a damages calculation where the calculation cannot be mathematically proven.") (quotes and cites omitted); *E.I. DuPont deNemours & Co. v. Universal Moulded Prods. Corp.*, 191 Va. 525, 572-73 (1950) ("intelligent and probable estimate" of damage is sufficient).

The stock-drop caused by the Sweep meets this standard. It reflects the objective judgment of the market that at least 50% of the value of the private shares held by the three classes was nullified by the Sweep. Given that the Sweep made it impossible for shareholders to ever receive any distribution from the Companies no matter how large their future profits, that market-based judgment almost certainly understates damages. Plaintiffs' expert gave unrebutted testimony that the $1.6 billion in damages "still persists today." JA955. Defendants call this "*ipse dixit*," but they chose not to offer any contrary testimony from their expert. JA4516-4607. And they waived any ability to challenge Dr. Mason's testimony as unreliable. Further, the law supports measuring damages as of the time of the breach. *See Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000) ("the most accurate and immediate measure of damages is the market value of the asset at the time of breach"); *United Va. Bank v. Dick Herriman Ford, Inc.*, 215 Va. 373, 375 (1974)

42

("The general rule is that damages are to be determined at the time of breach of a contract. Evidence of fluctuations in value after the breach is irrelevant.").[9]

### C. There Is Sufficient Evidence Showing The Sweep Caused The Stock-Drop Used To Measure Damages.

Defendants say Dr. Mason failed "to account for a possible alternative cause of the one-day drop"—i.e., that in addition to the Sweep, the Third Amendment also provided for the Companies to accelerate the pace at which they reduced their "retained mortgage portfolio." Br.-43-45.

Dr. Mason gave unrebutted testimony explaining why the reduction in the retained portfolio could not have caused the stock-price drop. He explained that the Third Amendment's "accelerated reduction" of the portfolio was merely a change from 10% per year to 15% per year, and that both Companies were always going "to stop at $250 billion of portfolio value per entity," which the Third Amendment did not change and which the market had known for years. JA991-93. He testified that this marginal difference in the reduction of the portfolio could not have caused the drop in stock price on August 17, 2012, especially in light of "the overriding effect"

---

[9] *Jaroslawicz v. M&T Bank Corp.*, 2024 WL 474846, at *17-18 (D. Del. 2024) (Br.-43) involved a successful class certification challenge to an expert's constant-dollar inflation approach in a securities fraud case—an otherwise commonly-accepted methodology—because the expert offered "no discussion or rationale." That has no application here, given that the Sweep remains in effect and continues to alienate shareholders from the Companies' profits.

of the Sweep.  JA957-58.  He testified that the Sweep was "very dramatic," that "in my study of financial crises from my entire career, I've never seen this done before, just taking all the profits and saying to shareholders, You'll never see a thing and the companies will never get to benefit from that money."  JA953.  It was that dramatic and unprecedented Sweep, he explained, that caused the sudden drop in stock price.  JA953-54.  This testimony was more than sufficient for the jury rationally to conclude that the Sweep is what caused the stock drop, not the marginal change in the portfolio reduction.

Other evidence further supported this conclusion. The former Freddie CEO testified the Third Amendment only "slightly speeded up" the reduction in the portfolio, and that "the numbers were not that large at that point." JA712.  Defendants' expert (Dr. Attari) agreed with this characterization.  JA4608-09.  Plaintiffs' expert Dr. Dharan further corroborated that the Sweep was the "key part of the third amendment" and the portfolio reduction "didn't have the same impact." JA4500.

Defendants rely on misleading excerpts from the cross-examination of Dr. Mason to suggest he admitted there was no way to disaggregate the effect of the Sweep versus the portfolio reduction.  Br.-44-45.  In context, he merely agreed to generalized statements by defense counsel regarding the need to address plausible competing explanations in an event study; he never agreed that the portfolio

44

reduction was a plausible competing explanation for the stock-price drop, and ample evidence showed it was not.

Defendants point to no testimony or document saying that the portfolio reduction caused the stock drop. And if there were *any* plausible argument that it did, Defendants' expert—who created the event study relied on by Dr. Mason—would have given testimony to that effect. Instead, he never addressed the point. JA4516-4607. Nor did Defendants even bother arguing this point to the jury in closing—which they would have if they believed what they are saying now.[10]

## III. DEFENDANTS' ARGUMENT THAT THE IMPLIED COVENANT CLAIM DID NOT "TRAVEL" TO POST-SWEEP SHAREHOLDERS IS WAIVED AND MERITLESS.

Defendants say class members who purchased shares after the Sweep announcement lack "standing" because the implied covenant claims did not "travel with the shares." Br.-46. This argument is meritless.

### A. The Implied Covenant Claim Traveled to Post-Sweep Purchasers Under Delaware and Virginia Law.

Both Delaware and Virginia have codified UCC §8-302, which provides:

"a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer."

---

[10] *See also Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 489 (S.D.N.Y. 2022) (upholding damages based on event study; jury award of less than full amount showed how "carefully they parsed the evidence").

6 Del. C. §8-302(a); Va. Code Ann. §8.8A-302(a).  That or something similar dates

back to the original UCC, and codified what had long been the law before that.  Cox

& Hazen, *Treatise on the Law of Corporations* §28:6 (4th ed. Dec. 2024 update).

Section 8-302 and caselaw applying it make clear that Plaintiffs' claims

automatically "travel with the shares" upon sale.  Because Defendants have no

answer to this, they have a four-page wind-up filled with misleading assertions (*see*

§III(A)(2), below).  The starting point should be the Delaware caselaw that makes

clear Plaintiffs' claims automatically travel with sale.  Delaware is not an "outlier"

as Defendants falsely assert without citation; as shown in §III(A)(2) below, the

central principle is inherent in §8-302(a) and applies everywhere, including Virginia.

### 1.  Delaware Law

On its face, §8-302 conveys "***all*** rights in the security" that a seller "***had power***

***to transfer***."  Delaware caselaw confirms this includes all legal claims "arising from

the relationship among stockholder, stock and the company."  *Urdan v. WR Cap.*

*Partners*, 244 A.3d 668, 677 (Del. 2020).   "A corporate charter violation claim

travels with a stock sale because the injury 'is to the stock and not the holder.'"  *Id.*

Under Delaware law, the contract between shareholders and their companies

includes the corporate charter, which itself incorporates the certificates of

designation for the issued shares.  *See, e.g.*, *W. Palm Beach Firefighters' Pension*

*Fund v. Moelis & Co.*, 311 A.3d 809, 822 (Del. Ch. 2024); *Halifax Fund L.P. v.*

*Response USA, Inc.*, 1997 WL 33173241, at *1 (Del. Ch. May 13, 1997). Thus, a claim that the shareholder contract has been breached is a claim that the corporate charter has been breached; it travels with the shares.

More generally, any claim that is inherent to what it means to own "all the rights in the security" must travel with the shares. Other examples include challenges to the fairness of a proposed transaction, a challenge to an executive compensation plan, or breach-of-fiduciary-duty claims. *Urdan*, 244 A.3d at 676-78. Common to such claims "is the close relationship between the stock and the claims asserted." *Id.* "When a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit from any recovery or other remedy, travel with the shares." *In re Activision Blizzard Inc. S'holder Litig.*, 124 A.3d 1025, 1050 (Del. Ch. 2015). Thus, "a buyer of stock gains the right to assert and recover on direct claims regarding pre-purchase conduct." *In re Endeavor Grp. Holdings, Inc. S'holders' Litig.*, 2025 WL 2754367, at *5 & n.28 (Del. Ch. Sept. 29, 2025) (collecting cases).[11]

The principle is so well-established that, in class actions involving the implied covenant, Delaware courts routinely certify classes consisting of "transferees" and

---

[11] *See also Moelis*, 310 A.3d at 1002 ("the ability to assert any direct claim and benefit from any remedy passes to the buyer with the shares"); *Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broad. Sys.*, 2014 WL 2943570, at *4 (Del. Ch. June 27, 2014) (preferred-stock certificate right "is a right inherent in these securities, and thus was transferred, upon sale of the shares, to the purchaser").

"successors-in-interest." *See, e.g.*, *In re CVR Refining, LP*, 2022 WL 2902642, at *1 (Del. Ch. July 22, 2022); *In re CVR Ref., LP*, 2020 WL 506680, at *13 (Del. Ch. Jan. 31, 2020) (implied covenant); *Allen v. El Paso Pipeline GP Co., LLC*, 90 A.3d 1097, 1098 (Del. Ch. 2014).

Plaintiffs allege that the Sweep breached shareholders' contracts by causing "a fundamental and permanent change to the capital structure of the company, permanently alienating shareholders from the profits of the GSEs." JA2388. For such a claim, "the right to assert the claim and benefit from any recovery is a property right associated with the shares. *By default, that property right travels with the shares*." *Activision*, 124 A.3d at 1044 (emphasis added).

By contrast, it is only "[r]ights that are personal to the security holder" that do not automatically transfer with the sale of the security. *Urdan*, 244 A.3d at 677. Such claims "do not depend on the relationship between the stockholder and the corporation or the existence of an underlying security." *Id.* Examples of personal claims are "a tort claim for fraud in connection with the purchase or sale of shares," (including a securities fraud claim, as discussed below), or a claim that the breach of "an agreement to purchase or sell shares"—as opposed to a breach of the *security contract* itself. *Id.* For these "personal" claims, "the cause of action is not a property right carried by the shares, nor does it arise out of the relationship between the stockholder and the corporation." *Id.*

Defendants have no answer to this. They do not even attempt to distinguish Plaintiffs' implied covenant claim from the other types of claims that *Urdan* and *Actvision* say travel with the shares.

Instead, they try to liken Plaintiffs' contractual rights to the plainly personal rights at issue in *Sabby Volatility Warrant* Master *Fund Ltd. v. Jupiter Wellness, Inc*., 2025 WL 1363171 (2d Cir. May 12, 2025). Br.-53. They are nothing alike. *Sabby* involved the right to recover a specific dividend that was due when plaintiff owned his shares. The court found the right to "receive payment of a lawfully declared dividend is a separate property right of the record stockholders and, thus, is not a right 'in the security.'" *Sabby*, 2025 WL 1363171, at *2 (quoting *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001)). The company bylaws expressly stated that "only stockholders of record on the date so fixed" could receive "payment of such dividend" "notwithstanding any subsequent transfer." *Sabby*, 2025 WL 1363171, at *2. That reflected an established custom that "[a]s of the record date for the dividend, shares customarily trade 'ex dividend,' meaning that the seller, who is the record holder as of the record date, retains the right to the dividend," a fact that "[t]he buyer knows" and which is reflected in the share price. *Sunstates*, 2001 WL 432447, at *3 n.11.

By contrast, Plaintiffs' claim here does not involve a "separate property right" that the Companies' bylaws (and custom) say belongs to owners as of a certain date.

49

2.      **Virginia Law**

Defendants say Delaware is an outlier, but they cite nothing in support.  In

reality, Delaware just has more caselaw interpreting §8-302(a). But all states have

that provision, and when the issue arises of what claims "travel with the shares,"

states generally follow Delaware's approach, rooted as it is in the principles of §8-

302(a).[12]

Thus, since Virginia has an identical §8-302(a) provision to Delaware's,[13] the

only rational conclusion is that the result in Virginia is identical to that in Delaware.

Indeed, Virginia courts consistently look to Delaware for guidance on matters of

corporate law.  *E.g.*, *Pagliara v. Federal Home Loan Mort. Corp.*, 203 F. Supp. 3d

678, 689 n.18 (E.D. Va. 2016).[14]

---

[12] *E.g.*, *FDIC v. Citibank N.A.*, 2016 WL 8737356, *4-*5 (S.D.N.Y. Sept. 30, 2016)
("New York and Delaware law are consistent" in applying §8-302(a) to hold that
"[w]here the claim concerns the relationship between the stockholder and the
corporation, or attributes of the security or bond *itself*, the claim "inheres" in the
security and passes with the sale of the security"); *R.A. Mackie & Co., L.P. v.
PetroCorp Inc.*, 329 F. Supp. 2d 477, 507 (S.D.N.Y. 2004) (applying Texas version
of §8-302(a) to hold breach of contract claim "automatically transferred").

[13] *Compare* Va. Code Ann. §8.8A-302(a) *with* 6 Del. C. §8-302(a).

[14] While Defendants claim that §8-302(a) is interpreted in *Day v. MCC Acquisition,
LC*, 848 S.E.2d 800 (Va. 2020), that is obviously false.  *Day* was an interpleader case
addressing who was the equitable owner of stock; it had nothing to do with the
question of what claims travel with the shares nor did it rely on §8-302(a).

Further, as with Delaware, Virginia holds that shareholder contracts include the corporate charters, which incorporate the certificates of designation issued with the shares. *Middleburg Training Center, Inc. v. Firestone*, 477 F. Supp. 2d 719, 724 (E.D. Va. 2007). A claim that the Sweep breached the implied covenant inherent in those shareholder contracts is a claimed violation of the corporate charter and, therefore, travels with the shares.

Defendants argue that Virginia law should be interpreted to be "uniform" with other jurisdictions. That makes no sense since they never demonstrate that any other jurisdiction would hold that Plaintiffs' claims would not travel with the shares.

Given the above, it is perhaps unsurprising that Defendants decided to ignore §8-302(a) and Delaware caselaw for the first four pages of their argument, where they seek to construct a misleading framework based on inapposite caselaw.

Defendants first cite cases for the proposition that "a legal claim relating to property is not automatically assigned when the property is sold" (Br.-47). Defendants cite (a) a federal common law ruling that antitrust claims require an express assignment if not the entity injured, *DNAML Pty, Ltd. v. Apple Inc*., 2015 WL 9077075, at *1 (S.D.N.Y. Dec. 16, 2015), and (b) a case addressing the ability to challenge regulations governing real estate that had been sold, *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 821-22 (6th Cir. 2015). Such cases are inapposite because they

51

do not involve the sale of securities and thus do not involve UCC §8-302(a) as elucidated by cases like *Urdan* and *Activision*.

Defendants then claim that what they call the "common-law no-automatic-assignment rule" also "applies to federal ***securities fraud*** claims." Br.-48 (emphasis added). But claims involving fraud are personal to the defrauded victim, are not "inherent in the security," and are not based on "the relationship among stockholder, stock and the company." *Urdan*, 244 A.3d at 677. And contrary to their representation, the cases Defendants cite (Br.-48) do not apply a general "common-law no-automatic-assignment rule," but instead just hold that federal securities laws generally protect those who sell at a loss caused by a violation, making the claims personal in nature (consistent with Delaware law).

Defendants then misleadingly assert that "[t]he overwhelming majority of states likewise 'have adopted the rule applied to federal securities law claims—i.e. there is no automatic transfer.'" Br.-49. But the cases they cite are "securities fraud" cases that simply follow the same inapposite principle that such claims are personal. All this is consistent with Delaware caselaw holding that claims inherent in a security's relationship with the company, like Plaintiffs' claims, must travel with the shares.

Defendants then assert that ***no*** claims can ever transfer with the sale of a security unless a state legislature "speaks directly" to the question. That is meritless

and contradicts §8-302(a) and the caselaw cited in §III(A)(1) above. Defendants are trying to create a sort of "clear statement principle" that simply does not exist.

**B. Defendants Are Also Wrong To Say Their Argument Is Jurisdictional, Which They Do To Evade Their Waiver.**

Defendants claim their argument goes to Article III jurisdiction, citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). But *TransUnion* did not address whether legal claims traveled with the sale of shares. Moreover, courts have consistently recognized that arguments about whether a claim has been assigned are issues of contractual standing, not of Article III jurisdiction. *See Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350-51 (5th Cir. 2021) (distinguishing Article III standing and contractual standing based on assignment); *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) ("Contractual standing is distinct from Article III standing and does not implicate subject-matter jurisdiction."); *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1351 n.11 (11th Cir. 2009); *Quad/Graphics, Inc. v. One2One Commc'ns LLC*, 2012 WL 280605, at *1 (E.D. Wis. Jan. 31, 2012).

The reason Defendants strain to invoke Article III is to avoid their waiver. In August 2021, Plaintiffs filed a motion to certify the three classes, expressly invoking the proposition that the implied covenant claims "***traveled to the purchasers***" whenever such shares were sold. JA4462-63. Defendants did not challenge that principle, but instead stipulated to class certification. JA216; JA4477-79. While the

stipulation said it was "without prejudice" to the right of either party to seek to decertify or modify the class certifications through an "appropriate motion," *id.* ¶15, that provision can only be read as allowing such a motion based on a new development justifying a change, which Defendants cannot show.

Further, even defenses reserved in a stipulation can be waived if not timely raised.[15]   Defendants failed to raise their "standing" argument in the pretrial statement. JA4483-99.  Failure to include defenses in a pretrial statement is a waiver. *Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 784 (D.C. Cir. 1998).

*****

Finally, Defendants offer no authority for the proposition that, assuming their argument were correct, the result would be a reduction in the damages award.  The logic of Defendants' position is that the class definition should be modified to enable all shareholders who held at the time of the Sweep to share in the award.  Thus, if the Court somehow accepts the standing argument, the proper remedy would be to leave the verdict and damages award intact, and remand for further proceedings.

## CONCLUSION

The verdict should be affirmed.

---

[15] *Lelchook v. Lebanese Canadian Bank*, 2024 WL 967078, at *3 (S.D.N.Y. Mar. 6, 2024); *In re Cases*, 2023 WL 11767011, at *3 (N.D. Fla. Nov. 17, 2023).

November 7, 2025

Respectfully submitted,

*/s/ Hamish P.M. Hume*
Hamish P.M. Hume
Samuel C. Kaplan
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Eric L. Zagar
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Adam Wierzbowski
Robert Kravetz
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com
robert.kravetz@blbglaw.com

Michael J. Barry
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000

Fax: (302) 622-7100
mbarry@gelaw.com

*Counsel for Appellee Class*

David H. Thompson
Brian W. Barnes
John D. Ramer
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
Tel: (202) 220-9659
Fax: (202) 220-9601
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Berkley Plaintiffs-*
*Appellees/Cross-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i), because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 13,000 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ Hamish P.M. Hume
Hamish P.M. Hume

November 7, 2025

## CERTIFICATE OF SERVICE

I certify that on November 7, 2025, I filed a copy of this brief using the Court's case management electronic case filing system, which will automatically serve notice of the filing on registered users of that system.

/s/ Hamish P.M. Hume
Hamish P.M. Hume

November 7, 2025