No. 25-5113 (consolidated with Nos. 25-5121, 25-5154, 25-5155)

# In the United States Court of Appeals for the District of Columbia Circuit

FAIRHOLME FUNDS, INC, ON BEHALF OF ITS SERIES, THE FAIRHOLME FUND, *et al.*,
*Plaintiffs-Appellees*,

*v.*

FEDERAL HOUSING FINANCE AGENCY, IN ITS CAPACITY AS CONSERVATOR OF THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, *et al.*,
*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Columbia
Nos. 13-cv-1053, 13-mc-1288 (Hon. Royce C. Lamberth)

**PETITION FOR PANEL REHEARING OR REHEARING EN BANC**


Meaghan VerGow
O'MELVENY & MYERS
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
mvergow@omm.com
*Counsel for Federal National Mortgage Association*

Michael J. Ciatti
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 661-7828
mciatti@kslaw.com
*Counsel for Federal Home Loan Mortgage Corporation*

John P. Elwood
Anthony J. Franze
Orion de Nevers
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
john.elwood@arnoldporter.com
*Counsel for Federal Housing Finance Agency*

**TABLE OF CONTENTS**

TABLE OF CONTENTS....................i

INTRODUCTION AND RULE 40(b) STATEMENT....................1

STATEMENT OF THE CASE....................5

ARGUMENT....................8

I. THE PANEL'S DECISION CANNOT BE RECONCILED WITH *COLLINS*....................8

A. *Collins* Leaves No Contractual Gap for the Implied Covenant to Fill....................8

B. *Collins* Foreclosed a Finding That FHFA Acted Arbitrarily or Unreasonably....................13

II. THE DAMAGES JUDGMENT "AFFECTS" FHFA'S EXERCISE OF ITS CONSERVATORSHIP POWERS....................15

CONCLUSION....................18

## TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*Blaustein v. Lord Baltimore Capital Corp.*,
84 A.3d 954 (Del. 2014) .......... 12

**Collins v. Yellen*,
594 U.S. 220 (2021) .......... 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16

*Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*,
302 A.3d 430 (Del. Ch. 2023) .......... 10, 11

*DG BF, LLC v. Ray*,
2021 WL 776742 (Del. Ch. Mar. 1, 2021) .......... 11, 12

*Fairholme Funds, Inc. v. FHFA*,
2022 WL 4745970 (D.D.C. Oct. 3, 2022) .......... 7

**Jacobs v. FHFA*,
908 F.3d 884 (3d Cir. 2018) .......... 4, 17

**Khan v. Warburg Pincus, LLC*,
2025 WL 1251237 (Del. Ch. Apr. 30, 2025) .......... 9, 10, 12

*N.S. v. Dixon*,
141 F.4th 279 (D.C. Cir. 2025) .......... 3

**Nemec v. Shrader*,
991 A.2d 1120 (Del. 2010) .......... 9, 10, 13

**Perry Cap. LLC v. Mnuchin,*
864 F.3d 591 (D.C. Cir. 2017) .......... 2, 3, 4, 7, 10

**Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors*,
2012 WL 3548206 (Del. Ch. Aug. 16, 2012) .......... 11, 12, 13

[*] Authorities upon which Appellants chiefly rely are marked with asterisks.

**Statutes**

12 U.S.C.
§ 4617(b)(2)(J)(ii) ....................................................................................5, 9, 11

§ 4617(f)..............................................................................................4, 5, 6, 16, 18

## INTRODUCTION AND RULE 40(b) STATEMENT

The panel decision establishes a rule with extraordinary consequences for the exercise of federal conservatorship authority: FHFA may act within the authority Congress conferred, choose a course the Supreme Court held it reasonably could take, and *still* have that choice result in hundreds of millions in state-law contract damages because a jury concludes that shareholders did not anticipate that particular exercise of conservatorship authority. That result cannot be reconciled with the Housing and Economic Recovery Act (HERA) or *Collins v. Yellen*, 594 U.S. 220 (2021). HERA is incorporated into the shareholder contracts by operation of law and gives FHFA sweeping authority to act in the interests of Fannie Mae and Freddie Mac (the Enterprises) or the Agency, and even to "subordinate the best interests of the [Enterprises] to its own best interests and those of the public." *Collins*, 594 U.S. at 254. Congress did not give FHFA that unusually broad crisis-management authority—and sharply limit judicial interference with its exercise—only to permit massive state-law contract liability whenever FHFA responds to unforeseen circumstances in a way shareholders did not specifically anticipate. Flexible crisis-management authority exists precisely because the measures an emergency may require cannot all be specified or foreseen in advance.

This case arises from FHFA's response to the 2008 financial crisis. Under funding agreements put in place during the crisis, Treasury committed hundreds of

billions of dollars in capital to the Enterprises in exchange for senior preferred stock carrying a fixed dividend. As the Enterprises drew increasingly on Treasury's commitment, their dividend obligations increased as well, threatening to deplete Treasury's remaining funding commitment. In 2012, FHFA, acting as Conservator, exercised its statutory authority by amending the Enterprises' funding agreements with Treasury to replace the fixed dividend with a variable dividend known as the "Net Worth Sweep." Shareholders, who would have lost the complete value of their shares in 2008 if Congress had not enacted HERA, brought class action lawsuits challenging the Sweep. And in 2017 this Court's decision in *Perry Capital LLC v. Mnuchin* allowed them to assert claims for breach of the implied covenant of good faith and fair dealing. 864 F.3d 591, 631–33 (D.C. Cir. 2017).

Then came *Collins*. The Supreme Court considered the same Sweep and unanimously held that HERA "authorized the Agency to choose this option." 594 U.S. at 239. It determined that FHFA "could have reasonably concluded" that the Sweep served the public interest and could "reasonably view[]" it as preferable to the alternatives shareholders advocated. *Id.* at 239–40. The Court also emphasized that FHFA's "business decisions" as Conservator are protected from judicial review. *Id.* at 254. Coming four years after *Perry*, *Collins* materially altered the legal framework under which this Court allowed the implied covenant claim.

Nevertheless, five years after *Collins,* the panel affirmed $812 million in liability for FHFA's authorized, reasonable adoption of that Sweep. Its analysis remained anchored to *Perry*: because *Perry* had allowed plaintiffs to plead implied-covenant claims, the panel asked whether *Collins* specifically displaced that holding. Op. 13–19. But the question is not whether *Collins* expressly overruled a holding about a contract claim it did not consider. It is whether the claim *Perry* allowed to proceed—which required Plaintiffs to show that FHFA acted arbitrarily or unreasonably in frustrating shareholders' reasonable expectations—remains viable after the Supreme Court unanimously held that HERA authorized the challenged conduct and that FHFA reasonably could choose it. *See N.S. v. Dixon*, 141 F.4th 279, 288 (D.C. Cir. 2025) (an intervening Supreme Court decision adopting a "broader" statutory interpretation than prior circuit precedent effects a "change in circuit law").

That question warrants consideration by the full Court.

The panel's implied-covenant holding is irreconcilable with *Collins* for another reason: The shareholder contracts incorporate HERA, and *Collins* establishes that HERA authorized FHFA to choose the Sweep in the interests of the public even when those interests diverged from shareholders' interests. The implied covenant cannot supply a contractual term forbidding conduct the contract expressly authorizes. Yet the panel found room for an implied prohibition because HERA did not "specifically authorize" the Sweep itself. Op. 20. That reasoning transforms

state-law implied covenants from a device for filling contractual gaps into a means of narrowing broadly conferred federal authority whenever the governing agreement fails to catalogue in advance every way that authority may be exercised. The panel dramatically constrained the crisis-management authority Congress conferred, and directly contradicted *Collins*.

Review is also warranted because the panel's treatment of § 4617(f) is in significant tension with the Third Circuit's construction of that provision in *Jacobs v. FHFA*, 908 F.3d 884, 895 (3d Cir. 2018). Relying on *Perry*, the panel held that the damages award fell outside § 4617(f) because it does not undo or prohibit the Conservator's actions. Op. 18–19. But the statute bars "any" judicial action that would "restrain *or affect*" the Conservator's exercise of its powers, and *Jacobs* holds that the inquiry turns on the practical effect of the relief, not "damages versus injunctions." 908 F.3d at 895 (acknowledging conflict with *Perry*). Imposing massive liability because FHFA selected one authorized course over another necessarily "affects" that exercise. The panel's rule thus places a substantial new constraint on Conservator decisions in the precise circumstances where the Supreme Court already ruled that Congress gave FHFA extensive latitude to respond to unforeseen conditions.

Rehearing is warranted. The panel's decision cannot be squared with *Collins*'s intervening holdings concerning the scope and reviewability of FHFA's authority,

is at odds with the Third Circuit's effects-based interpretation of § 4617(f), and involves a question of exceptional importance concerning the Conservator's ability to respond to financial crises within the parameters Congress set. Future conditions may require FHFA to exercise its authority in new ways that shareholders likewise did not anticipate, and every new exercise of FHFA's authority could create the same problem anew. Congress conferred flexible crisis-management authority precisely to address circumstances that could not be fully foreseen; it cannot have intended an authorized response to become the basis for onerous state-law damages just because shareholders allege they did not foresee that response to an unprecedented crisis. The full Court should determine whether that result can stand.

## STATEMENT OF THE CASE

1. Fannie Mae and Freddie Mac are government-sponsored enterprises that Congress established to support the national housing market. When the 2008 housing crisis pushed the Enterprises toward default, Congress concluded that their survival was vital to "the national economy" and enacted HERA. *Collins*, 594 U.S. at 226.

HERA created FHFA and granted it "expansive authority" as Conservator. *Id.* at 237. FHFA may take any action it "determines is in the best interests of the regulated entity or the Agency." 12 U.S.C. § 4617(b)(2)(J)(ii). That unusual authority permits the Conservator to "subordinate the best interests of the [Enterprises] to its own best interests and those of the public." *Collins*, 594 U.S. at

254. HERA also "sharply circumscribed judicial review of" the Conservator's actions, *id.* at 237, providing that "no court may take any action to restrain or affect" the exercise of its statutory powers. 12 U.S.C. § 4617(f).

The shareholders held their shares subject to that statutory framework. HERA, including its "best interests" provision, is incorporated into Plaintiffs' shareholder contracts. Op. 17.

2. FHFA entered into funding agreements with Treasury that made hundreds of billions of dollars in capital available to the Enterprises, support that enabled them to continue operating through the financial crisis. In return, Treasury received senior preferred stock carrying a fixed dividend tied to the amount drawn by the Enterprises. As the Enterprises' losses mounted, they drew increasingly on Treasury's commitment to pay Treasury's fixed dividends—thereby increasing both Treasury's investment and future dividend obligations. By mid-2012, the Enterprises had drawn more than $187 billion, including $26 billion for dividends. *Collins*, 594 U.S. at 233.

In 2012, the "Third Amendment" to the funding agreement replaced the fixed dividend with a variable formula known as the Net Worth Sweep. Under it, each Enterprise paid Treasury its quarterly net worth above a declining capital reserve but owed nothing when its net worth did not exceed that reserve. *Id.* at 233–34. *Collins* unanimously held that HERA "authorized the Agency" to adopt the Sweep as a

matter of law. *Id.* at 239. Because the fixed dividend threatened to consume the remaining Treasury commitment, FHFA "could have reasonably concluded" that the Sweep served the public interest by preserving Treasury's capital to support the Enterprises during difficult quarters. *Id.* at 239–40. The Court emphasized that FHFA's "business decisions are protected from judicial review." *Id.* at 254.

3. Plaintiffs filed these actions in 2013. The district court dismissed every claim. This Court affirmed in most respects, but remanded Plaintiffs' state-law implied-covenant claims. *Perry*, 864 F.3d at 598–99, 633–34. On remand, the sole surviving claim alleged that Defendants breached the implied covenant by adopting the Sweep, eliminating the possibility of future dividends. JA2330–32. The district court certified shareholder classes and allowed the claim to proceed notwithstanding the Supreme Court's intervening decision in *Collins*. *Fairholme Funds, Inc. v. FHFA*, 2022 WL 4745970 (D.D.C. Oct. 3, 2022).

After a mistrial, a second jury found for Plaintiffs. JA2335–37. The jury awarded $612.4 million, and the district court entered judgment of $812,050,000 with prejudgment interest. JA2336; JA2351. The panel affirmed.

## ARGUMENT

### I. THE PANEL'S DECISION CANNOT BE RECONCILED WITH *COLLINS*

#### A. *Collins* Leaves No Contractual Gap for the Implied Covenant to Fill

The panel's implied-covenant holding cannot be reconciled with *Collins*. The panel recognized that the implied covenant cannot impose liability for "conduct authorized by the terms of the agreement," Op. 19, and that Plaintiffs' contracts incorporate HERA, Op. 6–7. Those two propositions should have resolved the appeal in Defendants' favor because *Collins* establishes what the statute (and thus Plaintiffs' shareholder contracts) permits: HERA "authorized the Agency to choose" the Sweep. 594 U.S. at 239. Once the Supreme Court held that Congress authorized FHFA to adopt the Sweep in the best interests of the public even when those interests diverged from shareholders', the implied covenant could not imply a contractual term imposing liability on the Defendants for that decision. Yet the panel held that the covenant prohibited the Sweep because HERA did not "specifically authorize" that precise mechanism. Op. 20. That transaction-specific requirement upends *Collins* and contravenes the implied covenant's limited gap-filling function.

"Under Delaware and Virginia law, a party generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." Op. 19 (cleaned up). The covenant is a "limited and extraordinary" gap-

filling doctrine, *Nemec v. Shrader*, 991 A.2d 1120, 1125–26, 1128 (Del. 2010), that applies "only when the contract is truly silent concerning the matter at hand"; otherwise, "there is no gap for the implied covenant to fill." *Khan v. Warburg Pincus, LLC*, 2025 WL 1251237, at *5–6 (Del. Ch. Apr. 30, 2025). The covenant cannot be invoked to reallocate risks the parties' agreement assigned. *Nemec*, 991 A.2d at 1126–28.

There is no gap to fill here because the shareholder contracts expressly identify both the scope of the Conservator's authority and the interests that may guide its exercise. There is no dispute that the Enterprises' shareholder contracts incorporate "the corporate law under which [they are] formed and regulated," including HERA. Op. 6–7. The agreements accordingly provide that FHFA, as Conservator, may take actions that it determines serve "the best interests of the regulated entity or the Agency," 12 U.S.C. § 4617(b)(2)(J)(ii). As *Collins* explained, that provision permits FHFA to "subordinate the best interests of the [Enterprises] to its own best interests and those of the public." *Collins*, 594 U.S. at 254. As *Collins* showed, the governing contractual framework addresses the very question the implied covenant purportedly answers: whose interests FHFA may serve when exercising its conservatorship authority.

That should have ended the implied-covenant inquiry. A party "cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the

agreement." Op. 19. And *Collins* conclusively holds that the legal regime incorporated into these agreements authorized FHFA to choose the Sweep in the public's best interests, even if it was not in the interests of the Enterprises or their shareholders. 594 U.S. at 239. The implied covenant cannot supply an unstated term forbidding a Conservator decision that the Supreme Court already ruled HERA affirmatively permits. The panel thus incorrectly gave the 2017 *Perry* decision controlling force over the Supreme Court's later construction of the same authority.

The panel tried to save *Perry* by requiring HERA to "specifically" authorize the Sweep. Op. 20. But a contract may define the scope and purposes of authority without enumerating every mechanism by which that authority may later be exercised. *See, e.g.*, *Khan*, 2025 WL 1251237, at *7–8. The panel's contrary rule manufactures a contractual "gap" whenever a party exercises broadly conferred authority in a previously unspecified way—turning a doctrine for filling silence into a means of restraining authority the agreement affirmatively grants. *Contra Nemec*, 991 A.2d at 1125–28.

The panel's reliance on cases granting one contractual party "sole discretion" does not support the panel's conclusion. Those cases establish only that a bare grant of "sole discretion" does not by itself displace the implied covenant. *Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 460 (Del. Ch. 2023). But "[w]hen a contract confers discretion on one party," "the implied

covenant does not come into play when 'the scope of discretion is specified,' because in that instance, 'there is no gap'" for the implied covenant to fill. *DG BF, LLC v. Ray*, 2021 WL 776742, at *15 (Del. Ch. Mar. 1, 2021). Put differently, "[w]hen a contract provision states how a grant of discretion is to be exercised, there is no place for the implied covenant in that provision." *Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012).

Here, the shareholder agreements specify, through HERA, whose interests guide the Conservator's decisions—those of the public, which can be favored *even at shareholders' expense*. 12 U.S.C. § 4617(b)(2)(J)(ii); *Collins*, 594 U.S. at 238–39. Good faith in this context means "faithfulness to the scope, purpose, and *terms of the parties' contract*," not some free-floating notion of fairness or reasonableness. *Cygnus*, 302 A.3d at 460–61 (emphasis added) (cleaned up). The panel therefore erred in invoking cases involving bare grants of sole discretion to demand some further "standard limiting how the FHFA is to make" its business decisions: the shareholder agreements specified the substantive standard and *Collins* held FHFA reasonably could choose the Sweep under it. Op. 20.

Even apart from *Collins*, the implied covenant cases make clear that where, as here, an agreement specifies how discretion may be exercised, "the implied covenant does not come into play." *DG BF*, 2021 WL 776742, at *15. Numerous cases applying that principle confirm the point.

*Khan*, for example, held there was "no gap preventing" controlling investors from adopting an amendment to eliminate minority investors' rights because the agreement authorized them to "act exclusively in their own interests and without regard to the interest of any other Person." 2025 WL 1251237, at *7 (cleaned up). The panel concluded that the *Khan* contract "provided a more specific process" than the contracts here because it included a voting requirement. Op. 20–21. But that provision played *no part* in *Khan*'s reasoning that the "best interest" provision left no gap to fill, 2025 WL 1251237, at *7–9. And in any case, the *Khan* contract provides no greater specificity than HERA's specification that FHFA may act in the public interest at the expense of shareholder interests.

The panel similarly misapplied *Policemen's Annuity* and *Blaustein v. Lord Baltimore Capital Corp.*, 84 A.3d 954, 959 (Del. 2014). Although the agreement in *Policemen's Annuity* required a 75% vote to remove the managing partner, Op. 21, the relevant feature foreclosing the implied covenant was again the agreement's express authorization that the partners could determine removal was "necessary for the best interest" of the partnership. 2012 WL 3548206, at *11–12. Likewise, in *Blaustein* the parties' "complete discretion" to negotiate stockholder redemption proposals was not susceptible to additional implied terms. 84 A.3d at 959.

The same reasoning applies here: The shareholder contracts supplied "a contractual standard for evaluating" the Conservator's actions by specifying that it

could act in its or the public's best interests rather than those of the Enterprises or their shareholders. *Policemen's Annuity*, 2012 WL 3548206, at *12. That left no gap for the covenant to fill.

### B. *Collins* Foreclosed a Finding That FHFA Acted Arbitrarily or Unreasonably

Even if Plaintiffs' shareholder contracts contained an implied limitation on FHFA's authority, *Collins* still independently foreclosed the verdict. *Collins* held that FHFA reasonably could choose the Sweep under HERA's best-interests standard. 594 U.S. at 239–40. The panel characterized that determination as involving a "different type of reasonableness" because *Collins* addressed FHFA's statutory authority rather than shareholders' contractual expectations. Op. 16. But to prevail on their implied covenant claim, Plaintiffs had to show not just that their expectations were reasonable—they also had to show that FHFA "acted arbitrarily or unreasonably." *Nemec*, 991 A.2d at 1126. The panel's distinction does not resolve that separate requirement. Once *Collins* held that FHFA reasonably could choose the Sweep to serve interests HERA authorized, a jury could not deem that decision arbitrary or unreasonable merely because the shareholders had not anticipated it. The panel's narrow reading of *Collins* provides another reason for review.

*Collins* upheld the pleading-stage dismissal of a claim by shareholder plaintiffs asserting factual allegations materially identical to Plaintiffs' here. Accepting those allegations as true, the Court explained that the fixed dividend

created a "realistic possibility" that the Enterprises would exhaust Treasury's remaining commitment to satisfy their increasing dividend obligations, while the Sweep eliminated that risk and preserved Treasury's capital as a backstop during difficult quarters. *Collins*, 594 U.S. at 239. It therefore held that FHFA "reasonably viewed" the Sweep "as more certain to ensure market stability" than the shareholders' proposed alternatives and thus "could have reasonably concluded" that the Sweep served the public interest—as HERA and the shareholder contracts explicitly allowed the Conservator to do. *Id.* at 239–40. That reasonableness determination supplied the basis for the Court's holding that HERA "authorized the Agency to choose this option." *Id.* at 239.

Plaintiffs tried this case on the same theory *Collins* rejected. They argued that the Enterprises were poised for "sustained profitability," JA784, that accounting write-downs would become write-ups and produce "big profits," JA2058, and that paying dividends by increasing the liquidation preference offered a "foolproof solution" to the circular-draw problem, JA794; *see* JA2083, JA2086. *Collins* considered those alternatives and held that FHFA reasonably could reject them as less certain. 594 U.S. at 240–41. Plaintiffs' evidentiary presentation did not change the substance of this theory: they asked the jury to deem unreasonable the Conservator's decision to enter the Sweep instead of less certain alternatives that *Collins* already held FHFA could reasonably make under the best interests provision.

The panel's reliance on the Sweep's "unprecedented" character confirms the error. The panel reasoned that the Sweep could violate shareholders' expectations because it was unprecedented, yet explained that FHFA could "now … sell new shares and afterwards implement a new sweep" because "a future shareholder could no longer argue the sweep was unprecedented." Op. 18–19. Novelty may bear on foreseeability; it does not establish that FHFA acted arbitrarily or unreasonably. Here, *Collins* confirmed that FHFA's unprecedented response to unprecedented circumstances was reasonable. Plaintiffs thus could not establish the separate requirement that FHFA's exercise of authority was unreasonable under the terms of the agreement. Op. 19.

The panel's answer materially curtails FHFA's ability to respond to future financial crises. The next unforeseen exercise of FHFA's conservatorship authority may not be another Sweep. Based on the panel's rationale, another authorized and reasonable response to new circumstances may again expose the Enterprises to substantial damages simply because shareholders had not foreseen it. For a conservator charged with responding to unprecedented, dire financial conditions, that rationale materially restrains or affects the flexibility Congress conferred.

## II. THE DAMAGES JUDGMENT "AFFECTS" FHFA'S EXERCISE OF ITS CONSERVATORSHIP POWERS

Section 4617(f) independently warrants rehearing because the panel's treatment of this damages judgment is at odds with both HERA's text and the Third

Circuit's effects-based construction of the same provision. HERA provides that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator." 12 U.S.C. § 4617(f). Consistent with that statutory design, *Collins* explained that Congress "sharply circumscribed judicial review of any action that the FHFA takes as a conservator or receiver." 594 U.S. at 237. Under that broad grant, *Collins* emphasized that Conservator "business decisions" are "protected from judicial review," including decisions that subordinate the Enterprises' or shareholders' interests to those of the Agency and the public. *Id.* at 254.

Although the panel acknowledged that FHFA "acted within its authority," Op. 15, the panel sustained more than $812 million in liability for that authorized decision. The panel reasoned that this damages judgment did not "restrain or affect" FHFA's powers because it neither undoes the Sweep nor prevents another one. Op. 18–19. But HERA does not merely prohibit courts from undoing or preventing conservatorship actions. It bars "*any* action" that would "restrain *or affect*" the Conservator's exercise of its powers. 12 U.S.C. § 4617(f) (emphasis added). As the Third Circuit explained in rejecting another challenge to the Sweep seeking monetary relief, the "focus is not on the form of requested relief, but its effect." *Jacobs v. FHFA*, 908 F.3d 884, 895 (3d Cir. 2018).

That approach follows directly from HERA's text. HERA "says nothing about law versus equity or damages versus injunctions." *Id.* It applies broadly to "any action." The question is the judicial action's *effect*: "If monetary relief would have [the prohibited] effect, then it is barred. If not, then it is permitted." *Id.* The panel itself invoked that effects-based rule elsewhere in the same opinion. Op. 35. But in sustaining this judgment, it treated damages as permissible because they do not formally undo the Sweep or prohibit another one. Op. 18–19. That is the form-of-relief distinction that *Jacobs* rejected, and it deprives the statute's "or affect" language of any independent force.

The judgment here plainly affects the exercise of FHFA's powers. HERA permits FHFA to decide the course that it determines will serve the interests Congress specified. The panel's rule adds a different consideration: whether a jury might later conclude that shareholders did not anticipate an authorized measure and impose enormous state-law damages. It thereby injects liability exposure into a decision Congress committed to FHFA based on the interests of the Agency and the public. By attaching enormous liability to the selection of one authorized course rather than another, the judgment changes the consequences of exercising the Conservator's statutory authority and thus "affect[s]" that exercise within the ordinary meaning of § 4617(f). Instead of allowing the Conservator to act in the "best interests" of the *public*, the panel's rule permits hundreds of millions of dollars

in damages for failing to act consistent with the "reasonable expectations" of *shareholders*. Congress carefully designed HERA to avoid that result.

## CONCLUSION

The Court should grant rehearing or rehearing en banc.

Dated: September 8, 2026

Respectfully submitted,


/s/ John P. Elwood
John P. Elwood
Anthony J. Franze
Orion de Nevers
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
john.elwood@arnoldporter.com

*Counsel for Federal Housing Finance Agency*

/s/ Meaghan VerGow
Meaghan VerGow
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
mvergow@omm.com

*Counsel for Federal National Mortgage Association*

/s/ Michael J. Ciatti
Michael J. Ciatti
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 661-7828
mciatti@kslaw.com

*Counsel for Federal Home Loan Mortgage Corporation*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rules of Appellate Procedure 32(g) and 40(d)(3)(A), that the foregoing petition contains 3,899 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

Dated: September 8, 2026

Respectfully submitted,

*/s/* John P. Elwood
John P. Elwood

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2026, I caused the foregoing document to be electronically filed using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 8, 2026 Respectfully submitted,

*/s/* John P. Elwood
John P. Elwood

# ADDENDUM

**TABLE OF CONTENTS**

Opinion, D.C. Cir. No. 25-5113 (July 24, 2026) .................... 1a

Certificate as to Parties and Amici Curiae .................... 41a

Corporate Disclosure Statement .................... 44a

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 21, 2026 Decided July 24, 2026

No. 25-5113

FAIRHOLME FUNDS, INC, ON BEHALF OF ITS SERIES, THE FAIRHOLME FUND, ET AL.,
APPELLEES

v.

FEDERAL HOUSING FINANCE AGENCY, IN ITS CAPACITY AS CONSERVATOR OF THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, ET AL.,
APPELLANTS

Consolidated with 25-5121, 25-5154, 25-5155

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cv-01053)
(No. 1:13-mc-01288)

*John P. Elwood* argued the cause for appellants/cross-appellees. With him on the briefs were *R. Stanton Jones*, *Anthony Franze*, *Orion de Nevers*, *Meaghan M. VerGow*, and

*Michael J. Ciatti*. *David B. Bergman* and *Taylor T. Lankford* entered appearances.

*Hamish Hume* argued the cause for Class appellees. With him on the brief were *Adam H. Wierzbowski*, *Robert Kravetz*, *Michael J. Barry*, *David H. Thompson*, *Brian W. Barnes*, and *John Ramer*. *Craig L. Briskin* and *Jonathan M. Shaw* entered appearances.

*Brian W. Barnes* argued the cause for Berkley appellees/cross-appellants. With him on the briefs were *David H. Thompson* and *John Ramer*. *Charles J. Cooper* and *Peter A. Patterson* entered appearances.

Before: WALKER and CHILDS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

I. Background ... 5
A. The Housing and Economic Recovery Act ... 5
B. The Net Worth Sweep ... 7
C. Procedural History ... 9
II. Analysis ... 11
A. The Implied Covenant of Good Faith and Fair Dealing ... 12
1. *Collins v. Yellen* ... 12
2. “Gap” in the shareholder agreements ... 19
3. Anticipatory breach ... 21
B. Harm Caused by the Net Worth Sweep ... 23
C. Standing of Post-Third Amendment Purchasers ... 26
D. Cross-Appeal ... 33
1. Restitution ... 34
2. Reliance damages ... 36
III. Conclusion ... 40

GINSBURG, *Senior Circuit Judge*: In the midst of the 2008 housing crisis, the Congress established the Federal Housing Finance Agency (FHFA or Agency) and authorized its Director to place into conservatorship the Federal National Mortgage Association (Fannie) and the Federal Home Loan Mortgage Corporation (Freddie). After doing so, the Director entered into a stock purchase agreement with the United States Department of the Treasury to make capital available to the companies. In exchange, Fannie and Freddie would pay the Treasury a quarterly dividend at a fixed rate based upon the funds drawn from the Treasury.

In 2012 the FHFA and the Treasury abandoned the fixed-rate dividend and instead required the companies to pay the Treasury a quarterly dividend equal to the amount by which their net worth exceeded their capital reserve. On the day the FHFA announced this arrangement, known as the "Net Worth Sweep," the value of Fannie and Freddie shares dropped precipitously. In the years that followed, the companies paid the Treasury significantly more money than they would have under the fixed-rate dividend formula. Perhaps least surprising, shareholders of Fannie and Freddie sued the FHFA, Fannie, and Freddie (the Defendants) for damages.

After a decade of litigation, one claim made its way to trial: By adopting the Net Worth Sweep, the FHFA, as conservator of Fannie and Freddie, violated the covenant of good faith and fair dealing implicit in its contract with shareholders. A jury agreed, and the district court entered a final judgment of $812 million including prejudgment interest.

On appeal, the FHFA argues the implied covenant claim was unavailable as a matter of law, the Plaintiffs failed to prove they were harmed by the Net Worth Sweep, and certain Plaintiffs lack standing to bring their claims. One group of

Plaintiffs cross-appealed, asserting that the district court should have allowed them to seek restitution or reliance damages in the amount of $48 billion. Because these arguments lack merit, we affirm the judgment of the district court.

## I. Background

We fully recounted the background events giving rise to this litigation in *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (2017). We restate here only the information relevant to this appeal.

### A. The Housing and Economic Recovery Act

Fannie and Freddie are government-sponsored entities the shares of which have been publicly traded since 1968 and 1989, respectively. During the 2008 housing crisis, the Congress "concluded that resuscitating Fannie Mae and Freddie Mac was vital for the Nation's economic health." *Id.* at 598. In order to prevent the companies from defaulting, the Congress enacted the Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654, which created the FHFA and authorized its Director to appoint the FHFA as their conservator. *See Collins v. Yellen*, 594 U.S. 220, 226-27 (2021) (citing 12 U.S.C. §§ 4511, 4617).

The Recovery Act "invests [the] FHFA as conservator with broad authority and discretion over the operation of" Fannie and Freddie. *Perry*, 864 F.3d at 600. Two provisions of the Act are central to this appeal:

- **The "Best Interests" Provision, 12 U.S.C. § 4617(b)(2)(J)(ii),** authorizes the FHFA as conservator to "take any action authorized by this section, which the Agency determines is in the best interests of the regulated entity or [of] the Agency."

  Therefore, "when the FHFA acts as a conservator, it may aim to rehabilitate the regulated entity in a way that, while not in the best interests of the regulated entity, is beneficial to the Agency and, by extension, the public it serves." *Collins*, 594 U.S. at 238.

- **The Bar to Judicial Review, 12 U.S.C. § 4617(f),** provides that, with exceptions not here relevant, "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator."

The Recovery Act also temporarily authorized the Treasury to purchase shares of Fannie and Freddie "if it determined that infusing the companies with capital would protect taxpayers and be beneficial to the financial and mortgage markets." *Collins*, 594 U.S. at 229; *see* §§ 1455(*l*)(1), (4), 1719(g)(1), (4). Because the companies are federally chartered, the provisions of the Recovery Act are incorporated in the contracts between the companies and their shareholders. *See Fairholme Funds, Inc. v. FHFA* (*MTD Opinion*), Nos. 13-cv-1053, 1439, 2018 WL 4680197, at *8-9 (D.D.C. Sept. 28, 2018) ("[A]n investor's contract with [a] corporation includes not only documents such as the stock certificate, certificate of designations, the corporate charter, and bylaws, but also the

corporate law under which the corporation is formed and regulated").

**B. The Net Worth Sweep**

In September 2008 the Director of the FHFA placed Fannie and Freddie into conservatorship and entered into Senior Preferred Stock Purchase Agreements (PSPAs) with the United States Department of the Treasury, which agreed to make $100 billion available to Fannie and Freddie in exchange for one million preferred shares in each company. As relevant here, the Treasury was also entitled to receive (1) "a dollar-for-dollar increase in [its] liquidation preference each time Fannie and Freddie drew upon Treasury's funding commitment," and (2) a quarterly dividend "at a rate of 10% of Treasury's liquidation preference or a commitment to increase the liquidation preference by 12%." *Perry*, 864 F.3d at 601. Fannie and Freddie could not pay dividends to their shareholders without the consent of the Treasury.

As Fannie and Freddie continued to incur losses, the FHFA and the Treasury twice amended the PSPAs to increase the capital available to Fannie and Freddie. When Fannie and Freddie drew upon this capital, however, it increased the Treasury's liquidation preference which, in turn, increased the dividend owed to the Treasury. This resulted in "the circular practice of [Fannie and Freddie] drawing funds from Treasury's capital commitment just to hand those funds back as a quarterly dividend." *Collins*, 594 U.S. at 233.

On August 17, 2012 the FHFA and the Treasury amended the PSPAs for a third time to "ensure[] that Fannie Mae and Freddie Mac would never again draw money from Treasury just to make their quarterly dividend payments." *Id.* at 234. The Third Amendment replaced the 10% dividend with a dividend

based upon Fannie's and Freddie's net worth. If either company's net worth at the end of a quarter exceeded its capital reserve, then the company would pay the surplus to the Treasury. If the company's net worth did not exceed the reserve or if the company lost money during the quarter, then it was not required to pay any dividend to the Treasury. *See id.* This new arrangement, known as the Net Worth Sweep, "meant that the companies would not be able to accrue capital in good quarters," *id.*, and that shareholders would never receive any dividends. "In simple terms, the Third Amendment require[d] Fannie and Freddie to pay quarterly to Treasury a dividend equal to their net worth — however much or little that might be." *Perry*, 864 F.3d at 602.

The Third Amendment also required Fannie and Freddie to accelerate the reduction of their retained mortgage portfolios. Before the Third Amendment, Fannie and Freddie were already required to reduce their portfolios at a rate of 10% annually, capped at $250 billion per company. The Third Amendment increased the reduction rate to 15% annually while retaining the $250 billion cap.

On the day the Net Worth Sweep was announced in 2012, the value of Fannie and Freddie common and junior preferred shares decreased by approximately $1.6 billion.* In 2013 Fannie and Freddie paid the Treasury $130 billion in dividends under the Net Worth Sweep. If the 10% dividend had been in effect, then the companies would have owed the Treasury only $19 billion. By the end of 2022 the companies had paid $151.2

* Both Fannie and Freddie have issued several classes of preferred shares that are junior to the preferred shares issued to the Treasury. *See Perry*, 864 F.3d at 601 (explaining that the PSPAs gave the Treasury "a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the entities were dissolved").

billion more under the Net Worth Sweep than they would have paid under the fixed-rate dividend. Although the companies no longer pay a cash dividend to the Treasury, all their profits are added to the Treasury's liquidation preference.

**C. Procedural History**

In 2013 two lawsuits were filed challenging the Net Worth Sweep: (1) a class action brought by holders of Freddie common shares and of Fannie and Freddie junior preferred shares, and (2) an individual action brought by holders of Fannie and Freddie junior preferred shares (the "Berkley Plaintiffs"). The lawsuits alleged violations of the Administrative Procedure Act and of the Takings Clause of the Fifth Amendment to the Constitution of the United States as well as various contract claims.

The district court dismissed the complaints for failure to state a claim. We affirmed that decision in most respects, but we remanded for further consideration of some of the Plaintiffs' contract claims. *See id.* at 633-34.

On remand, the district court dismissed all claims except the implied covenant claim with respect to the shareholders' right to receive dividends. *MTD Opinion*, 2018 WL 4680197, at *7-14. The district court denied the FHFA's motion for reconsideration, which argued that the implied covenant claim was effectively a non-cognizable claim for anticipatory breach.

Consistent with the parties' later stipulation, the district court certified three classes of plaintiffs consisting of: (1) holders of "junior preferred stock in Fannie," (2) holders of "junior preferred stock in Freddie," and (3) holders of "common stock in Freddie." Each class included the shareholders "as of the date of certification, or their successors

in interest to the extent shares are sold after the date of certification and before any final judgment or settlement."

In October 2022 the district court granted in part and denied in part the FHFA's motion for summary judgment. *Summary Judgment Opinion*, 2022 WL 4745970. The district court rejected the FHFA's arguments that the implied covenant claim was foreclosed by the Supreme Court's decision in *Collins v. Yellen* and that the implied covenant did not apply because the Recovery Act left no gaps in the shareholder agreements. *Id.* at *5-7. The court held, however, that the Plaintiffs could not seek damages based upon their "lost-dividends theory" — that "the Third Amendment [had] deprived plaintiffs of dividends that they would have eventually received." *Id.* at *9-10. The court also held the Plaintiffs could not seek restitution of what they had paid for their shares. *Id.* at *11-12. The parties therefore proceeded to trial on the implied covenant claim with the Plaintiffs seeking damages based upon their "lost-value theory" — that "the Third Amendment, by eliminating any possibility of future dividends for [the Plaintiffs], deprived [their] shares of much of their value, even if such dividends were not reasonably certain to occur in the foreseeable future." *Id.* at 11. The Plaintiffs pointed to the $1.6 billion drop in the value of Fannie and Freddie shares on the date the Net Worth Sweep was announced as the measure of harm.

Before trial the Plaintiffs filed a motion to amend their pretrial statement by adding a request for reliance damages. The district court denied that motion. *See Pretrial Amend. Opinion I*, 2022 WL 11110548, at *3-4 (D.D.C. Oct. 19, 2022).

The first jury trial took place in the Fall of 2022 and ended in a hung jury. The Berkley Plaintiffs filed a motion before the second trial again seeking to present evidence on reliance dam-

ages, which the district court denied. *See Pretrial Amend. Opinion II*, 2023 WL 3790739, at *5-6 (D.D.C. June 2, 2023).

The second trial took place in the Summer of 2023; the jury found the FHFA had violated the implied covenant of good faith and fair dealing with respect to all Plaintiffs. The jury awarded the Plaintiffs a total of $612.4 million, and the district court entered a final judgment of $812 million after adding pre-judgment interest. The district court then rejected the FHFA's Rule 50(b) motion for judgment as a matter of law. *See Rule 50(b) Opinion*, 2025 WL 823938 (D.D.C. Mar. 14, 2025).

## II. Analysis

We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's conclusions on the motion to dismiss, the motion for summary judgment, and the motion for judgment as a matter of law. *See Vasquez v. District of Columbia*, 110 F.4th 282, 287, 290 (D.C. Cir. 2024); *Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*, 881 F.3d 912, 918 (D.C. Cir. 2018). When reviewing the district court's conclusions on the motion for judgment as a matter of law, however, "we apply to the jury's decision the same forgiving standard as did the district court." *Vasquez*, 110 F.4th at 290. "Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." *Id.* (cleaned up). As for the district court's denial of the Berkley Plaintiffs' motions to amend their pretrial statement, we review the court's legal conclusions de novo and its trial-management decisions for abuse of discretion. *See Bauer v. FDIC*, 38 F.4th 1114, 1121 (D.C. Cir. 2022); *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1155-56 (D.C. Cir. 2004).

The parties agree that Delaware law applies to claims regarding Fannie and Virginia law applies to claims regarding Freddie. *Perry*, 864 F.3d at 626 n.24.

**A. The Implied Covenant of Good Faith and Fair Dealing**

The implied covenant of good faith and fair dealing applies "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected . . . . at the time of contracting." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010); *see Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 611 (4th Cir. 2021). The jury found the FHFA's adoption of the Net Worth Sweep violated this implied covenant.

The FHFA does not challenge the sufficiency of the evidence with respect to the parties' reasonable expectations. Instead, it argues the implied covenant claim fails as a matter of law for three reasons. First, Supreme Court precedent forecloses the implied covenant claim. Second, the implied covenant cannot apply to the shareholder agreements because those agreements leave no gap for the implied covenant to fill. Third, the implied covenant claim is really a non-cognizable claim for anticipatory breach.

**1. *Collins v. Yellen***

The FHFA's opening argument is that the Supreme Court's decision in *Collins v. Yellen* forecloses the Plaintiffs' implied covenant claim. That decision rested upon 12 U.S.C. § 4617(f): "Except as provided in this section . . . no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." First, relying upon the Court's holding that § 4617(f) protects the

FHFA's business decisions from judicial review, *Collins*, 594 U.S. at 254, the FHFA reasons that the jury could not second-guess the Net Worth Sweep because it was a "core exercise" of the FHFA's "broad" powers under the Recovery Act. Second, because *Collins* held the FHFA "could have reasonably concluded" that the Net Worth Sweep was in the public's interest, *id.* at 239, the FHFA says "*Collins* squarely rejected the central element of Plaintiffs' implied covenant claim — that FHFA acted 'arbitrarily or unreasonably' in agreeing to the Net Worth Sweep."

The Plaintiffs respond that the FHFA overreads *Collins*. In their view, *Collins* simply involved a claim under the APA about the scope of the FHFA's authority; it said nothing about how § 4617(f) would apply to a claim for contract damages or whether the Net Worth Sweep was consistent with the reasonable expectations of the parties.[†] We agree with the Plaintiffs that *Collins* did not foreclose the implied covenant claim in this case.

We begin with our pre-*Collins* decision in *Perry*. There we held that § 4617(f) barred the Plaintiffs' claims that the FHFA's adoption of the Third Amendment violated the Recovery Act and the APA, among other claims. 864 F.3d at 604-16. In response to our dissenting colleague's concern that

---

[†] The Plaintiffs also argue the FHFA waived its reliance upon § 4617(f) because it did not invoke this provision on remand after *Perry*. Wrong. The district court addressed the FHFA's *Collins* argument and the Supreme Court's discussion of § 4617(f) in its summary judgment opinion, 2022 WL 4745970, at *5-6; the FHFA then renewed this argument in its Rule 50(a) motion "for preservation purposes"; and the district court declined to reconsider its holding when denying the FHFA's Rule 50(b) motion, explaining that "[i]f Defendants wish to re-open this purely legal challenge, they must do so with the D.C. Circuit," 2025 WL 823938, at *7. Just so.

our decision would "foreclose[] *any* opportunity for meaningful judicial review of FHFA's actions," *id.* at 642 (Brown, J.), we pointed out that § 4617(f) "only limits judicial *remedies* (banning injunctive, declaratory, and other equitable relief) after a court determines that the actions taken fall within the scope of [the FHFA's] statutory authority." *Id.* at 613-14. We did not interpret the Recovery Act to preclude "judicial review through cognizable actions for damages like breach of contract." *Id.* at 614.

We also rejected the FHFA's argument that the Recovery Act preempted state laws imposing an implied covenant of good faith and fair dealing. *Id.* at 630. We noted that the Act authorized the FHFA to "disaffirm or repudiate any contract" executed by Fannie and Freddie before the conservatorship "which the conservator determines to be burdensome within a reasonable period following the agency's appointment as conservator." *Id.* (cleaned up). "That the Recovery Act permits the FHFA in some circumstances to repudiate contracts," we explained, "indicates that the Companies' contractual obligations otherwise remain in force." *Id.* We therefore remanded the implied covenant claim, "insofar as it seeks damages," to the district court for further proceedings. *Id.* at 631.

Our pre-*Collins* decision therefore recognized that the Recovery Act leaves room for an implied covenant claim for damages against the FHFA as conservator. *See also Jacobs v. FHFA*, 908 F.3d 884, 895 (3d Cir. 2018) (citing an "appropriate damages claim" for breach of contract as the type of claim courts may allow to proceed against the FHFA).

This brings us to *Collins*. As relevant here, a group of shareholders alleged the FHFA's adoption of the Net Worth Sweep exceeded its authority under the Recovery Act because the Sweep "did not actually serve the best interests of the

FHFA or the public." 539 U.S. at 239-40. At the outset, the Court explained that § 4617(f), which it referred to as the "anti-injunction clause," applies "only where the FHFA exercised its powers or functions as a conservator or a receiver." *Id.* at 237 (cleaned up). The Court then considered whether the FHFA had done so and concluded that it had. Given Fannie's and Freddie's repeated inability to make their dividend payments without drawing on the Treasury's capital commitment, the FHFA "could have reasonably concluded that [the Net Worth Sweep] was in the best interests of members of the public," *id.* at 239; hence the Agency acted within its authority under § 4617(b)(2)(J)(ii), and § 4617(f) barred the shareholders' statutory claim, *id.* at 242.

As we said, the FHFA reads *Collins* as foreclosing the implied covenant claim in this case. Insofar as *Perry* supports a different result, the FHFA says *Collins* "eliminated" that part of *Perry*. We disagree.

As the Plaintiffs note, in *Collins* the Court never considered how § 4617(f) would apply to a contract claim for damages; that case involved a statutory claim for declaratory and injunctive relief. *See* 594 U.S. at 227. In the Court's own words, it "conclude[d] only that under the terms of the Recovery Act, the FHFA did not exceed its authority as a conservator, and therefore the anti-injunction clause bars the shareholders' statutory claim." *Id.* at 242. The Court's later statement that the FHFA's "business decisions are protected from judicial review," *id.* at 254, must therefore be read in the context of its narrow holding on the statutory claim. The Court also adopted the parties' framing of § 4617(f) as an "anti-injunction clause," *id.* at 237, further indicating that it was not deciding how § 4617(f) would apply to other forms of relief, such as damages.

Nor did *Collins* address whether the Net Worth Sweep was reasonable based upon the expectations of the parties. When the Court held that "the FHFA could have reasonably concluded" the Net Worth Sweep was in the public interest, *id.* at 239, it was considering whether the Sweep was within the scope of the FHFA's statutory authority to act in the public interest. Answering that question "involve[d] a different type of reasonableness analysis" than the one implicated here by the implied covenant claim. *Summary Judgment Opinion*, 2022 WL 4745970, at *5. As the district court correctly explained in denying the Defendants' motion for summary judgment:

> *Collins* does not resolve the issue here, because although reasonableness factors into both analyses, it is reasonableness with respect to different matters. At issue in *Collins* was whether FHFA could reasonably have determined that adopting the Third Amendment was in the *best interests* of the *regulated entity* or [of] the *Agency* and thus acted within its statutory authority as conservator of [Fannie and Freddie] in so doing. Here, in contrast, the issue is whether FHFA violated the reasonable *expectations* of the *parties* by adopting the Third Amendment.

*Id.* (cleaned up).

The FHFA offers two responses to the district court's distinction. First it invokes the similarities between the arguments raised by the *Collins* plaintiffs and those raised by the Plaintiffs here. Doing so again overlooks that the underlying questions differ. Even if the arguments overlap, the question whether the FHFA acted within its statutory authority is not coextensive

with the question whether it acted in accordance with the shareholders' reasonable expectations. For example, the FHFA determined the Net Worth Sweep would benefit the public, but the jury also heard testimony that such a step was "unprecedented." The Plaintiffs also introduced evidence that two weeks before the Net Worth Sweep was announced, the Treasury and the FHFA had received a report showing that Fannie and Freddie had generated profits exceeding the 10% dividend owed to the Treasury in the most recent quarter. Despite this indication that the companies might be returning to longer-term profitability, the Treasury and the FHFA responded by making a "renewed push" to implement the Net Worth Sweep. The jury therefore could conclude the Net Worth Sweep was not consistent with the reasonable expectations of the parties, regardless whether it was consistent with the FHFA's authority under the Recovery Act.

The FHFA next argues that the scope of the FHFA's statutory authority necessarily affects the expectations of the shareholders. Fair enough. Recall that the Recovery Act authorized the FHFA to act "in the best interests of the regulated entity or [of] the Agency," § 4617(b)(2)(J)(ii), and the shareholder agreements incorporate this provision. From this, the FHFA reasons that the shareholders should have reasonably expected it to "act in the *public* interest without regard for whether doing so [was] in *shareholders'* interests."

We agree the FHFA's authority under the Recovery Act may inform the parties' reasonable expectations, but that does not require a different outcome here. In *Perry* we specifically instructed the district court on remand to consider whether "the enactment of the Recovery Act and the FHFA's appointment as conservator affected these expectations." 864 F.3d at 631. At trial, the district court duly informed the jury that the Recovery Act "amends or informs the shareholder contracts,"

so the jury could consider the terms of the Act when assessing the reasonable expectations of the shareholders. It also informed the jury that, under the Recovery Act, the FHFA was authorized to act in the best interests of Fannie and Freddie or of itself and hence the public. The district court then explained that the FHFA could "still have violated the implied covenant of good faith and fair dealing if it exercised that authority in a way that arbitrarily or unreasonably violated plaintiffs' reasonable expectations under the contract" as amended by incorporation of the Act. The jury was thus allowed to consider the extent to which the Recovery Act informed the parties' reasonable expectations, but it was not required to reject the claim based upon the FHFA's statutory authority. That instruction was consistent with *Perry*, and nothing in *Collins* suggests a contrary result.

Finally, we do not view this outcome as incompatible with the outcome in *Collins*. It is easy to understand how granting the statutory claim in *Collins* would have "restrain[ed] or affect[ed]" the FHFA's exercise of its authority. § 4617(f). Holding that the FHFA lacked the authority to implement the Net Worth Sweep would have forced the Agency to abandon the Sweep and would have prevented it from implementing a future sweep. Awarding damages, on the other hand, does not require the FHFA to undo any action, nor does it restrain the FHFA from implementing a future sweep. After all, an implied covenant claim is based upon the reasonable expectations of the parties at the time of contracting. *Nemec*, 991 A.2d at 1126. Here the Plaintiffs introduced undisputed evidence that the Net Worth Sweep was "unprecedented" and therefore could not reasonably have been expected. If, however, the FHFA were now to sell new shares and afterwards implement a new sweep, then a future shareholder could no longer argue the sweep was unprecedented; the FHFA having demonstrated that it views

the Net Worth Sweep as a reasonable option would have informed that future shareholder's expectations.

In sum, *Collins* did not abrogate our holding in *Perry* that the Recovery Act does not bar "judicial review through cognizable actions for damages like breach of contract." 864 F.3d at 614. We therefore reject the FHFA's argument that *Collins* foreclosed the implied covenant claim as a matter of law.

**2. "Gap" in the shareholder agreements**

The FHFA next argues the implied covenant does not apply because the shareholder contracts "specify the scope of FHFA's contractual discretion." Under Delaware and Virginia law, a party "generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005); *see Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997). As the FHFA puts it, the implied covenant cannot apply when there is no "gap" in the contract for it to fill. There is no gap here, says the FHFA, because the Recovery Act provides that the FHFA may act "in the best interests of the regulated entity or [of] the Agency." § 4617(b)(2)(J)(ii). According to the Plaintiffs, however, that provision "merely enhances the already broad discretion conferred" on the FHFA; it does not specify in any meaningful way how the FHFA should exercise that discretion.

The Plaintiffs again have the better argument. When a contract authorizes a party to act in its "sole discretion," we have recognized the party may still violate the implied covenant if it exercises that discretion "arbitrarily or unreasonably." *Perry*, 864 F.3d at 631. Delaware and Virginia law are clear on this point: "Terms that enhance the level of discretion . . . do not eliminate the implied duty. When a party has sole discretion to

make a decision, that setting provides more reason for the implied covenant to apply, not less." *Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*, 302 A.3d 430, 460 (Del. Ch. 2023) (cleaned up); *see Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, No. 4872-C, 1993 WL 13029827, at *3 (Va. Cir. Ct. Sept. 28, 1993); *see also Drummond Coal Sales*, 3 F.4th at 611-12; *Va. Vermiculite, Ltd. v. W.R. Grace & Co-Conn.*, 156 F.3d 535, 542 (4th Cir. 1998).

This case is a perfect example of that sort. The Recovery Act does not specifically authorize the conduct giving rise to this appeal. Rather, the Recovery Act is "framed in terms of expansive grants of permissive, discretionary authority for [the] FHFA to exercise as the 'Agency determines is in the best interests of the regulated entity or [of] the Agency.'" *Perry*, 864 F.3d at 607 (quoting § 4617(b)(2)(J)(ii)). The FHFA claims the "best interests" phrase "defines the scope of [its] contractual discretion," but that phrase does not render the implied covenant inapplicable. On the contrary, per the Supreme Court of Delaware, the implied covenant "encompasses the principle of contract construction that if one party is given discretion in determining whether a condition in fact has occurred, that party must use good faith in making that determination." *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (2022) (cleaned up). That is precisely the circumstance here: The FHFA unilaterally determined what was in the "best interests" of the Agency. As the Plaintiffs note, the statute does not contain any standard limiting how the FHFA is to make that determination.

The FHFA relies upon three cases in which a court held the implied covenant did not apply, but those cases are inapposite. In two of those cases, the relevant contracts provided a more specific process or standard that restrained the party's discretion. *See Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors LLC*, No. 7204, 2012 WL 3548206, at *3

(Del. Ch. Aug. 16, 2012) (agreement providing for removal of a general partner if "75% of the Limited Partnership Interests" consented to the removal and made a "good faith" determination that removal was necessary for the partnership's best interests); *Khan v. Warburg Pincus, LLC*, No. 2024-0523, 2025 WL 1251237, at *6-7 (Del Ch. Apr. 30, 2025) (agreement allowing majority investors to "act exclusively in their own interests" provided that any amendment that "disproportionately affected" one class of investors "in a material and adverse manner" be supported by the "prior written consent of a majority of the affected class" (cleaned up)). The third case is even further afield because the agreement gave "both parties complete discretion in deciding whether" to execute a repurchase of a minority shareholder's shares, which required approval by a majority of the board of directors or 70% of the shareholders. *Blaustein v. Lord Balt. Cap. Corp.*, 84 A.3d 954, 959 (Del. 2014). The Recovery Act does not contain any comparable feature or limitation on the FHFA's discretion. We see no reason the implied covenant does not apply under these circumstances.

**3. Anticipatory breach**

Lastly, the FHFA argues the implied covenant claim is really an "unripe claim for anticipatory breach." "Anticipatory breach is a doctrine of accelerated ripeness" that "gives a plaintiff the option to have the law treat a promise to breach or an act rendering performance impossible as the breach itself." *Perry*, 864 F.3d at 632-33 (cleaned up). In the FHFA's view, the Plaintiffs raise a claim for anticipatory breach because they "claim that the Net Worth Sweep prevented [Fannie and Freddie] from possibly paying dividends at some unspecified point in the future." The Plaintiffs dispute this characterization of their claim, arguing that they seek to hold the FHFA liable for a present breach of contract.

The FHFA's argument misapprehends the nature of the Plaintiffs' claim. The implied covenant imposes an ongoing obligation to act in good faith. It "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap*, 878 A.2d at 442 (cleaned up). A party that violates the implied covenant thus commits a present breach of its contract. *See* Restatement (Second) of Contracts § 235 cmt. b (1981) ("Non-performance of a duty when performance is due is a breach whether the duty is imposed by a promise stated in the agreement or by a term supplied by the court, as in the case of the duty of good faith and fair dealing"). We therefore agree with the district court that the Plaintiffs "seek to hold defendants presently accountable for a present breach of an implied promise" rather than for a "future breach of an express provision." *Partial Reconsideration Order*, at 3 (D.D.C. May 16, 2019), Class Pls. ECF No. 104, Berkley Pls. ECF No. 99.

The FHFA's argument to the contrary rests upon its misplaced emphasis on the future effect of the Net Worth Sweep. The Plaintiffs alleged the Net Worth Sweep deprived them of the opportunity to receive future dividends; they do not, however, claim the FHFA breached a promise to pay them future dividends. Instead, they claim that by eliminating any possibility of dividends, the FHFA violated its ongoing obligation to act in good faith. This is what distinguishes the implied covenant claim from the Plaintiffs' claim for breach of their "contractual rights to receive a liquidation preference," which alleged the FHFA had repudiated a future contractual obligation and which the district court dismissed as a claim for anticipatory breach. *MTD Opinion*, 2018 WL 4680197, at *5-6. That the breach also had a future effect does not turn the implied covenant claim into a claim for anticipatory breach. We agree with the Plaintiffs that "what matters is when the

*breach* occurred, not whether the harm caused by the breach persists in the future."

The FHFA speculates that this conclusion will allow future plaintiffs to recast their claims of anticipatory breach as implied covenant claims. This matters, it says, because Virginia and Delaware law do not allow claims for anticipatory breach of unilateral contracts, *see Fairfax-Falls Church Cmty. Servs. Bd. v. Herren*, 337 S.E.2d 741, 744 (Va. 1985); *cf. Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 78 n.102 (Del. Ch. 2013), and the contracts here became unilateral when the shareholders completed their performance by purchasing the shares. We do not share this concern. The FHFA does not direct us to a single case in which a court has incorrectly conflated these claims. Even if a future plaintiff attempted this maneuver, it would still have to satisfy the standard for stating an implied covenant claim. We see no reason our holding today will cause courts to mistake an implied covenant claim for a claim of anticipatory breach involving a unilateral contract.

### B. Harm Caused by the Net Worth Sweep

In order to prevail on their implied covenant claim, the Plaintiffs needed to demonstrate "both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." *Base Optics Inc. v. Liu*, No. 9803, 2015 WL 3491495, at *16 (Del. Ch. May 29, 2015); *see Saks Fifth Ave., Inc. v. James. Ltd.*, 630 S.E.2d 304, 311 (Va. 2006). Recall that the implied covenant claim proceeded to trial based upon a "lost-value theory" of harm, to wit, "that the Third Amendment, by eliminating any possibility of future dividends for [the Plaintiffs], deprived [their] shares of much of their value." *Summary Judgment Opinion*, 2022 WL 4745970, at *11. The Plaintiffs pointed to

the $1.6 billion decrease in the value of Fannie and Freddie common and junior preferred shares outstanding on August 17, 2012 — the day the Net Worth Sweep was announced — as their measure of harm.

The FHFA offers three reasons the Plaintiffs failed to meet the standard of proof: The Plaintiffs (1) did not address increases in Fannie's and Freddie's share price in the weeks following the announcement of the Net Worth Sweep; (2) did not prove the Net Worth Sweep continued to harm the share value today; and (3) did not address possible alternative causes for the drop in the value of Fannie and Freddie on August 17, 2012. None persuades us to set aside the verdict.‡

First, the FHFA claims the Plaintiffs "introduced no evidence" regarding the rebound of Fannie's and Freddie's share price after the FHFA announced the Net Worth Sweep. The FHFA derives this "rebound" rule from securities fraud cases involving the Private Securities Litigation Reform Act. It does not cite a single case in which a court has applied that rule to a breach-of-contract claim.

Even setting that aside, the Plaintiffs did introduce evidence — an event study prepared by the FHFA's own expert — addressing the price increase. Although the event study showed that Fannie and Freddie shares recovered some of the losses incurred when the Net Worth Sweep was announced, the Plaintiffs note that it also listed several contemporaneous events that may have contributed to that recovery.

‡ The Plaintiffs argue the FHFA waived or forfeited certain objections to the evidence of harm presented at trial. The FHFA responds that the Plaintiffs forfeited most of their waiver and forfeiture arguments. We need not address these arguments because, in any event, the FHFA's challenge to the sufficiency of the evidence fails on the merits.

For example, the event study reports five days in October 2012 when Fannie and Freddie shares reported excess returns between 3.7% and 12.9%. Around the same time, Fannie released the results of a national housing survey reporting "increasing faith in the nascent housing recovery"; the FHFA released a four-year strategic plan on housing finance, as well as updated projections of Treasury draws by Fannie and Freddie that showed an "improved outlook"; and Freddie announced the dismissal of a securities fraud class-action lawsuit brought against it. This evidence allowed the jury to conclude that subsequent increases in the value of Fannie and Freddie were caused by something other than a market reevaluation of the Net Worth Sweep.

Second, the FHFA erroneously contends that the Plaintiffs did not prove the Net Worth Sweep continues to harm the value of the shares today. The Plaintiffs' expert witnesses and the then-Acting Director of the FHFA testified that Fannie and Freddie would have been better off if they could have retained some of their earnings to reinvest in their operations or to provide protection during another economic downturn. The jury also heard testimony that Fannie and Freddie must still allocate 100% of their now-substantial profits to the Treasury — through an increase in the Treasury's liquidation preference. Perhaps most important, when the Plaintiffs' expert Dr. Mason was asked whether the "$1.6 billion in damages from the Net Worth Sweep still persist today," he replied unequivocally, "Yes." Although the FHFA now characterizes his testimony as conclusory, the FHFA did nothing to rebut it. The jury was entitled to credit this testimony, and it is not our role to second-guess their determination or to reweigh the evidence. *See Vasquez*, 110 F.4th at 290.

Third, the FHFA argues that the Plaintiffs did not address possible alternative causes for the one-day drop in the value of

Fannie and Freddie, namely the Third Amendment's portfolio-reduction requirement. The record tells a different story. Dr. Mason testified that the Net Worth Sweep was "the overriding effect" of the Third Amendment, and he did not have "any reason to believe that anything besides the Net Worth Sweep could have caused the huge decline in [the] stock price on August 17th, 2012." The FHFA says the jury could not rely upon this testimony because Dr. Mason formed this opinion based upon the event study, which did not evaluate the effect of the Net Worth Sweep separately from the effect of the portfolio-reduction requirement. Far from relying upon only the event study, however, Dr. Mason testified that he had also reviewed financial filings, FHFA reports, and other documents and testimony in this case. Nor was Dr. Mason alone in his characterization of the Net Worth Sweep. The Plaintiffs point us to testimony from other witnesses describing the Net Worth Sweep as "unprecedented" and "the key part of the Third Amendment," whereas the portfolio-reduction requirement "didn't have the same impact" and caused only a slight change. This testimony provided an ample basis for the jury to find that the Net Worth Sweep caused the drop in the value of Fannie and Freddie on August 17, 2012.

At bottom, the FHFA asks us to reweigh the evidence and to discredit testimony heard by the jury. Because that exceeds the scope of our review, *see Vasquez*, 110 F.4th at 290, we reject the FHFA's arguments.

**C. Standing of Post-Third Amendment Purchasers**

The FHFA's final argument is that the Plaintiffs who purchased their shares after the FHFA announced the Third Amendment do not have standing to bring their implied covenant claim. As discussed earlier, the certified classes included shareholders at the time of certification or "their successors in

interest." According to the FHFA, the implied covenant claim did not "travel with the shares" but remains with the seller, so the post-Third Amendment purchasers could not pursue their claim. The Plaintiffs argue their claim traveled with the shares under Delaware law, and Virginia courts would likely follow Delaware law.

As an initial matter, the FHFA incorrectly frames its objection as raising a question of constitutional standing. "Contractual standing is distinct from Article III standing and does not implicate [the court's] subject-matter jurisdiction." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020). "Article III standing speaks to the power of a court to adjudicate a controversy; contractual standing speaks to a party's right to relief for breach of contract." *Id.* Whether the post-Third Amendment purchasers have "a contractual right to bring this suit" is therefore "part of the inquiry into the merits of [their] claim." *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2020).

Turning to the merits of the FHFA's argument, we look to Delaware and Virginia law to determine whether the implied covenant claim traveled with the shares. Those states have identical statutes, drawn from § 8-302 of the Uniform Commercial Code, providing that "a purchaser of a . . . security acquires all rights in the security that the transferor had or had power to transfer." 6 Del. Code § 8-302(a); Va. Code. § 8.8A-302(a). We hold that these provisions allowed the post-Third Amendment purchasers to bring their implied covenant claim.

Start with Delaware law. "When a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit from any recovery or other remedy, travel with the shares." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1050

(Del. Ch. 2015). Delaware courts have explained that "[t]he phrase 'all rights in the security'" in § 8-302(a) distinguishes "between personal rights of the holder, on the one hand, and rights that inhere in the security itself, on the other." *Urdan v. WR Cap. Partners, LLC*, 244 A.3d 668, 677 (Del. 2020). It is the latter sort of rights that travels with the shares.

In order to determine whether a right "inhere[s] in the security itself," Delaware courts look for a "close relationship between the stock and the claims asserted." *Id.* A right "arising from the relationship among stockholder, stock and the company," such as a "corporate charter violation," therefore travels with the shares. *Id.*; *see Yosaki Tr. v. Weber*, No. 157, 2025 WL 3632823, at *3-4 (Del. 2025) (applying *Urdan* and holding that shareholder claims of dilution of equity interests and diversion of consideration traveled with the shares). In such a case, the violation injures "the stock and not the holder." *Urdan*, 244 A.3d at 677. In contrast, examples of "personal rights" that do not travel with the shares include (1) breach of an agreement to purchase or sell shares, and (2) a tort claim for fraud in connection with the purchase or sale of shares. *In re Activision*, 124 A.3d at 1056.

We agree with the Plaintiffs that under Delaware law the implied covenant claim traveled with the shares. As the district court explained, the Net Worth Sweep "removed one of the most valuable sticks" from the bundle of rights that constitute the shares, namely, the possibility of future dividends. *Rule 50(b) Opinion*, 2025 WL 823938, at *11. By "effectively eliminat[ing] the dividend rights that came with the shares," the Net Worth Sweep diminished the value of those shares. *Id.* The implied covenant claim thus bears a "close relationship" to the stock. *Urdan*, 244 A.3d at 677.

The FHFA resists this conclusion by citing *Sabby Volatility Warrant Master Fund Ltd. v. Jupiter Wellness, Inc.*, No. 24-2777, 2025 WL 1363171 (2d Cir. May 12, 2025). There the Second Circuit held that "under Delaware law, the right to receive payment of a lawfully declared dividend is a separate property right of the record stockholders and, thus, is not a right in the security that transfers with the sale of shares." *Id.* at *2 (cleaned up). That holding does not apply here. As the Plaintiffs explain, "*Sabby* involved the right to recover a specific dividend that was due when [the] plaintiff owned his shares." That specific dividend, rather than the general right to receive dividends, was what the Second Circuit deemed a "separate property right" that did not travel with the shares. *Id.* The failure to pay that dividend harmed the shareholder, but it would not affect the value of the share to a subsequent purchaser. *See Urdan*, 244 A.3d at 677.

We think Delaware law is clear that the implied covenant claims involving Fannie traveled with the shares. Virginia law, however, is a different story. Neither party points us to a Virginia case addressing this question, nor are we aware of one. Still, we believe Virginia courts would follow Delaware's approach. We therefore hold the claims involving Freddie also traveled with the shares.

As the Plaintiffs point out, Virginia courts have long looked to Delaware for guidance on matters of corporate law. *See, e.g.*, *Pagliara v. Fed. Home Loan Mort. Corp.*, 203 F. Supp. 3d 678, 689 n.18 (E.D. Va. 2016) ("It is not uncommon for courts interpreting Virginia corporate law to look for guidance from other courts, especially Delaware corporate law"); *Abella v. Universal Leaf Tobacco Co.*, 546 F. Supp. 795, 798-800 (E.D. Va. 1982) (relying upon Delaware law relevant to a shareholder derivative action); *U.S. Inspect, Inc. v. McGreevy*, No. 160966, 2000 WL 33232337, at *4-5 (Va. Cir. Ct. Nov. 27,

2000) (reviewing decisions of the Supreme Court of Delaware for guidance on determining the value of a shareholder's pre-merger interest in a company); *Milstead v. Bradshaw*, No. C96-1498, 1997 WL 33616661, at *6 (Va. Cir. Ct. Oct. 3, 1997) (finding "great persuasive authority" in Delaware cases regarding the standing of equitable owners of stock to file derivative suits). That Virginia courts would look to Delaware law here seems particularly likely because, not only do Delaware and Virginia have identical provisions governing the rights that travel to a new owner, but the Supreme Court of Delaware has weighed in recently on the meaning of that provision. *Compare* 6 Del. Code § 8-302(a), and Va. Code. § 8.8A-302(a); *see Yosaki Tr.*, 2025 WL 3632823, at *3-4; *Urdan*, 244 A.3d at 677-78; *see also Abella*, 546 F. Supp. at 798 (considering Delaware case law when "[t]he Code of Virginia contain[ed] provisions substantially the same as the Delaware provisions the [Supreme Court of Delaware had] construed").

To rebut this argument, the FHFA first invokes a different bit of Virginia law providing that only particular claims with respect to real or personal property are assignable. *See* Va. Code § 8.01-26 ("Only those causes of action for damage to real or personal property, whether such damage be direct or indirect, and causes of action ex contractu are assignable"). From this provision, the FHFA reasons "there is no *automatic* assignment" of shareholder rights under Virginia law. We doubt this general assignment law displaces the specific rule as to when a claim involving a security travels with it. In any event, Delaware law also provides that only some claims (those that inhere in the security itself) travel with the share, whereas others (those involving personal rights) do not.

The FHFA next argues we should look to the common law rather than Delaware law because Virginia did not abrogate the common-law rule for the assignment of a claim to a purchaser.

Yet the only case the Agency cites does not discuss whether a claim travels with the share. *See also 17 Williston on Contracts* § 51:4, Applicable Statutes — Article 8 of the Uniform Commercial Code (4th ed. updated May 2026) (recognizing the UCC "modified in many respects the[] common-law rules" and later citing the Supreme Court of Delaware's holding in *Urdan* that claims involving "rights that inhere in the security" travel with the shares).

The FHFA also seeks support from New York law. Although "New York and Delaware law are consistent" in that "[w]hen a security or bond is sold . . . any claims arising out of breach of the rights associated with" that security or bond travel with it, *FDIC v. Citibank N.A.*, Nos. 15-cv-6574, 6560, 6570, 2016 WL 8737356, at *4 (S.D.N.Y. Sept. 30, 2016), the FHFA says New York law in fact demonstrates that the Plaintiffs' claim does not travel with the shares under any state version of UCC § 8-302. The Agency's argument goes like this: (1) New York has adopted UCC § 8-302. (2) New York has also enacted General Obligations Law § 13-107(1), which provides that a claim for damages travels with certain securities.[§] (3) If that were already true under § 8-302, then New York would not have needed to enact § 13-107(1). In the FHFA's telling, § 13-

[§] New York General Obligations Law § 13-107(1) states:

> Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, (a) for damages or rescission against the obligor on such bond, (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding, and (c) for damages against any guarantor of the obligation of such obligor, trustee or depositary.

107(1) therefore was intended to address a shortcoming in § 8-302.

This argument could be made only on the assumption that the court is too incurious or too lazy to notice that New York adopted the UCC and § 8-302 thereof long after it had enacted the original version of § 13-107(1) in 1950. *See* 1950 N.Y. Laws 2263-64 (codified at N.Y. Pers. Prop. Law § 41(4); reenacted in 1963 as N.Y. Gen. Oblig. Law § 13-107(1), *see* 1963 N.Y. Laws 2223). New York did not adopt the UCC for another 12 years, and the current version of § 8-302(a) did not appear for another three decades after that. *See* 1962 N.Y. Laws 2724 (relevant provision codified at N.Y. UCC § 8-301(1); repealed and replaced in 1997 and codified at § 8-302(a), *see* 1997 N.Y. Laws 3287, 3303). So much for the General Obligations Law § 13-107(1) having been enacted to fill a gap in § 8-302.

Finally, the FHFA asserts Delaware is an outlier, and the majority of jurisdictions hold a claim is not automatically assigned to a purchaser of a share. The FHFA refers to this as the "no-automatic-assignment rule," which it derives primarily from cases involving federal securities fraud claims. Those cases get the FHFA nowhere because fraud claims under Delaware law, like fraud claims under federal securities laws, do not travel with the shares; they are "personal claims [that] do not depend on the relationship between the stockholder and the corporation or the existence of an underlying security." *Urdan*, 244 A.3d at 677; *see also In re Activision Blizzard*, 124 A.3d at 1056 (citing a "tort claim for fraud in connection with the purchase or sale of shares" as a "[q]uintessential example[]" of a personal claim that does not travel with the shares). These cases tell us nothing about whether the type of claim in this case, which "inhere[s] in the security itself," *Urdan*, 244 A.3d at 677, travels with the shares.

That leaves the FHFA with a smattering of cases that provide some support for its position, but they do not tip the scales in its favor. In *Royal Parks Investments SA/NV v. U.S. Bank National Ass'n*, for example, the court said "[t]he majority rule is that there is no automatic assignment of an accompanying litigation right or claim when transferring property." 324 F. Supp. 3d 387, 398 (S.D.N.Y. 2018). Yet the court did not cite any cases in support of that assertion or even discuss UCC § 8-302; it cited only the Restatement (Second) of Contracts § 324, which also does not mention § 8-302. *See id.* The Supreme Court of Ohio, to its credit, undertook a more detailed analysis of how other jurisdictions apply § 8-302. *See Paul Cheatham I.R.A. v. Huntington Nat'l Bank*, 137 N.E.3d 45, 51-57 (2019). There the court held the Ohio version of § 8-302 "does not operate to allow the automatic assignment of rights upon a transfer of title." *Id.* at 53. In so doing, however, the court distinguished the personal claim before it from the non-personal claim considered by the Delaware Chancery Court in *Activision*. *See id.* at 55-56. Moreover, that case was decided before the Supreme Court of Delaware's decision in *Urdan*, and the FHFA has not provided us reason to think Virginia would prefer Ohio's approach to that of Delaware.

We therefore agree with the district court that the post-Third Amendment purchasers had contractual standing to bring their implied covenant claim under both Delaware and Virginia law.

**D. Cross-Appeal**

Following our remand in *Perry*, the Plaintiffs stated in their initial disclosures that they would seek "the highest of either restitution, expectancy damages, or reliance damages." *See* Fed. R. Civ. P. 26(a)(1)(A)(iii) (requiring parties to dis-

close "a computation of each category of damages claimed"). The district court concluded the Plaintiffs could not seek restitution or reliance damages. In their cross-appeal, the Berkley Plaintiffs argue that they should have been allowed to present these damages theories to the jury.[**] We disagree and affirm the decision of the district court.

**1. Restitution**

The Plaintiffs explained in their initial disclosures that they sought restitution in an amount "equal to the prices originally paid for [the] shares that Plaintiffs own in [Fannie and Freddie], plus prejudgment interest." The Plaintiffs' expert calculated restitution damages at approximately $48 billion.

The district court held § 4617(f) barred the Plaintiffs from seeking that restitution. The court relied upon our statement in *Perry* that § 4617 bars "judicial injunctions, declaratory judgments, or other equitable relief" for actions the FHFA was authorized to take. *Summary Judgment Opinion*, 2022 WL 4745970, at *11 (quoting 864 F.3d at 606). The district court understood our reference to "other equitable relief" to mean "remedies other than a money judgment or enforcement thereof." *Id.* Then, relying upon Dr. Mason's testimony, the court characterized the Plaintiffs' request for restitution as a request for rescission because the remedy would "require the Defendants to disgorge the net benefits they have received under the contracts and [the] Plaintiffs to give up their right to the shares." *Id.* at 12 (cleaned up). In other words, the remedy would "unwind the shareholder contracts in their entirety," *id.*

[**] The Class Plaintiffs joined the cross appeal "without seeking to overturn or vacate the existing final judgment in their favor." Class Pls.' Notice of Cross-Appeal at 1, No. 1:13-mc-01288 (D.D.C. Apr. 25, 2025), ECF No. 436.

(cleaned up), which the court viewed as equitable relief and barred by § 4617.

The Berkley Plaintiffs argue the district court erred in two respects. First, they claim the district court misread our reference to "other equitable relief" in *Perry*; § 4617 does not bar all equitable remedies, they say, but only those that would interfere with the FHFA's powers as conservator. Second, they assert that granting restitution would not interfere with the FHFA's exercise of its powers.

Starting with *Perry*, we agree that the district court read our reference to "other equitable relief" too broadly. That phrase must be read in reference to what comes directly before and after it: "The plain statutory text [of § 4617(f)] draws a sharp line in the sand against litigative interference — through judicial injunctions, declaratory judgments, or other equitable relief — with FHFA's statutorily permitted actions as conservator or receiver." 864 F.3d at 606. Viewed in context, our reference to "other equitable relief" meant equitable relief that amounted to interference with the FHFA's actions as conservator. As the Third Circuit put the point, "[t]he focus is not on the *form* of requested relief, but its *effect*." *Jacobs*, 908 F.3d at 895. The FHFA seems to agree. *See* Appellants' Combined Response and Reply Br. 35 ("The bar is functional: courts may not take '*any* action' — regardless of label — that would restrain or affect the Conservator's conduct").

The district court's error, however, is not reason enough to grant the remand the Berkley Plaintiffs seek. For we agree with the FHFA that regardless whether we characterize rescission as equitable or legal, granting that remedy would restrain or affect the FHFA's exercise of its authority as conservator, in violation of § 4617(f).

Granting rescission would not, as the Berkley Plaintiffs claim, simply require the FHFA to "write a check." As the district court explained, granting rescission in this case would also require the FHFA to "terminate plaintiffs' shareholder contracts, extinguishing their ownership rights and forcing a reorientation of [Fannie's and Freddie's] capital structure." *Summary Judgment Opinion*, 2022 WL 4745970, at *12; *see also* 12 C.F.R. pt. 1240, subpt. B (setting "Capital Requirements and Buffers" for Fannie and Freddie); January 2, 2025 Letter Agreements, https://perma.cc/6WC4-FGCY (agreements between the FHFA and the Treasury to amend the PSPAs by requiring Fannie and Freddie to "comply with the Enterprise Regulatory Capital Framework" set forth in 12 C.F.R. pt. 1240). Moreover, the Plaintiffs' own expert admitted that granting rescission would require the Defendants to "disgorge the net benefits they have received under the contracts" and would result in an "unwinding [of] the [shareholder] contracts in their entirety." *Summary Judgment Opinion*, 2022 WL 4745970, at *12. Section 4617(f) bars us from granting that relief. *Accord Jacobs*, 908 F.3d at 895-96 (holding that § 4617(f) barred the court from granting "damages, disgorgement, and restitution" that would "unravel the Third Amendment, reverse the monetary payments made under it, and prevent or at least deter the Agency from implementing it further").

**2. Reliance damages**

The Plaintiffs also explained in their initial disclosures that they would seek reliance damages equal to "the original price of Plaintiffs' shares, plus prejudgment interest." They did not, however, assert that theory of damages again until after the district court had dismissed their request for restitution. The Plaintiffs then moved to amend their pretrial statement to include a request for reliance damages. The district court

denied that motion for two reasons. First, the court explained that allowing the amendment "on the eve of trial" would prejudice the FHFA or force a delay to the start of the trial. *Pretrial Amend. Opinion I*, 2022 WL 11110548, at *3. Second, the court believed that the Delaware and Virginia courts would not allow the Plaintiffs to seek "reliance damages so far in excess of ascertainable expectation damages that they would necessarily place those plaintiffs in a better position than they would have been in had the contract been performed." *Id.* at *4. After the jury in the first trial hung, the Berkley Plaintiffs filed a similar motion before the second trial. The district court acknowledged that its concern about the first motion coming "on the eve of trial" did not apply to this second motion, but it again held that reliance damages were unavailable because they far exceeded ascertainable expectation damages. *Pretrial Amend. Opinion II*, 2023 WL 3790739, at *5. The district court also invoked "its inherent 'trial-management discretion'" to deny the motion, reasoning that "it would be fundamentally unfair to defendants to require the presentation of evidence and arguments on an entirely new and substantial issue at the second trial simply because the jury hung at the first." *Id.* at *6.

The Berkley Plaintiffs argue that the district court erred by holding reliance damages unavailable as a matter of law and that it abused its discretion by denying their motions based upon other considerations. As to the first issue, we agree with the district court's decision to reject the Berkley Plaintiffs' motions as a matter of law. The district court relied upon Delaware and Virginia cases holding that expectation damages are the standard remedy in contract cases. *See, e.g.*, *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001); *Est. of Taylor v. Flair Prop. Assocs.*, 448 S.E.2d 413, 416 (Va. 1994). The district court also cited decisions from other courts holding that plaintiffs may not "pursue — let alone recover — reliance damages in excess of ascertainable expectation damages."

*Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1026-27 (10th Cir. 2018) (applying Colorado law); *see also Merry Gentleman, LLC v. George & Leona Prods., Inc.*, 799 F.3d 827, 830, 832 (7th Cir. 2015) (applying Illinois law).

Here the Plaintiffs seek reliance damages of approximately $48 billion, the same amount they had claimed as restitution damages and 30 times their expectation damages of $1.6 billion — the decrease in the value of Fannie and Freddie shares on August 17, 2012. The Berkley Plaintiffs have not provided us any reason to think Delaware or Virginia courts would allow a plaintiff to seek reliance damages so far in excess of ascertainable expectation damages. *See* Berkley Pls.' Br. 19 (describing the "paradigmatic use of reliance damages" as "when the full extent of expectation damages is not quantifiable").[††]

Rather than dispute this general rule, the Berkley Plaintiffs argue that, because the district court rejected one of their theories of expectation damages, the full amount of their expectation damages was "too uncertain" to quantify. Recall that the district court held the Plaintiffs could not seek damages based upon their "lost-dividends theory" — *i.e.*, that the Net Worth Sweep deprived them of dividends they eventually would have received. According to the Berkley Plaintiffs, this

[††] Many jurisdictions similarly hold that expectation damages are the preferred remedy when they can be calculated with reasonable certainty. *See, e.g.*, *ATACS Corp. v. Trans World Comms., Inc.*, 155 F.3d 659, 669 (3d Cir. 1998) (applying Pennsylvania law); *Nashville Lodging Co. v. Resolution Tr. Corp.*, 59 F.3d 236, 245-46 (D.C. Cir. 1995) (applying Tennessee law); *Scapa Tapes N. Am., Inc. v. Avery Dennison Corp.*, 384 F. Supp. 2d 544, 552 (D. Conn. 2005) (applying Connecticut law).

means their expectation damages were too uncertain, thus making their request for reliance damages appropriate after all.

This argument proceeds from the faulty premise that the district court rejected the lost-dividends theory because the calculation of expectation damages was too uncertain. In fact, the court held the theory of harm was altogether too speculative. *See Summary Judgment Opinion*, 2022 WL 4745970, at *9-10. As the district court and the FHFA have explained, the Berkley Plaintiffs "confuse the *fact* of harm with the *measure* of damages." *Pretrial Amend. Opinion I*, 2022 WL 11110548, at *4.

As to the second issue, the district court did not abuse its discretion by denying the Plaintiffs' motions under its trial-management discretion. The Berkley Plaintiffs argue that the district court should have allowed them to amend their pretrial statement because their failure to include a request for reliance damages amounted to "excusable neglect." In concluding otherwise, the district court not only cited concerns about timing, prejudice to the FHFA, and fairness; it also noted that the Berkley Plaintiffs had "made no subsequent effort in the four years" after their initial disclosure to develop their theory of reliance damages. *Id.* at *3; *see Pretrial Amend. Opinion II*, 2023 WL 3790739, at *6. These are relevant considerations under Supreme Court precedent defining "excusable neglect." *See Pioneer Inv. Servs. Co. v. Brunswick Assocs., Ltd. P'Ship*, 507 U.S. 380, 395 (1993) (discussing the risk of prejudice, the delay of judicial proceedings, and the reason for the delay as relevant considerations); *see also* D.D.C. L. Civ. R. 16.5(a)(2) (allowing an amendment to a pretrial statement based upon "excusable neglect"). We will not disturb the district court's weighing of these considerations. *See United States v. Mathis-Gardner*, 783 F.3d 1286, 1288 (D.C. Cir. 2015) ("Our review for abuse of discretion does not permit us to substitute our judgment for that of the trial court" (cleaned up)).

**III. Conclusion**

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

## CERTIFICATE AS TO PARTIES AND AMICI CURIAE

Pursuant to D.C. Circuit Rule 40(c), Defendants-Appellants the Federal Housing Finance Agency, in its capacity as Conservator ("FHFA" or "Conservator") of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"); Fannie Mae; and Freddie Mac state as follows:

### I. Parties and *Amici*

Defendants-Appellants ("Defendants") in these consolidated cases are:

- FHFA, in its capacity as Conservator of Fannie Mae and Freddie Mac;
- Fannie Mae;
- Freddie Mac.

Plaintiffs-Appellees/Cross-Appellants ("Plaintiffs") in these consolidated cases are:

- Fairholme Funds, Inc., on behalf of its series, The Fairholme Fund;
- Fairholme Fund, a series of Fairholme Funds, Inc.;
- Berkley Insurance Company;
- Acadia Insurance Company;
- Admiral Indemnity Company;
- Admiral Insurance Company;
- Berkley Regional Insurance Company;

- Carolina Casualty Insurance Company;
- Midwest Employers Casualty Insurance Company;
- Nautilus Insurance Company;
- Preferred Employers Insurance Company;
- Joseph Cacciapalle;
- Michelle M. Miller;
- Timothy J. Cassell;
- Barry P. Borodkin.

No *amici* or intervenors appeared in the district court. The following parties appeared as *amici* in the prior appeal in this case in Case No. 14-5243 (consolidated with Nos. 14-5254, 14-5260, 14-5262):

- Center for Individual Freedom (in support of Plaintiffs);
- Association of Mortgage Investors, Mr. Robert H. Hartheimer, Independent Community Bankers of America and Mr. William M. Isaac (in support of Plaintiffs);
- 60 Plus Association, Inc. (in support of Plaintiffs);
- National Black Chamber of Commerce (in support of neither party);
- Investors Unite (in support of Plaintiffs);
- Timothy Howard and the Coalition for Mortgage Security (in support of Plaintiffs);

- Stephen Rattien, Pershing Square Capital Management, LP, Louise Rafter, and Josephine Rattien (in support of Plaintiffs);
- Jonathan R. Macey (in support of Plaintiffs);
- Better Markets, Inc. (in support of Defendants);
- Federal Deposit Insurance Corporation (in support of Defendants).

## CORPORATE DISCLOSURE STATEMENT

As a federal agency, FHFA is not required to file corporate disclosure statements under Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1.

The Federal National Mortgage Association ("Fannie Mae") is a government-sponsored enterprise chartered by Congress to "establish secondary market facilities for residential mortgages," to "provide stability in the secondary market for residential mortgages," and to "promote access to mortgage credit throughout the Nation." 12 U.S.C. § 1716(1), (4). Fannie Mae has no parent corporation. It is a publicly traded company and, according to public securities filings, no publicly held corporation owns 10% or more of Fannie Mae's common stock.

The Federal Home Loan Mortgage Corporation ("Freddie Mac") is a government-sponsored enterprise chartered by Congress "to promote access to mortgage credit throughout the Nation." 12 U.S.C. § 1451 note. Freddie Mac has no parent corporation. It is a publicly traded company and, according to public securities filings, no publicly held corporation owns 10% or more of Freddie Mac's common stock.